IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| **VASO ACTIVE PHARMACEUTICALS INC.,** | Case No. 10-10855 (CSS) |
| Debtor. | Hearing Date: May 3, 2010 at 11:00 a.m. (ET)<br>Objection Deadline: April 26, 2010 at 4:00 p.m. (ET) |

## MOTION TO CONVERT CASE TO CHAPTER 7 OF THE BANKRUPTCY CODE

Iroquois Master Fund, Ltd. ("Iroquois" or the "Agent"), Smithfield Fiduciary LLC, Rockmore Investment Master Fund, Ltd., Otago Partners LLC, as assignee of RAQ LLC, and Portside Growth and Opportunity Fund (collectively, the "Noteholders"), as and for their motion (the "Motion") to convert the Debtor's Case to Chapter 7 of the Bankruptcy Code, by their undersigned counsel, respectfully allege as follows:

### Introduction[1]

1. In August 2005, the movant Noteholders loaned $2.5 million to Vaso Active Pharmaceuticals Inc. ("Vaso" or the "Debtor") to fund its nascent business offering over-the-counter treatments for athlete's foot and arthritis pain. Vaso granted a senior security interest in *all of its assets* to the Noteholders, who perfected their interests in September 2005. Two years later, after an SEC investigation and related lawsuits, Vaso became unable to operate its pharmaceutical business. In 2007, Vaso defaulted on the loan, leaving the Noteholders with no ready way to recoup their losses, as Vaso had no hard assets to its name and no source of revenue.

---

[1] The Court has approved an expedited schedule in connection with a pending adversary proceeding between the Debtor and the Noteholders (Adversary Case No. 10-50835 (CSS)) determining the nature and extent of the Noteholders" liens. The Court has entered an Order Approving Briefing Schedule, dated March 23, 2010 (ECF No. 7) regarding a briefing schedule for disposition of the matter by summary judgment. While the Noteholders are confident that they are fully secured, irrespective of the outcome of that adversary proceeding, the Debtor's chapter 11 case should be converted to Chapter 7.

2. Before the SEC problems forced the Debtor to shut down, the Debtor's operations had been marginal at best. The Debtor has never earned a profit and through September 2008 had $17.5 million in accumulated losses. The Debtor has not reported financial results since late 2008. The Debtor has lingered for the past three years solely to pursue a lawsuit filed against its former law firm, alleging negligence in connection with the Debtor's filings with the Securities and Exchange Commission (the "SEC"). The Debtor claimed in its SEC filings that it had received FDA approval for certain pharmaceutical assets, when no approval had been granted.

3. Three months ago, Vaso received approximately $2.5 million in settlement of the litigation, far less than it had hoped. The Debtor promptly dissipated all but $620,147 of the settlement funds to preferred creditors. The balance of the settlement funds now represent Vaso's *only* available asset. The Noteholders obtained a state court TRO against the Debtor to freeze the remaining settlement funds. On the eve of an injunction hearing in New York, the Debtor filed its Chapter 11 case.

4. For the reasons described below, the Debtor's case should be converted to a case under Chapter 7.

## Background

5. The Debtor filed a "skeletal" voluntary Chapter 11 petition on March 12, 2010 (the "Petition Date").

6. The Debtor filed no first day motions.

7. No statutory committees have been formed.

8. This Court has jurisdiction over this matter pursuant to 28 U.S.C §§ 157 and 1334 and 11 U.S.C §§ 105 and 1112.

## The Noteholder Loans

9.  On August 16, 2005, Vaso entered into a secured loan transaction with the Noteholders, with Iroquois acting as collateral agent, pursuant to the following written agreements: (1) a Securities Purchase Agreement dated August 16, 2005 (the "SPA"); (2) Senior Secured Convertible Notes (the "Notes") dated August 16, 2005, which provided, *inter alia*, that the principal loan amount totaling $2.5 million was due on May 1, 2007 and that interest of 18% would be payable on any past due amounts; and (3) a Security Agreement (the "Security Agreement") dated August 16, 2005, which generally pledged as collateral for the Notes all of the Company's assets, and in particular, all of the Company's accounts and general intangibles. All of these agreements are governed by New York law. Financing statements were duly filed with the Delaware Secretary of State.

10.  The Notes called for final payment of all principal, totaling $2.5 million, on or before the maturity date of May 1, 2007.

