# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

In re:

Vaso Active Pharmaceuticals, Inc.,

      Debtor.

Chapter 11

Case No. 10-10855 (CSS)

## DEBTOR VASO ACTIVE PHARMACEUTICALS, INC.'S OPPOSITION TO THE NOTEHOLDERS' MOTION TO CONVERT THE DEBTOR'S CASE TO CHAPTER 7 OF THE BANKRUPTCY CODE

Michael R. Lastowski (DE 3892)
Christopher M. Winter (DE 4163)
Duane Morris LLP
1100 North Market Street, Suite 1200
Wilmington, DE 19801-1246
(302) 657-4942
mrlastowski@duanemorris.com
cmwinter@duanemorris.com

Thomas H. Curran
Eric D. Levin
Jennifer V. Doran
Hinckley, Allen & Snyder LLP
28 State Street
Boston, MA  02109
(617) 345-9000
tcurran@haslaw.com
elevin@haslaw.com
jdoran@haslaw.com

*Attorneys for the Debtor and
Debtor in Possession*

Dated:  April 26, 2010

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................1

STATEMENT OF FACTS .............................................................................................2

I.     The Debtor's Business .......................................................................................2

II.    Lawsuits Arising Out of Vaso's Initial Public Offering ...........................................3

III.   Iroquois Fund's Loan to the Debtor in August 2005 .................................................3

IV.    Iroquois Fund's Bad Faith Breach of Contract to Provide Additional Funding
       and Attempt to Extort Unreasonable and Oppressive Loan Terms and Gain
       Control of the Debtor .........................................................................................4

V.     Iroquois Fund's Bad Faith Refusal to Allow the Debtor to Obtain Additional
       Funding from Cornell Capital Partners .....................................................................7

VI.    The Debtor's Legal Malpractice Lawsuit Against Robinson & Cole LLP...............9

VII.   The Debtor's Lawsuit Against Iroquois Fund in Massachusetts ..............................9

VIII.  Bankruptcy Filing ............................................................................................10

IX.    Plan of Reorganization........................................................................................10

ARGUMENT ................................................................................................................11

I.     THE MOTION TO CONVERT THE CHAPTER 11 CASE SHOULD BE
       DENIED BECAUSE NO BASIS EXISTS FOR CONVERSION. ...........................11

       A.    The Noteholders Do Not Establish "Cause" Under § 1112(b)(4)(A). ...........11

             1.    The Debtor's Estate Has Suffered No Substantial Diminution. ........12

             2.    The Debtor has a Reasonable Likelihood of Rehabilitation. .............14

       B.    Conversion is Not in the Best Interests of the Debtor's Estate or its
             Creditors........................................................................................16

             1.    Reorganization Benefits All Creditors, Including the
                   Noteholders. ......................................................................................16

             2.    No Creditor Will Derive Value From the Debtor's Valuable
                   Assets if the Case is Converted to Chapter 7. ...................................17

DM3\1361304.1

3. The Debtor Should Be Given a Reasonable Period of Time to Propose a Plan ................................................................................. 18

II. THE DEBTOR WILL BE SUCCESSFUL ON ITS CLAIMS AGAINST IROQUOIS FUND AND ITS LIKELY RECOVERY WILL OFFSET ANY RECOVERY BY IROQUOIS FUND IN THIS BANKRUPTCY PROCEEDING, SUCH THAT IROQUOIS FUND OVERSTATES ITS CONTROL OVER THE DEBTOR'S REORGANIZATION ................................................................. 19

A. The Debtor Will Be Successful on its Claims Against Iroquois Fund in in the Massachusetts Lawsuit ........................................................ 20

1. Breach of Contract ............................................................. 20

2. Promissory Estoppel .......................................................... 24

3. Unfair and Deceptive Acts in Violation of Massachusetts General Laws Chapter 93A, § 11 ..................................... 25

B. The Debtor's Likely Recovery on its Claims Against Iroquois Fund Will Be Substantial and Offset Any Recovery by Iroquois Fund in the Bankruptcy Proceeding ................................................................. 28

C. Iroquois Fund and the Other Noteholders Will Not Have Control Over the Debtor's Plan of Reorganization ................................................. 29

CONCLUSION ...................................................................................... 29

DM3\1361304.1

# TABLE OF AUTHORITIES

**Cases**

Alcon v. Kinton Realty, Inc.,
    2 A.D.2d 454 (N.Y.App.Div. 1956) ............................................................................ 22

Anthony's Pier Four, Inc. v. HBC Assoc.,
    583 N.E.2d 806 (Mass. 1991) ............................................................................ 26

Atkinson v. Rosenthal,
    598 N.E.2d 666 (Mass. App. Ct. 1992) ............................................................................ 26

Carroll v. Xerox Corp.,
    294 F.3d 231 (1st Cir. 2002) ............................................................................ 23

Cellucci v. Sun Oil Co.,
    320 N.E.2d 919 (Mass. App. Ct. 1974) ............................................................................ 24, 25

Clamp-All Corp. v. Foresta,
    763 N.E.2d 60 (Mass. App. Ct. 2002) ............................................................................ 27

Cohen v. United States of America,
    191 B.R. 482 (S.D.Fla. 1995) ............................................................................ 12

Datacomm Interfacts, Inc. v. Computerworld, Inc.,
    489 N.E.2d 185 (Mass. 1986) ............................................................................ 26

Gateway Access Solutions, Inc.,
    374 B.R. 556 (Bankr.M.D.Pa. 2007) ............................................................................ 13

Greenstein v. Flatley,
    474 N.E.2d 1130 (Mass. App. Ct. 1985) ............................................................................ 25

In re Brown,
    951 F.2d 564 (3d Cir. 1991) ............................................................................ 14, 15

In re Denrose Diamond,
    49 B.R. 754 (Bankr.S.D.N.Y. 1985) ............................................................................ 14, 15

In re Economy Cab & Tool Company, Inc.,
    44 B.R. 721 (Bankr.D.Minn. 1984) ............................................................................ 14, 15

In re Johnston,
    149 B.R. 158 (9th Cir. 1992) ............................................................................ 15

DM3\1361304.1

In re Motel Properties, Inc.,
    314 B.R. 889 (Bankr.S.D.Ga. 2004) ...................................................... 11, 12, 16

In re Penn Traffic Co.,
    524 F.3d 373 (2d Cir. 2008).............................................................................. 14

In re Schriock Construction, Inc.,
    167 B.R. 569 (Bankr.D.N.D. 1994) ................................................................ 13

In re The 1031 Tax Group, LLC,
    374 B.R. 78 (Bankr.S.D.N.Y. 2007)......................................................... 16, 17

In re The Adbrite Corp.,
    290 B.R. 209 (Bankr.S.D.N.Y. 2003) ....................................................... 14, 15

Linthicum v. Archambault,
    398 N.E.2d 482 (Mass. 1979) ......................................................................... 26

Loranger Constr. Corp. v. E.F. Hauserman Co.,
    384 N.E.2d 176 (Mass. 1978) ................................................................... 23, 25

Michelson v. Digital Fin. Servs.,
    167 F.3d 1715 (1st Cir. 1999) ......................................................................... 20

M.J.C. Properties, Inc. v. Hurley,
    27 Mass. App. Ct. 250 (1989) ......................................................................... 22

Neuhoff v. Marvin Lumber & Cedar Co.,
    370 F.3d 197 (1st Cir. 2004) ..................................................................... 23, 25

Olin Aegis v. Finnegan,
    2002 U.S. Dist. LEXIS 2339 (D. Mass. Feb. 12, 2002) ................................. 25

Pepsi-Cola Metro. v. Checkers, Inc.,
    754 F.2d 10 (1st Cir. 1985)............................................................................. 27

PMP Assocs. v. Globe Newspaper Co.,
    321 N.E.2d 915 (Mass. 1975) ......................................................................... 26

Renovator's Supply, Inc. v. Sovereign Bank,
    892 N.E.2d 777 (Mass. App. Ct. 2008) ......................................................... 26

Rhode Island Hosp. Trust Nat'l Bank v. Varadian,
    647 N.E.2d 1174 (Mass. 1995) ....................................................................... 23