11.  In various filings with the SEC starting on May 1, 2007, Vaso has acknowledged that the Noteholders have liens against "all assets" of the Company and that the Notes have matured and remain in default. The collateral securing the Notes is set forth in Section 3 of the Security Agreement, which provides in relevant part:

> As collateral security for the prompt payment in full when due (whether at stated maturity, by acceleration or otherwise) of the Secured Obligations, the Company hereby pledges, grants, assigns, hypothecates and transfers to the Agent [Iroquois] on behalf of the Purchasers [Noteholders] as hereinafter provided, a security interest in and Lien upon all of the Company's right, title and interest in, to and under all personal property and other assets of the Company, whether now owned or hereafter acquired by or arising in favor of the Company, whether now existing or hereafter coming into existence, whether owned or consigned by or to the Company, or leased from or to the Company and regardless of wherever located, except for the Excluded Collateral, (all being collectively referred to herein as "COLLATERAL") including:

3

. . .

  d. all accounts and general intangibles (each as defined in the Uniform Commercial Code) of the Company constituting any right to the payment of money, including (but not limited to) all moneys due and to become due to the Company in respect of any loans or advances for the purchase price of Inventory or Equipment or other goods sold or leased or for services rendered, all moneys due and to become due to the Company under any guarantee (including a letter of credit) of the purchase price of Inventory or Equipment sold by the Company and all tax refunds (such accounts, general intangibles and moneys due and to become due being herein called collectively "ACCOUNTS");

. . .

  m. all other tangible or intangible property of the Company, including, without limitation, all proceeds, products and accessions of and to any of the property of the Company described in clauses (a) through (l) above in this Section 3 (including, without limitation, any proceeds of insurance thereon), and, to the extent related to any property described in said clauses or such proceeds, products and accessions, all books, correspondence, credit files, records, invoices and other papers, including without limitation all tapes, cards, computer runs and other papers and documents in the possession or under the control of the Company or any computer bureau or service company from time to time acting for the Company.

### Vaso's Default on the Notes and Admissions that the Noteholders have Valid Security Interests on "All of the Assets" of the Debtor

12. On May 1, 2007, Vaso defaulted, failing to pay any of the $2.5 million in principal that was due. In an SEC filing and press release, Vaso conceded its default:

> On May 1, 2007, the Company failed to pay the principal amount outstanding under the Notes. Under the terms of the Notes, this may be deemed to be an Event of Default, which gives the holders of the Notes the right to require the Company to repurchase the notes at 115% of the outstanding principal and interest (or, if greater, 115% of the value of the shares that such holder could receive upon conversion of the Notes, based on a five day trading average price). In addition, the default rate of interest on any unpaid amounts is 18%. In addition, Iroquois Master Fund, L.P. ("Iroquois"), as collateral agent for the purchasers of the Notes, may assert its rights under the Security Agreement, dated August

4

16, 2005, among the Company, Iroquois and the purchasers of the Notes.

13. In the Debtor's Quarterly Report on Form 10-Q filed with the SEC (for the period ended September 30, 2008), the Debtor admitted that the Noteholders' Notes were "secured by all of the assets of the Company." The Debtor has not made any quarterly or annual SEC filings since late 2008.

14. According to several of Vaso's public filings and upon information and belief, Vaso's pharmaceutical business has all but ceased to operate as a result of various issues with licensing and FDA approval. Consequentially, there are currently very little, if any, operating funds going in and out of Vaso's business.

15. According to Vaso's own admissions in another lawsuit, the Debtor has not been able to operate its business or market any products since May 2007.

16. It appears clear that the only business the Debtor has been engaged in for the past several years was the pursuit of the litigation against its former law firm. In its Report on Form 8-K filed with the SEC on March 31, 2009 and accompanying Press Release, the Debtor confirmed that pursuing the litigation against its former law was its only business activity when it announced as follows:

> VASO VOLUNTARILY SUSPENDS FILING OF ITS REPORTS UNDER THE SECURITIES EXCHANGE ACT OF 1934.
>
> DANVERS, Mass – (Business Wire) – March 31, 2009 – Vaso Active Pharmaceuticals, Inc. (the "Company") (VAPH.ob) announced today that it has made the strategic decision to voluntarily suspend filing of its reports under the Securities Exchange Act of 1934 (the "Act"). Although the Company has not been required to make filings under the Act since 2007, it has until now remained a voluntary filer. At the present time, management has determined that it is in the best interest of the Company and its shareholders to eliminate the costs associated with those filings. This decision was made by the Company as part of its strategy to prevent any unnecessary resource allocation **in order to allow the**

**Company to preserve and maximize its longevity in pursuing its case for alleged negligence committed by the Company's former law firm, Robinson Cole.** The case is currently pending in the Suffolk Superior Court in Boston Massachusetts. (Emphasis added.)