DM3\1361304.1

Rooney v. Osborne Desk Co.,
    645 N.E.2d 50 (Mass. App. Ct. 1995) ............................................................. 25

Rose v. Spa Realty Associates,
    42 N.Y.2d 338 (1977) ....................................................................................... 22

Singarella v. City of Boston,
    173 N.E.2d 290 (Mass. 1961) ........................................................................... 20

Staples Coal Co. v. Ucello,
    333 Mass. 464 (1956) ........................................................................................ 22

Zarthar v. Saliba,
    282 Mass. 558 (1933) ........................................................................................ 22

## Statutes

11 U.S.C. § 546 ..................................................................................................... 11

11 U.S.C. § 547 ..................................................................................................... 11

11 U.S.C. § 548 ..................................................................................................... 11

11 U.S.C. § 1107 ................................................................................................... 10

11 U.S.C. § 1108 ................................................................................................... 10

11 U.S.C. § 1112 ................................................................................ 1, 11, 13, 16

Mass. Gen. Laws ch. 93A, § 11 ........................................................................... 26

## Other Authorities

Joseph M. Perillo & Helen H. Bender, Corbin on Contracts § 71.2(2) at 419–20 (1995) ............ 22

Restatement (Second) of Contracts § 89 ............................................................... 22

Richard A. Lord, Williston on Contracts § 29:42 at 735–36 (2008) ........................................... 22

Debtor Vaso Active Pharmaceuticals, Inc. ("Vaso" or "Debtor") submits this memorandum in opposition to the Motion of Iroquois Master Fund, Ltd. ("Iroquois Fund"), Smithfield Fiduciary LLC, Rockmore Investment Master Fund, Ltd., Otago Partners LLC, as assignee of RAQ LLC, and Portside Growth and Opportunity Fund (collectively, the "Noteholders") to Convert the Debtor's Case to Chapter 7 of the Bankruptcy Code ("Motion").

## INTRODUCTION

The Debtor opposes the Motion on the basis that the Motion is premature and based on pure speculation. The Motion should be denied for the following reasons:

- The Noteholders fail to show cause for conversion under 11 U.S.C. § 1112(b) because (1) the Debtor's estate has not experienced substantial diminution in value since the Petition Date (as defined herein), and (2) the Debtor will propose a viable and confirmable plan of reorganization within the next sixty days. It is an undisputed fact that the estate's assets have not suffered any diminution in value since the Petition Date.

- Contrary to the statements of the Noteholders, the Debtor has assets other than the Settlement Funds it received from the Malpractice Litigation (as defined and discussed herein). The Debtor holds a License of intellectual property relating to a transdermal drug delivery system by which the Debtor has the right to market the pharmaceutical products that incorporate the unique technology. The License is a valuable asset that will be an integral part of the Debtor's plan of reorganization. However, if this case is converted, the License would revert to the licensor and the estate would receive no value whatsoever from the License.

- The Debtor's business was stifled for several years by the Malpractice Litigation, but at this time, the Malpractice Litigation is resolved and the Debtor is in position to realize the potential of its assets, particularly the License and the public company platform. The best interests of creditors will be served by achieving the maximum value of these assets through a plan of reorganization, whereas conversion of the case would result in the complete loss of the License and the public company platform.

- The Debtor has commenced an adversary proceeding against Iroquois Fund challenging the scope of the security interest that Iroquois Fund and the other Noteholders assert against the Debtor, and the Debtor has brought claims against Iroquois Fund for damages based on its breach of contract and unfair

and deceptive acts prior to the Debtor's bankruptcy filing.[1]  When the Debtor offsets its damages against the Noteholders' claim in this case, the Noteholders will not have any vote (or will have a much lower claim to vote) on the Debtor's plan of reorganization.  As a result, the Noteholders' ability to block the Debtor's plan of reorganization is overstated at best.

In the alternative, the Motion should be denied without prejudice to the Noteholders' right to move for conversion until after such time as (1) the Court adjudicates the actual amount of the Noteholders' claim, including the validity of the Noteholders' asserted security interest in the Settlement Funds, any preferences that may apply to the Noteholders' claims, and any counterclaims that the Debtor holds against the Noteholders, and (2) the Debtor presents its disclosure statement and plan of reorganization to the creditors, which disclosure statement and plan will be filed within sixty (60) days hereof.

## STATEMENT OF FACTS

I.     The Debtor's Business

The Debtor is a Delaware corporation with its headquarters in Danvers, Massachusetts.  It is partially-owned and controlled by BioChemics, Inc. ("BioChemics").  The Debtor's business is commercializing over-the-counter ("OTC") pharmaceutical products developed by BioChemics.  BioChemics owns and develops drug delivery technologies, including a transdermal drug delivery system known as "VALE" (Vaso-Active Lipid Encapsulated) and a topical technology known as PENtoCORE.  Both technologies are novel and represent an advance over other transdermal and topical technologies currently available.  The Debtor has a license (the "License") to market three OTC products formulated by BioChemics.  The License incorporates a marketing and development agreement, under which BioChemics would continue

---

[1] The Debtor filed a lawsuit against Iroquois Fund and its affiliate, Iroquois Capital, LP, in Massachusetts state court on January 27, 2010.  Iroquois Fund recently removed the case to federal court.  The Debtor anticipates that the parties will transfer the lawsuit to this Court.

to develop products for the Debtor to market. (Affidavit of Joseph Frattaroli ("Frattaroli Aff.") ¶¶ 2-5 and Exs. 1-2.)

## II.     Lawsuits Arising Out of Vaso's Initial Public Offering

The Debtor conducted an initial public offering of stock on the NASDAQ on December 15, 2003. The Securities and Exchange Commission ("SEC") began an investigation of the Debtor on or about March 2004 and suspended trading in Vaso on April 1, 2004 based on public statements that BioChemics' products had received FDA approval – all of which were based on negligent legal advice from the Debtor's law firm Robinson & Cole LLP. In August 2004, the SEC filed a civil action against the Debtor, and the Debtor immediately settled with the SEC. (Id. ¶ 7.) Numerous follow-on shareholder class action lawsuits were filed against the Debtor in 2004. In September 2005, the Debtor settled the shareholder suits for $1.1 million in cash, plus $860,000 in two-year, subordinate callable notes that were convertible to the Debtor common stock at $1.75 per share.

## III.    Iroquois Fund's Loan to the Debtor in August 2005

The Debtor needed to raise capital as a result of the SEC and shareholder lawsuits, and it hired a brokerage firm named FTN Midwest to help it obtain funding. FTN Midwest presented the Debtor with an initial proposal from Iroquois Fund in the Summer of 2005, which called for a loan of $4.375 million to the Debtor. However, Iroquois Fund later decided to loan the $4.375 million to the Debtor in two separate tranches of $2.5 million and $1.875 million. The Debtor paid a commission to FTN Midwest based on a total loan value of $4.375 million. (Id. ¶ 9.)

On August 16, 2005, the Debtor entered into a Securities Purchase Agreement ("SPA") with the Noteholders, pursuant to which the Noteholders loaned $2.5 million to the Debtor. (Id. ¶ 10 and Ex. 2.) In exchange, the Noteholders received an Additional Investment Right, Senior Secured Convertible Notes (the "Notes"), a Warrant, and a Security Agreement – which are

attached as Exhibits A, B, C, and E to the SPA. Iroquois Fund acted as collateral agent on Senior Secured Convertible Notes held by the other Noteholders.[2] (Id. ¶ 11 and Ex. 2.) The Notes provided, *inter alia*, that the principal loan amount of $2.5 million was due on May 1, 2007, and that Iroquois Fund and the other Noteholders had the right to convert the Notes into Vaso common stock at a conversion price of $.70/share. (Id. ¶ 12.) The Additional Investment Right gave Iroquois Fund and the other Noteholders the right to loan up to an additional $1.875 million to the Debtor with the right to convert the note for any such additional loan into the Debtor common stock at a conversion price of $.70/share. (Id. ¶ 13.) The Warrant gave Iroquois Fund and the other Noteholders the right to purchase 1,298,701 shares of Vaso common stock at an exercise price of $.77/share. (Id. ¶ 14.)