### The Settlement Funds

17. In January 2010, Vaso informed Iroquois that it had settled the lawsuit against its former law firm and had received approximately $2.5 million. The Settlement Funds represented the only remaining asset of the Debtor. Reversing prior representations, Vaso also advised Iroquois that it would not pay off the Notes with the Settlement Funds, but instead would apply them to other debts. The Noteholders later learned that the Settlement Agreement had been signed on or about December 18, 2009, and the funds received by Vaso before year-end. Although the Noteholders' representative was in regular communication with Vaso in 2009, Vaso's CEO failed to disclose the settlement to him until more than a month had passed after its signing.

### The New York Action

18. Upon hearing of Vaso's plans to dissipate the Settlement Funds, Iroquois individually and as Agent, commenced an action on February 5, 2010 in the Commercial Part of the Supreme Court of the State of New York, County of New York, captioned *Iroquois Master Fund Ltd. v. Vaso Active Pharmaceuticals Inc.*, Index Number 600310-2010 (the "New York Action.")

19. The Complaint requested that the Court (1) grant specific performance of the Security Agreement, requiring Vaso to turn over the Settlement Funds to Iroquois, as agent, in full or partial repayment of the senior secured indebtedness of the Notes; and (2) award compensatory damages for breach of contract based on the note issued by Vaso to the Noteholders.

20. On the day that it filed the New York Action, Iroquois obtained a temporary restraining order (the "TRO") directing that: "Vaso and its agents, officers, directors, employees, attorneys, successors, assigns, and all those acting in concert with Vaso, shall be and hereby are enjoined and restrained from disbursing, transferring, selling, pledging, assigning or otherwise disposing of the Settlement Funds, with said Settlement Funds to be held in escrow until the final resolution of the within action."

21. It is clear under New York law that the Settlement Funds are rightly considered collateral for the Notes. Section 3(d) the Security Agreement provides that "all accounts and general intangibles" and Section 3(m) provides that "all other tangible or intangible property of the Company" are pledged by Vaso as collateral for the Notes. Under New York Uniform Commercial Code, settlement funds arising from lawsuits and tort claims are to be treated as a generic payment intangible. *See* N.Y.U.C.C. 9-109 and Comment 15 thereto of the Official Comments promulgated by the National Conference of Commissioners on Uniform State Laws (now known as the Uniform Law Commission): "Note that once a claim arising in tort has been settled and reduced to a contractual obligation to pay, the right to payment becomes a payment intangible and ceases to be a claim arising in tort.") The Security Agreement is unequivocal that the Noteholders have a security interest in "general intangibles" and "all other tangible or intangible property of the Company" as collateral the Settlement Funds are therefore collateral or proceeds thereof for the Notes.

22. Vaso's response to the Order to Show Cause was originally due on February 17, 2010, with a hearing scheduled for February 24, 2010. Vaso's counsel asked for, and received from Iroquois' counsel, an extension of the return date until March 12, 2010, extending Vaso's response date until March 5, 2010. At the time of the extension, Vaso advised Iroquois that it

would comply with the TRO and further that "approximately $1 million" was left from the $2.5 million Settlement Funds. The Debtor now has approximately $620,147 in total assets in its Chapter 11 petition, the vast majority, if not nearly all, being the Settlement Funds, raising the question whether the Debtor violated the TRO. Vaso did not serve Iroquois with its response in the New York Action until March 9, 2010, four days after it was due.

23. As required, Iroquois served Vaso with its reply brief in further support of Iroquois' motion for a preliminary injunction on March 11, 2010, and was preparing to attend the preliminary injunction hearing the next day, March 12, 2010, at noon.

24. Vaso filed for Chapter 11 on March 11, 2010, on the eve of the injunction hearing in New York Supreme Court.

### Relief Requested

25. By this Motion, the movant Noteholders seek entry of an order pursuant to Section 1112(a) of the Bankruptcy Code, substantially in the form attached hereto as Exhibit A, converting this case to Chapter 7 of the Bankruptcy Code, effective as of the date of entry of an order.