The Security Agreement provided that Iroquois Fund and the other Noteholders received a security interest in "all personal property and other assets of [Vaso] . . . including . . . all accounts and general intangibles . . . [and] all other tangible and intangible property." (Id. ¶ 15 and Ex. 2 at Ex. E – Security Agreement, § 3.) The Security Agreement does not claim a security interest in any lawsuit or commercial tort claim brought by the Debtor. (Id. ¶ 16.)

Both the Debtor and Iroquois Fund projected that the Debtor would be a successful company at the time that they signed the SPA in August 2005. (Deposition of Richard Abbe ("Abbe Dep.") at 64, 67-68.)

**IV.    Iroquois Fund's Bad Faith Breach of Contract to Provide Additional Funding and Attempt to Extort Unreasonable and Oppressive Loan Terms and Gain Control of the Debtor**

Around the same time that Iroquois Fund and the other Noteholders made the initial $2.5 million loan to the Debtor, Rich Abbe, a co-managing partner of Iroquois Capital, LP ("Iroquois

---

[2] Iroquois Fund was the lead investor in the transaction and loaned $1,125,000 to Vaso. The Security Agreement designated Iroquois Fund as agent with the power to act on behalf of the other Noteholders.

Capital"),[3] promised the Debtor that Iroquois Fund would make a second loan of $1.875 million to the Debtor under the same terms as the initial $2.5 million loan if the Debtor met certain milestones. These milestones were the filing of a registration statement with the SEC for the Debtor's common stock underlying Iroquois Fund's right to convert under the Note, the hiring of a national broker to sell the Debtor's products, and the shipment of products to buyers under the brokerage agreement with the broker. (Frattaroli Aff. ¶ 17.)

Mr. Abbe's promise to the Debtor was an oral contract for Iroquois to loan $1.875 million to Vaso under the same terms as the initial $2.5 million in exchange for the Debtor's agreement to achieve the three milestones described above. Based on this contract, the Debtor understood that if it achieved the milestones, Iroquois Fund would lend an additional $1.875 million under the same terms as the initial $2.5 million loan: the Debtor would sign a note for the principal, and Iroquois Fund would have the right to convert the note into Vaso's common stock at a conversion price of $.70/share. Indeed, these were the terms specified in the Additional Investment Right attached as Exhibit A to the SPA. (Id. ¶ 18.)

In the ensuing months, the Debtor expended time and money to achieve the milestones in anticipation and reliance on Iroquois Fund's contract and promise to make the second $1.875 million loan on the same terms as the first $2.5 million loan. Specifically, the Debtor registered the common stock underlying Iroquois Fund's conversion right which was effective on February 14, 2006, entered into a brokerage agreement with Ferole Group, a national brokerage firm, to sell the Debtor's products, and shipped products to customers pursuant to the brokerage agreement with Ferole Group. (Id. ¶ 19.)

---

[3] Iroquois Fund is a hedge fund established, run, and controlled by Iroquois Capital. Iroquois Capital and Iroquois Fund are located at the same address at 641 Lexington Ave., 26th Floor, New York, NY 10022. Iroquois Capital is in the business of private equity and venture capital investments and also manages hedge funds for clients.

On or after February 14, 2006, the Debtor told Iroquois Fund that it had achieved the milestones and requested the second $1.875 million loan. Receiving the additional $1.875 million loan was crucial because the Debtor otherwise lacked money to manufacture and market its products adequately: the Debtor did not have the ability to raise money through another public offering and its existing cash was depleted. (Id. ¶ 20.)

Iroquois Fund responded to the Debtor's request by stating that it would make the second loan *only if Vaso agreed to renegotiate the conversion prices in the SPA, Notes, Additional Investment Right, and Warrant*. First, it demanded that the Debtor amend the Notes for the first $2.5 million loan to provide for a new conversion price of $.10/share. A new conversion price of $.10/share represented an 86% decrease from the existing conversion price and would enable Iroquois Fund and the other Noteholders to convert the loan into far more shares of Vaso common stock than they were entitled to at the agreed-to conversion price of $.70/share. Moreover, if the Noteholders converted their Notes into Vaso common stock at $.10/share, it would result in them owning approximately 75% of Vaso, thereby gaining control of the company. Second, Iroquois Fund demanded that Vaso change the conversion price for the second $1.875 million loan from $.70/share as set forth in the Additional Investment Right to $.10/share. Third, Iroquois Fund demanded that Vaso change the execution price for the Warrant from $.77/share to $.10/share. The Debtor refused Iroquois Fund's new, oppressive and unreasonable terms. (Id. ¶¶ 21-22.)

Iroquois Fund breached the contract and its promise to make the second loan of $1.875 million under the same terms as the first $2.5 million loan by refusing to make the second loan unless the Debtor agreed to new and one-sided conversion prices of $.10/share for the initial loan, the second contemplated loan, and the Warrant. Moreover, Iroquois Fund's breach of

contract was in bad faith. In this regard, Iroquois Fund induced the Debtor to deplete its cash to meet certain milestones by contracting and promising to make the second $1.875 million loan under the same terms as the first $2.5 million loan, but then went back on its word and attempted to extort unreasonable and oppressive loan terms by forcing the Debtor to cut the conversion prices for the first and second loans by 86% (from $.70/share to $.10/share) and the conversion price for the Warrant by 87% (from $.77/share to $.10/share) and thereby turn over control of the company to Iroquois Fund and the other Noteholders. (Id. ¶¶ 23-24.)

## V.  Iroquois Fund's Bad Faith Refusal to Allow the Debtor to Obtain Additional Funding from Cornell Capital Partners

Following Iroquois Fund's breach of contract to make the second $1.875 million loan, the Debtor engaged into negotiations with Cornell Capital Partners, LP ("Cornell") to obtain necessary funding. Cornell and the Debtor signed a Convertible Debenture term sheet dated May 31, 2006, under which Cornell would commit to buy $1.8 million of debentures from the Debtor that were convertible into Vaso common stock ("Initial Term Sheet"). Mr. Abbe rejected the proposed Cornell deal. (Id. ¶¶ 25-27 and Exs. 3-4.)

The Debtor then renegotiated the proposed loan from Cornell, and the parties signed a revised Convertible Debenture term sheet dated June 12, 2006 ("Revised Term Sheet"). Under the Revised Term Sheet, Cornell would agree to buy $1.2 million of debentures from the Debtor that were convertible into Vaso common stock. However, unlike the Initial Term Sheet, Cornell agreed to subordinate its security interest to Iroquois Capital, thus allowing Iroquois Fund to retain its position as senior secured lender with first priority. (Id. ¶ 28 and Ex. 5.) The Revised Term Sheet would not have any dilutive effect on Iroquois Fund or the other Noteholders in the event that they chose to convert their Notes into Vaso common stock due to built-in repricing mechanisms in the Notes. (Id. ¶ 29.)

The Debtor's attorney sent the Revised Term Sheet to Joshua Silverman, a co-managing partner of Iroquois Capital, on July 20, 2006 along with a cover letter. The letter requested that Iroquois consent and/or waive certain provisions of the SPA and related documents for the sole purpose of allowing the Cornell deal to move forward. (Id. ¶ 30 and Ex. 5.) Iroquois Fund refused to consent to the Revised Term Sheet with Cornell, and Cornell refused to go forward on the deal without Iroquois Fund's consent. As a result, the Debtor lost crucial funding that was necessary to manufacture and market its products. (Id. ¶ 31.)

Iroquois Fund's refusal to consent to the Revised Term Sheet with Cornell was done with the intent to put the Debtor in a "no win" Catch-22 position by forcing the Debtor either to agree to an unreasonable and onerous new conversion price or face the threat of bankruptcy. Iroquois Fund's refusal was unreasonable and unwarranted given that Cornell's status as a junior secured creditor did not affect the position of Iroquois Fund and the other Noteholders as senior secured creditors or dilute their potential holdings of Vaso common stock in the event that they exercised the right of conversion. Iroquois Fund's refusal to consent to the Revised Term Sheet with Cornell had the effect of denying Vaso funding that it desperately needed to manufacture and market its products. (Id. ¶ 32.)