### Basis for the Relief Requested

26. The Debtor's case should be converted to Chapter 7 because there is a "continuing loss to or diminution of the [Debtor's] estate and the absence of a reasonable likelihood of rehabilitation" under 11 U.S.C. § 1112(b)(4)(A).

27. Since at least May 2007, Vaso has not been able to operate its business and market its products.

28. The Debtor has no real operations, revenues, or prospects. It has survived as a defunct corporate entity for the last several years simply to pursue its litigation claim for malpractice against its former law firm. (See March 31, 2009 Press Release.)

8

29. On the Petition Date, Debtor filed <u>no</u> first day motions. In fact, Debtor has not filed any first day motions as of the date hereof.

30. The Debtor voluntarily ceased being a reporting company under the Securities Exchange Act in March 2009. In its last significant public filing prior to going dark, the Debtor's Quarterly Report on Form 10-Q for the period ended September 30, 2008, the Debtor states that "The Company has incurred substantial operating losses and negative cash flows from operations since inception." <u>Id</u>. at p. 12. In the same SEC filing, Debtor reported $106,073 in current assets and $8,681,941 in current liabilities (inclusive of a line entry evidencing $2,781,250 owing under the "senior secured convertible notes"). It also reported net revenues of a mere $24,279 and net losses from operations of ($1,597,649), each for the nine-month period ended September 30, 2008. Since that time, the Debtor existed merely to continue the lawsuit.

31. The Debtor has continued to rapidly spend and lose money. The Debtor appears to have already dissipated all but $ 620,147 in less than ninety days. This fact, by itself, is sufficient to establish a continuing loss to, or diminution of, the Debtor's estate. Additionally, there is not a reasonable likelihood that the Debtor will be rehabilitated. Under these circumstances, this Court should to convert the Debtor's case to Chapter 7, before the Debtor loses everything and creditors lose any hope of a recovery.

32. 11 U.S.C. § 1112(b)(1) provides:

> Except as provided in paragraph (2) of this subsection, subsection (c) of this section, and section 1104(a)(3), on request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court **shall** convert a case to a case under Chapter 7 or dismiss a case under this Chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause. (Emphasis added.)

33. Through the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 (2005), Congress eliminated this Court's discretion that was previously reflected in the appearance of the permissive word "may" in 11 U.S.C. § 1112(b) and, through substitution of the mandatory word "shall" for "may," directed this Court to convert or dismiss the case, "whichever is in the best interests of the creditors and the estate," if "cause" is established. 7 COLLIER ON BANKRUPTCY § 1112.04(1) (15th ed. rev. 2005) ("... as amended in 2005, section 1112(b) circumscribes the court's discretion by directing certain instances in which the court must, and must not, convert or dismiss the case."); *cf. Association of Civilian Technicians v. FLRA*, 22 F.3d 1150, 1153 (D.C. Cir. 1994) ("The word 'shall' generally indicates a command that admits of no discretion on the part of the person instructed to carry out the directive.").

34. Under 11 U.S.C. § 1112(b)(4)(A), the term "cause" in 11 U.S.C. § 1112(b)(1) includes "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." Here, both prongs are easily satisfied.

35. The purpose of 11 U.S.C. § 1112(b)(4)(A) is to "preserve estate assets by preventing the Debtor in possession from gambling on the enterprise at the creditors' expense when there is no hope of rehabilitation." *In re Lizeric Realty Corp.*, 188 B.R. 499, 503 (Bankr. S.D.N.Y. 1995) (quoted in *Loop Corp. v. United States Trustee (In re Loop Corp.)*, 379 F.3d 511, 516 (8th Cir. 2004)). *See also, In re AdBrite Corp.*, 290 B. R. 209, 215 (Bankr. S.D.N.Y. 2003) (cause existed to convert the Chapter 11 cases in part because the Debtor had negative cash flow and inability to pay current expenses); *In re 3868-70 White Plains Road, Inc.*, 28 B.R. 515, 519 (Bankr. S.D.N.Y. 1983) (cause existed to convert a Chapter 11 to a Chapter 7 when

DB02:9437842.2

067287.1001

Debtor's assets were fully collateralized and it had negative cash flow coupled with an inability to pay current expenses).