The Debtor made interest payments to Iroquois Fund and the other Noteholders on the Notes through May 2007 and then was forced to stop for lack of funds. The Debtor reported its failure to pay the principal amounts outstanding under the Notes in a Form 8-K filing with the SEC on May 1, 2007. (Id. ¶ 33.) Iroquois Fund did not attempt to foreclose on the Notes at this time or any other time prior to 2010. (Abbe Dep. at 97-98; Deposition of Mitchell Kulick ("Kulick Dep.") at 57.)

## VI.    The Debtor's Legal Malpractice Lawsuit Against Robinson & Cole LLP

In November 2006, the Debtor brought a legal malpractice action against its former law firm Robinson & Cole in Massachusetts Superior Court, Civil Action No. 2006-04958-BL52 (the "Malpractice Litigation").  The Debtor claimed that Robinson & Cole provided negligent legal advice in connection with Vaso's IPO and registration statement, which caused harm as a result of lawsuits filed by the SEC and private investors based on alleged misstatements attributable to Robinson & Cole.  (Frattaroli Aff. ¶¶ 34-37.)  Iroquois Fund never amended the Security Agreement to claim a security interest in the Malpractice Litigation.  (Kulick Dep. at 57; Abbe Dep. at 100.)  Iroquois Fund did not participate in or provide funding for the Malpractice Litigation.  (Kulick Dep. at 79-80; Abbe Dep. at 104-05, 110.)  The Debtor and Robinson & Cole settled the Malpractice Litigation in December 2009.  As part of the settlement, Robinson & Cole paid $2,500,000 to the Debtor ("Settlement Funds").  (Frattaroli Aff. ¶¶ 34-37.)

## VII.    The Debtor's Lawsuit Against Iroquois Fund in Massachusetts

On January 27, 2010, the Debtor filed a lawsuit against Iroquois Fund and its affiliate Iroquois Capital in Massachusetts state court, in which the Debtor alleged claims for breach of contract, promissory estoppel, and unfair and deceptive acts and practices in violation of Massachusetts General Laws Chapter 93A, § 11 ("Massachusetts Lawsuit").  These claims are based on Iroquois Fund's bad faith breach of contract to provide additional funding to the Debtor, bad faith refusal to allow the Debtor to obtain additional funding from other sources, and attempt to extort unreasonable and oppressive loan terms and gain control of the Debtor.  (Id. ¶ 38.)[4]

---

[4] Iroquois Fund and Iroquois Capital recently removed the Massachusetts Lawsuit to federal court.  (Id. ¶ 39.)  The Debtor anticipates that the parties will transfer the Massachusetts Lawsuit to this Court.

Following Vaso's filing of the Massachusetts Lawsuit, Iroquois Fund filed a complaint in New York state court on February 4, 2010, in which it claimed, *inter alia*, that it had a perfected security interest in the Settlement Funds

## VIII.  Bankruptcy Filing

On March 11, 2010 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor is operating its business and managing its properties as a debtor-in-possession pursuant to §§ 1107(a) and 1108 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the "Bankruptcy Code").  No trustee, examiner or statutory committee has been appointed in this Chapter 11 case.

The filing of the bankruptcy petition was precipitated by the Preliminary Injunction Motion by which Iroquois Fund sought to prevent the Debtor from using the Settlement Funds in its business operations.  The Debtor sought the protection of the Bankruptcy Court to permit the Debtor to reorganize its business and resolve its disputes with Iroquois Fund and its other creditors.  The Debtor currently employs three (3) employees at its headquarters in Danvers, Massachusetts and continues to sell its products through on-line orders consistent with its pre-petition operations.

## IX.  Plan of Reorganization

The Debtor is preparing a plan of reorganization, which the Debtor anticipates will be filed within the next sixty (60) days.  The Debtor is involved in active negotiations with four (4) different pharmaceutical or medical device companies whose technology and intellectual property rights complement the License and the Debtor's marketing agreement with BioChemics.  The Debtor's technology and the technology of one of these target entities would be combined in the Debtor's public company form, such that the parties will maximize the value of their respective technologies.  The Debtor is negotiating with the four target companies,

---

based on Section 3 of the Security Agreement ("New York Lawsuit").  Iroquois Fund filed a motion for a preliminary injunction in the New York Lawsuit ("Preliminary Injunction Motion"), which Vaso opposed prior to filing its Chapter 11 petition in this Court.  The New York court never considered or decided whether Iroquois Fund has a security interest in the Settlement Funds.  (Id. ¶¶ 40-41.)

meeting with their senior management and boards of directors and preparing term sheets in order to determine which of the four companies would offer creditors the highest return for the Debtor's assets and the best opportunities for future growth. Moreover, the Debtor is negotiating with a lender to provide funding for the reorganized entity.

The plan of reorganization will also provide for the formation of a creditors' trust and the appointment of an independent trust administrator charged with investigating any preference or fraudulent transfer claims that the estate may have pursuant to 11 U.S.C. §§ 546, 547, 548 and 550 (collectively, the "Transfer Claims") and pursuing any Transfer Claims on behalf of creditors. Any proceeds recovered by the trust administrator would be distributed to creditors pro-rata in accordance with the priority rules of the Bankruptcy Code. Creditors will have the benefit of an independent review of the Debtor's pre-petition actions and will receive the same amount that they would receive if this case were converted to Chapter 7.

## ARGUMENT

## I. THE MOTION TO CONVERT THE CHAPTER 11 CASE SHOULD BE DENIED BECAUSE NO BASIS EXISTS FOR CONVERSION.

### A. The Noteholders Do Not Establish "Cause" Under § 1112(b)(4)(A).

Section 1112(b)(1) of the Bankruptcy Code provides that the Bankruptcy Court shall convert a chapter 11 case to a chapter 7 case or dismiss the case, whichever is in the best interests of creditors and the estate, if the movant establishes cause. See 11 U.S.C. § 1112(b)(1). The movant bears the burden of proof in a motion to convert a case. See In re Motel Properties, Inc., 314 B.R. 889, 894 (Bankr.S.D.Ga. 2004). The Noteholders cite to a single subsection of 11 U.S.C. § 1112(b) to establish cause for conversion, namely § 1112(b)(4)(A), which provides that "cause" includes "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A).

To meet its burden of proof, the Noteholders must establish (a) the substantial loss to or diminution of the estate, <u>and</u> (b) the absence of a reasonable likelihood that the estate will be rehabilitated. The Noteholders fail to satisfy either of the two prongs necessary to show cause for conversion of the Debtor's bankruptcy case. The Debtor has not depleted its assets, the value of which has remained constant since the Petition Date, and the Debtor has a viable plan by which it shall be restored to sound financial ground for the benefit of all of its creditors.

        1.       <u>*The Debtor's Estate Has Suffered No Substantial Diminution*</u>.

To determine whether there is a continuing loss to or diminution of a bankruptcy estate, the Court must evaluate the present condition of a debtor's estate. <u>See</u> <u>In re Motel Properties</u>, 314 B.R. at 894. As of the Petition Date, the Debtor had approximately $601,132.87 cash on hand. As of the date of this Opposition, the Debtor's cash on hand remains largely unchanged, Other than sales of inventory in the ordinary course of business, the proceeds of which have been deposited in the Debtor's bank account, the Debtor has not disposed of or depleted any of its other assets. <u>See</u> Frattaroli Aff. at ¶43. The Debtor's primary expense at this time is its legal fees relating to this bankruptcy case, but the incurrence of legal fees does not constitute diminution of the estate to provide a basis for conversion to Chapter 7. <u>See</u> <u>Cohen v. United States of America,</u> 191 B.R. 482 (S.D.Fla. 1995) (reversing bankruptcy court order converting case and stating that attorneys' fees are necessary and ordinary expenses of bankruptcy case administration that do not lead to a finding that estate is being diminished).