36. "Rehabilitation" as used in section 1112(b)(4)(A) is not synonymous with "reorganization." Instead, "Rehabilitation signifies that the Debtor will be reestablished on a sound financial basis, which implies establishing a cash flow from which current obligations can be met." *In re Rundlett*, 136 B.R. 376, 380 (Bankr. S.D.N.Y. 1992) (granting creditors' motion to convert Chapter 11 case to Chapter 7 where Debtor's use of estate property resulted in continuing loss or diminution of the estate, where there was not a reasonable likelihood of rehabilitation and the Debtor would be unable to effectuate a plan) *(citing* In re Kanterman, 88 B.R. 26, 29 (S.D.N.Y. 1988)) (affirming conversion of Chapter 11 case to Chapter 7 upon creditors' showing continuing diminution to the estate and absence of reasonable likelihood of rehabilitation).

37. A Debtor "should not continue in control of its business beyond a point at which reorganization no longer remains realistic," if creditor recoveries are eroding. *In re AdBrite Corp.*, 290 B.R. at 215; *In re Johnston*, 149 B.R. 158, 161 (B.A.P. 9th Cir. 1992) (granting motion to convert Debtor's Chapter 11 case to Chapter 7 where the Debtor lacked the ability to effectuate plan of reorganization because it had no income and further delay would prejudice creditors by eroding their position).

38. Courts may convert a Chapter 11 case to Chapter 7 where, as here, a defunct debtor is "incapable of reorganizing" *Adbrite* at 217; see also *In re Westerleigh Development Corp.*, 141 B.R. 38, 42 (Bankr. S.D.N.Y. 1992 (dismissing involuntary petition because nothing exists to reorganize where Debtor's business ceased operations prior to filing and was not generating any income).

39. Here, the Debtor has had no business operations since 2007 aside from its pursuit of its lawsuit. The Debtor ceased filing SEC reports. The Debtor has never generated a profit, only losses. The Debtor appears to have spent approximately 75% of the Settlement Funds, its only asset, in less than ninety days. It is beyond clear that the Debtor, which has not operated its business for years, has no business and no legitimate chance of rehabilitation. The Court should preserve what little remains for creditors.

40. The Debtor has listed the Noteholders' claims on its List of 20 Largest Unsecured Claims. Even assuming *arguendo* that this list is accurate (which it is not -- the claims are incorrectly listed and grossly understated), the Noteholders would have 70% percent of the total claims listed. If one removes the alleged $900,000 claim of VNA Holdings LLC[2], the Noteholders claims are 88% of the total claims listed, making a confirmable reorganization in this case, at best, highly unlikely and perhaps impossible. *See, Adbrite* at 216 ("A court may convert or dismiss a Chapter 11 case under § 1112(b)(2) for the "inability to effectuate a plan." "Inability to effectuate a plan" means that the debtor lacks the ability to formulate a plan or to carry one out." (citations omitted.)).

## Notice

41. Iroquois has provided notice of this Motion to the Debtor and the U.S. Trustee. In light of the nature of the relief requested, Iroquois submits that no other notice is necessary.

---

[2] The Debtor incurred this debt under a settlement of a past shareholder lawsuit for $1.1 million in cash, plus $750,000 in two-year, subordinate callable notes convertible to Vaso stock. The Debtor later defaulted on the notes, which the shareholder class then sold at 16% of their face value to VNA Holdings, Inc., described in public filings as "a corporation controlled by non-executive employees of BioChemics [the Debtor's parent company]."

## Conclusion

42. Under these circumstances, and consistent with 11 U.S.C. § 1112(b)(1), this Court is required to convert the above-captioned case to Chapter 7. In light of the facts and circumstances of this case, the Noteholders respectfully submit that conversion of the case to Chapter 7 is the appropriate course of action and respectfully request that the Court enter an order granting the relief requested herein or such other relief as the Court deems necessary and appropriate.

Dated: Wilmington, Delaware
March 31, 2010

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ *Donald J. Bowman, Jr.*
Robert S. Brady (No. 2847)
Donald J. Bowman, Jr. (No. 4383)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

and

Adam H. Friedman
Thomas J. Fleming
Jennifer L. Heil
OLSHAN GRUNDMAN FROME ROSENZWEIG
& WOLOSKY LLP
Park Avenue Tower
65 East 55th Street
New York, New York 10022
Telephone: (212) 451-2300
Facsimile: (212) 451-2222

*Attorneys for Iroquois Master Fund Ltd.*