The Debtor's most valuable assets, which include the License, its investor base and public company form, remain intact and available for incorporation into the Debtor's plan of reorganization. The Noteholders' claim that the Debtor has depleted the estate by hundreds of thousands of dollars is patently false. In fact, the Debtor has nearly the same asset value today as

it had on the Petition Date, such that there has been no diminution in the value of the Debtor's estate, let alone "substantial" diminution.

Further, the Debtor has not lost any employees or severed any relationships with customers. With the settlement of the Malpractice Litigation, the Debtor is ready to advance its business by using the License and public company platform to reorganize into a profitable venture. None of the Debtor's post-petition actions have in any way jeopardized its ability to reorganize. Indeed, the Debtor is preparing a plan that will combine its valuable assets – the License, the public company platform and investor base – with a new partner to form an economically viable enterprise for the benefit of all creditors.

The Noteholders erroneously point to *pre-petition* finances of the Debtor to argue that the Debtor has depleted its estate. The inquiry under § 1112(b)(4)(A) of the Bankruptcy Code is whether a debtor's assets are depleting *post-petition*. See In re Schriock Construction, Inc., 167 B.R. 569, 575 (Bankr.D.N.D. 1994) (noting that the diminution of the estate may be satisfied by showing the debtor's losses, negative cash flow or depreciating assets after the court enters the order for relief). See also In re Gateway Access Solutions, Inc., 374 B.R. 556, 564 (Bankr.M.D.Pa. 2007) (post-petition negative cash flow is evidence of continuing losses). The Noteholders have no evidence that the Debtor's assets diminished in value post-petition. (Kulick Dep. at 99; Abbe Dep. at 118-19.) From the Petition Date, the Debtor's assets have not lost any appreciable value and remain available to support the Debtor's reorganization. To the extent the Noteholders have secured claims against the Debtor (which claims the Debtor has contested), such position is not deteriorating because the Debtor's assets are not declining in value.

Further, if the Debtor had sustained any small present losses, such losses would be insufficient grounds for conversion of the Chapter 11 case because the Debtor has a reasonable

prospect of reorganization.  See In re Denrose Diamond, 49 B.R. 754, 756-757 (Bankr.S.D.N.Y. 1985) (finding that short-term operating losses do not warrant conversion if there is a realistic possibility of rehabilitation).  As set forth herein, the Debtor is preparing a plan of reorganization that will maximize the value of its assets for all creditors.

2. *The Debtor has a Reasonable Likelihood of Rehabilitation.*

The "overriding policy" of the Bankruptcy Code favors the reorganization and rehabilitation of debtors.  See In re Penn Traffic Co., 524 F.3d 373, 383 (2d Cir. 2008). See also In re Economy Cab & Tool Company, Inc., 44 B.R. 721, 724 (Bankr.D.Minn. 1984) (recognizing the purpose of Chapter 11 to rehabilitate economically distressed businesses). Rehabilitation means that the debtor will be reestablished on sound financial basis.  See In re The Adbrite Corporation, 290 B.R. 209, 216 (Bankr.S.D.N.Y. 2003).   The burden is on the moving party to establish that the debtor cannot be rehabilitated.  See In re Brown, 951 F.2d 564, 572 (3d Cir. 1991) (movants must demonstrate the factual basis for the motion to convert the bankruptcy case).

The Noteholders do not meet the burden of proof necessary to show cause for conversion because the Noteholders do not present any support for their claims that the Debtor cannot carry out a plan of reorganization.

> Under Section 1112(b)(2), the moving party must show that a debtor lacks all ability to formulate or carry out a plan.  The courts have usually limited application of this ground to cases where a debtor was little other than a corporate shell lacking a place of business, employees, payroll or discernible economic activity…Where a debtor is carrying on some business activity, this ground is not properly argued or applied before a plan is filed, when the debtor's ability to accomplish the plan first can be gauged.

In re Economy Cab & Tool Company, 44 B.R. at 725.  The Debtor's activities clearly rebut any argument by the Noteholders that this case should be converted to Chapter 7.  The Debtor

continues to sell its products through the on-line sales, and it continues to employ its pre-petition workforce and prepare plans for the future distribution of its products. Unlike the debtor in In re Johnston, 149 B.R. 158 (9th Cir. 1992), which the Noteholders cite in support of their Motion, the Debtor has the means to propose a plan, the position of the Debtor's creditors is not eroding and the Debtor has taken all necessary steps to preserve the Debtor's business operations for its reorganization. As such, the facts of this case do not support the Noteholders' argument that conversion is warranted.

The Debtor's short term operating losses are insufficient to support a conclusion that the Debtor has no prospect whatsoever of reorganizing. See In re Economy Cab & Tool Company, 44 B.R. at 724-25 (noting that even "precarious" chances of survival are enough if the corporate principals have business acumen and resilience). "A continuing loss or diminution of the estate may be tolerated where reorganization is feasible and the pattern of unprofitable operations can be reversed as a result of a successful reorganization." In re The Adbrite Corporation, 290 B.R.at 215. The Debtor must be given the opportunity to propose its plan of reorganization before the Court may determine that the Debtor has no prospect of reorganizing.

The Noteholders filed the Motion only 19 days after the Petition Date. It is entirely unreasonable to expect the Debtor to file a plan of reorganization within 19 days of the Petition Date. See In re Brown, 951 F.2d at 572 (denying a motion to dismiss filed a few weeks after the petition was filed and before the "posture of the case was clear."). See also In re Economy Cab & Tool Company, 44 B.R. at 724 (finding that a debtor must be given a reasonable amount of time to work out a plan); In re Denrose Diamond, 49 B.R. at 756 (noting that the debtor should be given the benefit of the doubt in the early stages of a Chapter 11 case).

Nonetheless, the Debtor is diligently working to present a viable plan of reorganization, which the Debtor expects to file within sixty days. The Debtor is in active negotiations with four entities engaged in the pharmaceuticals or medical devices industry whose products or technologies complement the Debtor's assets, particularly the License and public company platform. Through the License, the Debtor has rights to innovative technology that is attractive to other entities engaged in developing pharmaceutical products or medical delivery systems. The Debtor has been involved in meetings with the management and/or boards of directors of these four potential partners in an effort to determine the entity that offers the best synergies with the Debtor and the best prospects for the future potential of the Debtor. Such efforts and the prospect of a successful reorganization clearly rebut the Noteholder' assertion that causes exists to convert this case to Chapter 7. "The fact that there is a continuing loss to the estate, due to mounting administrative costs and the lack of any new business entering the estate, is insufficient to establish 'cause' within the meaning of § 1112(b)." In re The 1031 Tax Group, LLC, 374 B.R. 78, 93 (Bankr.S.D.N.Y. 2007) (noting that the debtor was working diligently with the creditors' committee to file a plan and disclosure statement). See also In re Motel Properties, 314 B.R. at 895 (finding that despite decrease in profits, the debtor could be financially viable through a franchising arrangement it was negotiating with a new partner and changes to the market conditions).

**B.      Conversion is Not in the Best Interests of the Debtor's Estate or its Creditors.**

1.      *Reorganization Benefits All Creditors, Including the Noteholders.*

Even if the Court were to find that cause exists under § 1112(b)(4)(A), the Debtor's case should not be converted to Chapter 7. "However, even if there is a finding of cause – a court is not obligated to convert the case – the decision remains within the court's discretion." See In re

The 1031 Tax Group, LLC, 374 B.R.at 93.  In determining whether to convert or dismiss a case, a court should consider the best interest of the creditors and the estate.

In this case, the best interests of all of the Debtor's creditors clearly would be served by the successful reorganization of the Debtor.  The Debtor has creditors other than the Noteholders, including employees, trade creditors, customers and shareholders, whose interests must also be considered.  If the case were to be converted to Chapter 7, these constituents likely would receive nothing from the liquidation of the Debtor's operating assets.

The immediate conversion of the case would provide the Debtor with no time to prepare a plan of reorganization following the settlement of the Malpractice Litigation, which Litigation consumed the Debtor for years and prevented the Debtor from realizing the true potential of its business and assets.   The Noteholders are acting for their own interests, not the interests of all creditors. The Debtor has commenced an adversary proceeding against Iroquois Fund and challenged the security interest claimed against the Debtor by Iroquois Fund.  Being that its claim is overstated, Iroquois Fund does not have the level of influence and control over the Debtor's reorganization that it represents in the Motion.  See, infra, § II.  Therefore, the Court cannot consider the interests of the Noteholders to the detriment of the Debtor's other creditors and the estate.

>    2.    *No Creditor Will Derive Value From the Debtor's Valuable Assets if the Case is Converted to Chapter 7.*

If the Court converts the case to a Chapter 7, the valuable operating assets of the Debtor's estate would be lost immediately.  The License would revert to BioChemics, and the public company platform would not be utilized for new investment opportunities but would merely dissolve.  Creditors would have no opportunity to realize any value from these assets, because the value of the License and the public company platform simply would evaporate.  This result is

not in the best interest of any creditor, not even Iroquois Fund.  Rather, the Debtor should be provided the opportunity to make use of its assets for the benefit of its creditors so that the existing value of the Debtor's business is not lost.  At this time, the Debtor is actively negotiating terms with four different entities whose level of interest in a business transaction with the Debtor is evidenced by the time their senior managements have devoted to negotiations with the Debtor.

The Debtor's proposed plan will provide for the creation of a creditors' trust and appointment of independent trustee to analyze and pursue any Transfer Claims.  In that way, creditors will have the benefit of an independent evaluation of the Transfer Claims and will receive any proceeds recovered by the independent trustee, just as creditors would receive in a Chapter 7.  However, by keeping this case as a Chapter 11, creditors will also receive the maximum value of the Debtor's operating assets and the benefit of the ongoing business.  As a result, conversion clearly does not serve the best interest of creditors because the only possible recovery in Chapter 7 would be the Transfer Claims, while Chapter 11 also provides creditors with the value of the Debtor's operating assets.

3.  *The Debtor Should Be Given a Reasonable Period of Time to Propose a Plan*.

The Debtor should be given a reasonable period of time to propose a viable plan of reorganization for the benefit of all creditors.  Even if the Court were to find that the Noteholders hold valid claims against the Debtor, the Noteholders will not be harmed and their position will not be eroded if the Court provides for a reasonable time for the Debtor to propose a plan.  As of this date, the Debtor is negotiating the terms of a plan of reorganization by which it intends to combine its assets with the assets of one of four potential partners to form a publicly traded pharmaceutical company with innovative, marketable products.  In accordance with the rehabilitative goals of Chapter 11, the Debtor intends to move beyond the litigation that stifled its

corporate beginnings and form an economically viable enterprise. Creditors will have the benefit

of any Transfer Claims that the estate holds against third parties, but creditors will also receive

value for the Debtor's other assets under the plan of reorganization.

**II.    THE DEBTOR WILL BE SUCCESSFUL ON ITS CLAIMS AGAINST IROQUOIS FUND AND ITS LIKELY RECOVERY WILL OFFSET ANY RECOVERY BY IROQUOIS FUND IN THIS BANKRUPTCY PROCEEDING, SUCH THAT IROQUOIS FUND OVERSTATES ITS CONTROL OVER THE DEBTOR'S REORGANIZATION.**

A primary argument that the Noteholders present in their Motion is that the Debtor is

unable to confirm a plan over the objection of the Noteholders. See Motion at p. 12. The

Noteholders' argument is both premature and entirely speculative. First, the Noteholders are not

privy to the intent of the Debtor's plan of reorganization; for example, the Debtor might pay the

Noteholders' claim in full, such that the Noteholders would have no right to vote on the plan.

Second, there is a strong likelihood that the Debtor will be successful on its claims against

Iroquois Fund and its affiliate Iroquois Capital in the Massachusetts Lawsuit for breach of

contract, promissory estoppel, and unfair and deceptive acts in violation of Massachusetts

General Laws Chapter 93A, § 11, such that the claim of Iroquois Fund and the other Noteholders

will be substantially reduced or eliminated, or the Noteholders may become obligated to pay

damages to the Debtor.

As explained above, Iroquois Fund breached a contract to provide additional funding to

the Debtor, and then unreasonably prevented the Debtor from obtaining additional funding from

Cornell. Iroquois Fund took these actions in bad faith with the purpose to extort oppressive loan

terms and gain control of the Debtor, and its conduct was unfair and deceptive. Moreover, given

that Iroquois Fund's wrongful conduct was a substantial cause of the Debtor's inability to

achieve success, the Debtor's recovery on its claims in the Massachusetts Lawsuit is likely to be

substantial and completely offset any recovery by the Noteholders in this bankruptcy proceeding.

As a result, the Noteholders will not have the ability to block the confirmation of the Debtor's plan of reorganization, thereby defeating one of the principal arguments in the Motion.

**A.** **The Debtor Will Be Successful on its Claims Against Iroquois Fund in the Massachusetts Lawsuit.**

       1. *Breach of Contract.*

Iroquois Fund is liable for breach of contract to provide additional funding to the Debtor. As in other jurisdictions, to establish a breach of contract claim in Massachusetts, a plaintiff must prove the existence of an agreement, the presence of consideration, the defendant's breach of the agreement, and the defendant's breach caused damage to the plaintiff. See Singarella v. City of Boston, 173 N.E.2d 290, 291 (Mass. 1961); Michelson v. Digital Fin. Servs., 167 F.3d 1715, 1720 (1st Cir. 1999). The Debtor satisfies each of these elements.

As set forth above, Iroquois Fund and the Debtor entered into an oral contract whereby Iroquois Fund agreed to make a second loan of $1.875 million to the Debtor under the same terms as the initial $2.5 million loan, in exchange for the Debtor's agreement to achieve the milestones of filing a registration statement with the SEC for the Debtor's common stock underlying the Noteholders' right to convert under the Notes, hiring a national broker to sell the Debtor's products, and shipping products to buyers under the brokerage agreement with the broker. The Debtor performed all of its obligations under the contract: it registered the common stock underlying the Noteholders' conversion right which was effective on February 14, 2006, entered into a brokerage agreement with Ferole Group, a national brokerage firm, to sell Vaso's products, and shipped products to customers pursuant to the brokerage agreement with Ferole Group. See, supra, Statement of Facts ("SOF") § IV.

Iroquois Fund breached the contract by refusing to make the second $1.875 million loan on the same terms as the initial $2.5 million loan and instead attempting to extort new,

oppressive, and one-sided conversion prices of $.10/share for the initial loan, the second contemplated loan, and the Warrant, which represented an 86% cut in the conversion price for the loans (from $.70/share to $.10/share) and an 87% cut in the conversion price for the Warrant (from $.77/share to $.10/share), and would result in turning over control of the Debtor to Iroquois Fund and the other Noteholders.  Iroquois Fund's breach caused damage by denying the Debtor the funding it desperately needed to manufacture and market its products and making it impossible for the Debtor to pay off the initial $2.5 million loan to the Noteholders.  Id.

In the New York Lawsuit, Iroquois Fund incorrectly claimed that the oral contract "appears to be an unenforceable oral modification of either the loan documents or an Additional Investment Right granted to Iroquois which would allow Iroquois to loan additional funds to Vaso, if Iroquois so chose."  Iroquois Fund's Reply Brief in the New York Lawsuit at 2 (emphasis omitted).  This argument fails because the oral contract between Vaso and Iroquois Fund contained *new terms* and *new consideration* from the prior agreements, and thus was not a "modification" of those prior agreements.  Mr. Abbe of Iroquois Capital promised to make a second loan of $1.875 million if Vaso met the milestones of filing a registration statement with the SEC, hiring a national broker to sell Vaso's products, and shipping products to buyers. These terms were new – Iroquois was not obligated to make a second loan under the prior agreements and Vaso was not obligated to hire a national broker to sell its products and ship its products to buyers under the prior agreements.  Thus, the oral contract was a new contract – not a "modification" of a prior contract.

Moreover, even if the oral contract was considered a modification of the prior agreements, this does not help Iroquois Fund because parties may orally modify a written agreement notwithstanding a "no oral modification clause" in that agreement.  Joseph M. Perillo

& Helen H. Bender, <u>Corbin on Contracts</u> § 71.2(2) at 419–20 (1995) ("[A]ny written contract . . .

can be rescinded or varied at will by the oral agreement of the parties, even though the written

agreement contains a provision stating that it cannot be orally varied or rescinded.");

Restatement (Second) of Contracts § 89; <u>Staples Coal Co. v. Ucello</u>, 333 Mass. 464, 468 (1956)

(enforcing oral modification despite no-modification provision); <u>Zarthar v. Saliba</u>, 282 Mass.

558, 560 (1933) (enforcing oral modification of contract despite no-modification provision

because "the parties had the power to waive or alter that provision orally at any time"); <u>M.J.C.</u>

<u>Properties, Inc. v. Hurley</u>, 27 Mass. App. Ct. 250, 251 (1989) (affirming finding of waiver

despite anti-waiver clause in contract). Oral modifications carry particular force where, as here,

one of the parties has fully performed the modified contract. Richard A. Lord, <u>Williston on</u>

<u>Contracts</u> § 29:42 at 735–36 (2008) ("[T]here is no debate that, when there has been full

performance of the modified contract by one of the parties, the other party cannot rely on the no

oral modification clause."); <u>accord</u> <u>Rose v. Spa Realty Associates</u>, 42 N.Y.2d 338, 340-41 (1977)

(enforcing oral agreement to modify written contract where one party performed under the oral

agreement); <u>Alcon v. Kinton Realty, Inc.</u>, 2 A.D.2d 454, 456 (N.Y.App.Div. 1956) ("That a

written contract may … be effectively modified, even when it contains a stipulation against oral

modification, has long been established."). Here, Vaso fully performed the modified contract by

meeting all of the milestones. Accordingly, even if construed as a modification of the prior

agreements, the oral contract is binding on Iroquois Fund.

 Iroquois Fund also incorrectly claimed in the New York Lawsuit that the parties' oral

contract is void under the statute of frauds because it was not in writing and could not be

performed in one year. <u>See</u> Iroquois Fund's Reply Brief in the New York Lawsuit at 4-5.

However, the oral contract easily could be performed within one year: Vaso could (and did)

achieve the milestones in the same year that Iroquois Fund loaned the second $1.875 million to Vaso.

Finally, Iroquois Fund argues that the oral contract constitutes an unenforceable "agreement to agree" on the purported ground that Mr. Abbe's promise "contemplated negotiation of later agreements and involved no consideration on Vaso's part." Id. at 6. On the contrary, the Debtor provided consideration for the oral contract by filing a registration statement with the SEC, hiring a national broker to sell its products, and shipping products to buyers. Vaso fulfilled its end of the bargain. Iroquois Fund did not. Accordingly, the Debtor will be successful on its claim for breach of contract against Iroquois Fund.

2.    *Promissory Estoppel*.

The Debtor also likely will succeed on its claim against Iroquois Fund for promissory estoppel. "A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promise or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." Restatement (Second) of Contracts § 90. "To prove a claim of promissory estoppel under Massachusetts law, 'a plaintiff must allege that (1) a promisor makes a promise which he should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promise, (2) the promise does induce such action or forbearance, and (3) injustice can be avoided only by enforcement of the promise." Neuhoff v. Marvin Lumber & Cedar Co., 370 F.3d 197, 203 (1st Cir. 2004) (quoting Carroll v. Xerox Corp., 294 F.3d 231, 242 (1st Cir. 2002), citing Loranger Constr. Corp. v. E.F. Hauserman Co., 384 N.E.2d 176, 308 (Mass. 1978)).[5]

---

[5] "Despite adopting what is commonly known as promissory estoppel as part of its jurisprudence, Massachusetts eschews the label 'promissory estoppel.'" Neuhoff, 370 F.3d at 203 n.1; see also Loranger, 384 N.E.2d at 179 (holding that "when a promise is enforceable in whole or in part by virtue of reliance, it is a 'contract,' and it is enforceable pursuant to a 'traditional contract theory' antedating the modern doctrine of consideration"); Rhode

Application of promissory estoppel precludes the defendant from asserting the statute of frauds as a defense and denying its promise. Cellucci v. Sun Oil Co., 320 N.E.2d 919, 923 (Mass. App. Ct. 1974), aff'd, 331 N.E.2d 813 (Mass. 1975). The Debtor can establish the elements of promissory estoppel.

First, Iroquois Fund promised to make a second loan of $1.875 million under the same terms as the initial $2.5 million loan if the Debtor met the three milestones described above. This promise was meant to induce the Debtor to spend money to achieve the milestones, and it did, in fact, induce the Debtor to spend money and deplete its cash to achieve the milestones. Second, the Debtor's reliance was reasonable given the Debtor's prior discussions with Iroquois Fund in which the parties contemplated from the beginning that there would be two separate loans with a total loan value of $4.375 million. The Debtor's reliance is even more reasonable given that the SPA contained an Additional Investment Right, and the Debtor had already paid a commission to FTN Midwest based on a total loan amount of $4.375 million. Third, given Iroquois Fund's extortionate conduct, enforcement of its promise is necessary "to avoid injustice." Iroquois Fund should not be allowed to pull a "bait and switch" on Vaso or any other unsuspecting company to whom it loans money.

Iroquois Fund argued in the New York Lawsuit that it was "unreasonable" for the Debtor to rely on its promise to make an additional loan of $1.875 million. See Iroquois Fund's Reply Brief in the New York Lawsuit at 6. However, the circumstances in this case made it perfectly reasonable for the Debtor to rely on Iroquois Fund's promise. As described above, Iroquois Fund's initial proposal called for a loan of $4.375 million to the Debtor. Iroquois Fund later decided to loan the $4.375 million to the Debtor in two separate tranches of $2.5 million and

---

Island Hosp. Trust Nat'l Bank v. Varadian, 647 N.E.2d 1174, 1179 (Mass. 1995) ("an action based on reliance is equivalent to a contract action, and the party bringing such an action must prove all the necessary elements of a contract other than consideration").

$1.875 million.  In addition, the Debtor paid a commission to FTN Midwest based on a total loan value of $4.375 million.  Based on these facts, the Debtor reasonably expected that Iroquois Fund would follow through on its promise to make the additional loan if the Debtor achieved the milestones, rather than trying to extort changes in the conversion price of the existing contracts between the parties.

Courts have found a party's reliance to be reasonable in similar circumstances.  See Loranger, 384 N.E.2d at 179 (holding that general contractor reasonably relied on subcontractor's oral promise to provide movable steel partitions at the quoted price); Greenstein v. Flatley, 474 N.E.2d 1130, 133-34 (Mass. App. Ct. 1985) (holding that plaintiffs, who were members of a CPA firm, reasonably relied on the oral promise of defendant owner of an office building to lease an office to them); Cellucci, 320 N.E.2d at 923 (holding that plaintiff seller of land reasonably relied on the defendant oil company's oral promise to buy the land); Neuhoff, 370 F.3d at 203-05 (reversing summary judgment and holding that defendant manufacturing company could have reasonably expected the plaintiffs to rely on its oral promise to replace decaying windows); Olin Aegis v. Finnegan, 2002 U.S. Dist. LEXIS 2339, at *9-11 (D. Mass. Feb. 12, 2002) (holding that employee reasonably relied on company's oral promise to dismiss lawsuit if employee gave up employment at competitor of company); Rooney v. Osborne Desk Co., 645 N.E.2d 50, 51-52 (Mass. App. Ct. 1995) (holding that plaintiff employee reasonably relied on defendant employer's promise to issue stock).

3.    *Unfair and Deceptive Acts in Violation of Massachusetts General Laws Chapter 93A, § 11.*

Iroquois Fund also is liable for a violation of Massachusetts General Laws Chapter 93A, § 11 (hereinafter, "Chapter 93A"), which prohibits unfair and deceptive acts and practices and provides for the recovery of treble damages and attorney's fees.  Chapter 93A provides a cause

of action to "[a]ny person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice." Mass. Gen. Laws ch. 93A, § 11. A successful plaintiff is entitled to actual damages, but if the defendant's conduct was "willful or knowing," the plaintiff is entitled to "up to three, but not less than two, times" the amount of the plaintiff's actual damages. Id.

The Supreme Judicial Court of Massachusetts "has underscored the broad impact of c. 93A as creating 'new substantive rights' and providing relief that is in addition to, and not in lieu of, traditional contract and tort remedies. Datacomm Interfacts, Inc. v. Computerworld, Inc., 489 N.E.2d 185, 197 (Mass. 1986) (quoting Linthicum v. Archambault, 398 N.E.2d 482, 485 (Mass. 1979)). Unfair conduct is defined broadly under Chapter 93A:

> The statutory criteria for unfair conduct are whether it lies 'within at least the penumbra of some common-law, statutory, or other established concept of unfairness; . . . whether it is immoral, unethical, oppressive, or unscrupulous; [and] . . . whether it causes substantial injury to consumers[,] competitors[,] or other business [entities].'

Renovator's Supply, Inc. v. Sovereign Bank, 892 N.E.2d 777, 786-87 (Mass. App. Ct. 2008) (quoting PMP Assocs. v. Globe Newspaper Co., 321 N.E.2d 915, 917 (Mass. 1975)).

"One of the more specific categories of unfairness developed by the case law consists of coercive or extortionate tactics designed to extract undeserved concessions from other business entities or consumers." Id. at 787. Thus, "[c]onduct in disregard of known contractual arrangements and intended to secure benefits for the breaching party" constitutes an unfair act or practice under Chapter 93A. Anthony's Pier Four, Inc. v. HBC Assoc., 583 N.E.2d 806, 821 (Mass. 1991). "[T]he use of a breach of contract" in this fashion, "as a lever to obtain advantage for the party committing the breach in relation to the other party," constitutes a violation of

Chapter 93A because it "has an extortionate quality that gives it the rancid flavor of unfairness." Atkinson v. Rosenthal, 598 N.E.2d 666, 670 (Mass. App. Ct. 1992).

For example, the Massachusetts Appeals Court has held a company liable under Chapter 93A for terminating a marketing agreement in order to compel the plaintiff to accept lower commissions. Clamp-All Corp. v. Foresta, 763 N.E.2d 60, 73 (Mass. App. Ct. 2002). Similarly, in Pepsi-Cola Metro. v. Checkers, Inc., 754 F.2d 10 (1st Cir. 1985), where the defendant withheld payment due under a contract not because of a dispute over liability or inability to pay, but rather as a "'wedge' against [the plaintiff] to enhance [the defendant's] bargaining power for more product," the court found commercial extortion in violation of Chapter 93A and affirmed the award of treble damages. Id. at 17-19.

The extortionate conduct giving rise to Chapter 93A liability in Clamp-All and Pepsi-Cola Metro is precisely the kind of conduct engaged in by Iroquois Fund. Not only did Iroquois Fund breach a contract to make a second loan of $1.875 million to the Debtor, but it did so in an attempt to extract more favorable terms on its *existing contract* with the Debtor, demanding that the Debtor renegotiate the conversion prices in the Notes, Additional Investment Right, and Warrant. This would have allowed Iroquois Fund and the other Noteholders to take over the Debtor, and the circumstances strongly suggest this was Iroquois Fund's intent. Iroquois Fund then compounded the problem that it created by refusing to consent to the revised deal with Cornell Capital Partners, which would have provided crucial additional funding to the Debtor. Iroquois Fund's refusal was intended to put the Debtor in a "no win" Catch-22 position by forcing the Debtor to either agree to new and onerous loan terms with Iroquois Fund or face the threat of bankruptcy. As set forth above, Iroquois Fund's refusal was unreasonable given that Cornell's status as a junior secured creditor would not affect the Noteholders' position as a

senior secured creditor or dilute their potential holdings of Vaso common stock in the event that they exercised the right of conversion.  See, supra, SOF §§ IV, V.  Iroquois Fund's extortionate conduct violated Chapter 93A and exposes it to multiple damages and attorney's fees.[6]

**B.**   **The Debtor's Likely Recovery on its Claims Against Iroquois Fund Will Be Substantial and Offset Any Recovery by Iroquois Fund in this Bankruptcy Proceeding.**

Iroquois Fund's wrongful conduct was a direct and substantial cause of the Debtor's inability to achieve success.  The Debtor needed the additional funding to manufacture and market its products adequately since it did not have the ability to raise money through another public offering and its existing cash was spent and depleted.  Without the additional funding and commensurate ability to manufacture and market its products, the Debtor had no means to convince retailers to carry its products in the first place.[7]

At the time they signed the SPA, Vaso and Iroquois Fund projected that Vaso would be a successful company.  See, supra, SOF § III.

Accordingly, the Debtor's recovery on its claims against Iroquois Fund in the Massachusetts Lawsuit is likely to be substantial.  In addition, given its intentional and bad faith conduct, Iroquois Fund may be liable for treble damages and attorney's fees under Chapter 93A. Accordingly, the Debtor's recovery against Iroquois Fund likely will exceed any possible recovery by Iroquois Fund in this bankruptcy proceeding.

---

[6] Any prior claims by Iroquois Fund that the Massachusetts court has no personal jurisdiction over Iroquois Fund and is an improper venue for Vaso's claims are not only wrong, but also will be rendered moot once the Massachusetts Lawsuit is transferred by the parties to this Court.

[7] Iroquois Fund makes the false claim in its Motion that "the SEC problems forced the Debtor to shut down." Motion at 2.  This statement ignores the actual timeline of events.  Vaso settled the SEC lawsuit in August 2004 – one year *before* Iroquois Fund and the Noteholders agreed to loan money to Vaso in August 2005.  Similarly, the follow-on shareholder lawsuits already had been filed against Vaso at the time that Iroquois Fund and the Noteholders signed the SPA and were settled for $1.1 million one month later in September 2005.  Armed with this knowledge, both Vaso and Iroquois Fund nevertheless projected that Vaso would be a successful company.  Iroquois Fund's own investment in Vaso is conclusive proof of this.  Accordingly, Iroquois Fund's litigation-driven claim that "SEC problems" forced Vaso to shut down is simply wrong.

**C. Iroquois Fund and the Other Noteholders Will Not Have Control Over the Debtor's Plan of Reorganization.**

In the Motion, the Noteholders argue that it would be impossible for the Debtor to confirm a plan of reorganization. See Motion at p. 12. However, the Noteholders' argument depends on the Noteholders actually having an allowed claim against the Debtor. The numerous claims that the Debtor has against Iroquois Fund and the other Noteholders likely will result in the Noteholders' claims being substantially reduced or even eliminated. As a result, the Noteholders do not have the level of control over the plan that they claim to have in the Motion.

## CONCLUSION

As set forth above, the Motion should be denied for the following reasons:

1. The Noteholders fail to establish cause for conversion of the case to Chapter 7.

2. The conversion of the case clearly is not in the best interests of creditors.

3. The Debtor has significant claims against Iroquois Fund and the other Noteholders that will result in their claims against the estate being reduced or eliminated, such that the Noteholders will not be able to block confirmation of the Debtor's plan of reorganization.

Accordingly, the Debtor respectfully requests that the Court deny the Noteholders' Motion to Convert the Debtor's Case to Chapter 7 of the Bankruptcy Code.

/s/ Christopher M. Winter
Michael R. Lastowski (DE 3892)
Christopher M. Winter (DE 4163)
Duane Morris LLP
1100 North Market Street, Suite 1200
Wilmington, DE 19801-1246
(302) 657-4942
mrlastowski@duanemorris.com
cmwinter@duanemorris.com

and

Thomas H. Curran
Eric D. Levin
Jennifer V. Doran
Hinckley, Allen & Snyder LLP
28 State Street
Boston, MA  02109
(617) 345-9000
tcurran@haslaw.com
elevin@haslaw.com
jdoran@haslaw.com

*Attorneys for the Debtor and*
*Debtor in Possession*

Date:  April 26, 2010