**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Vaso Active Pharmaceuticals, Inc., | Case No. 10-10855 (CSS) |
| Debtor. | |
| | Ref. No. 74 |

## OBJECTION OF SECURED NOTEHOLDERS TO THE DEBTORS' DISCLOSURE STATEMENT, PURSUANT TO 11 U.S.C. § 1125, WITH RESPECT TO CHAPTER 11 PLAN OF VASO, PHARMACEUTICALS, INC.

Iroquois Master Fund, individually and as agent ("Iroquois") for the Class 1 Secured Lenders , by and through its undersigned co-counsel, submits this objection (the "Objection") pursuant to Rule 3017(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") to the above referenced Debtor's Disclosure Statement (the "Disclosure Statement"), Pursuant To 11 U.S.C. § 1125, Relating To the Chapter 11 Plan Of Vaso Active Pharmaceuticals, Inc. (the "Plan"). In support of the Objection, Iroquois respectfully states as follows:

### HISTORY OF THE CASE

1.      Vaso Active Pharmaceuticals, Inc. ("Vaso") filed this voluntary Chapter 11 case on March 11, 2010. As the Court is aware, Vaso and the Noteholders, its senior secured creditors, engaged in significant litigation both before and after the filing of this case. Prior to the Chapter 11 filing, on January 28, 2010, Vaso filed a case against Iroquois in Massachusetts state court relating to certain loan documents between Vaso and the Noteholders. On February 5, 2010, the Noteholders obtained a temporary restraining order in New York state court directing that Vaso was restrained from disbursing certain settlement funds that were its primary

assets. The parties were set to attend a preliminary injunction hearing in the New York action on March 12, 2010. However, Vaso filed for Chapter 11 bankruptcy protection on the eve of the preliminary injunction hearing, during the evening of March 11, 2010.

2.      After the bankruptcy filing, on March 31, 2010, the Noteholders filed a motion to convert this case to Chapter 7. On April 5, 2010, Vaso filed a summary judgment motion asking this Court to find that the Noteholders had no security interest in the settlement funds that were at issue in the New York action. As of May 20, 2010, both motions were fully briefed. On May 21, 2010, the date on which a hearing was scheduled before this Court relating to both motions, Vaso and the Noteholders reached a global settlement of all outstanding cases and motions, which settlement was approved by Order of the Court dated June 7, 2010 (the "Stipulation and Order of Settlement").

3.      Several representations that Vaso made during the briefing of these motions and settlement negotiations were essential to the Noteholders' acceptance of the settlement. For example:

- Vaso represented that it would file a proposed plan of reorganization on or before July 31, 2010. (See Docket No. 69, Stipulation and Order of Settlement, ¶ 7.)

- Vaso represented that its proposed plan of reorganization would not include any releases of potential claims against insiders, and would instead provide for the formation of a creditors' trust and the appointment of an independent trust administrator charged with investigating any preference or fraudulent transfer claims that the estate may have and pursuing any transfer claims on behalf of creditors. (See Docket No. 40, Vaso Opposition to Motion to Convert, pp. 10-11;

Docket No. 54, Vaso Sur-Reply in Support of Opposition to Motion to Convert, p. 6.)

- Vaso and its key members of management, John Masiz and Joe Frattaroli, additionally represented that they had not and would not fraudulently transfer outside the reach of creditors any of their assets, including but not limited to the cash payments totaling more than $900,000 that they received from Vaso in December 2009 from the settlement funds that were Vaso's primary assets. (See Docket No. 69, Stipulation and Order of Settlement, ¶ 9.)

4.      Despite these representations, Vaso hastily filed its proposed plan of reorganization only one and a half hours before the midnight deadline on Saturday, July 31, 2010, without giving the Noteholders or any other creditors the opportunity to review the proposed plan ahead of time or an opportunity to engage in any meaningful negotiations. Additionally, directly contrary to Vaso's representations to this Court in its briefs and to the Noteholders in the Stipulation and Order of Settlement, the proposed plan of reorganization specifically provides for releases of claims against insiders. (See Docket No. 74, Disclosure Statement at § 11.18.)

## PRELIMINARY STATEMENT

5.      The Debtors have offered up a Plan and Disclosure Statement that have been hastily assembled in order to meet a court imposed deadline, and the Disclosure Statement lacks basic information that is required under the Bankruptcy Code. The Plan is premised on a fantastic set of facts, each with little or no detail of disclosure other than conclusory statements and allegations. The Disclosure Statement also describes a patently unconfirmable plan, and the Court should not approve the Disclosure Statement as a result.

YCST01:10090389.1

069382.1001

## THE PLAN AND DISCLOSURE STATEMENT

6.      The Disclosure Statement reveals that the Plan will be implemented through a "reverse merger" of a developmental stage company into the Debtor.  The Debtor will merge into BEE Medical Corporation ("BEE") through a reverse merger transaction, with BEE remaining the surviving entity and the Reorganized Debtor.  (Disclosure Statement at p.5).

7.      According to the "Business Plan" attached to the  Disclosure Statement as Exhibit B,  BEE is "an early stage medical device company" which appears to have no meaningful (if any) revenues or profits.  BEE has purportedly developed certain intellectual property which it intends on commercializing.  The Business Plan states that BEE's devices require FDA approval. No such approvals have been obtained, and the Disclosure Statement fails to adequately discuss the nature of FDA approvals, costs, or risk factors associated thereto.  However, the Business Plan asserts that BEE expects to receive final FDA approval in the "first quarter of 2011."

8.      In the Business Plan, BEE states that it requires the completion of a $5 million capital raise and thereafter it "intends to merge BEE with and into a publicly traded shell company as soon as possible…".  That "shell" is the Debtor.

9.      The Debtor's disclosures on the $5 million capital raise are inadequate.  Debtor reveals that that the merger will be financed with a $5 million "Merger Loan" obtained through "private investment sources" which will then become convertible into shares in the Reorganized Debtor (Disclosure Statement at p.11).  No disclosure is made as to who these "private investment sources" are, whether these funds have been committed, when they will be committed, or under what terms.  These disclosure items are simply essential to any creditor wishing to make an informed decision about the Plan, its feasibility, and creditor recoveries.

10.     Upon obtaining the $5 million merger loan and BEE reverse merging into the Debtor's "shell", the Debtor proposes to (i) issue 7,419,381 shares, into a Creditors Trust[1] for certain creditors; (ii) 2,914,392 shares will be issued to existing pre-petition equity holders, and (iii) 8,607,170 shares will be issues to Biochemics, Inc. an affiliated entity that owns 43% of the Debtor's equity interests.  (Disclosure Statement at p.10).  The New Common Stock to be issued to the Creditors Trust will thereafter be part of a inadequately described "10b5-1 Trading Plan" whereby the New Common Stock to be issued "in the Creditor Trust for a period of 18 months, after which the New Common Stock will be liquidated…and the proceeds of such sales hall be distributed to holders of Allowed Claims against the Debtor on a Pro Rata basis monthly." (Disclosure Statement at p.11).  No further meaningful disclosures are made.

11.     The Disclosure Statement at page 7 describes that the Class 1 Secured Lender Claims will receive "payment in cash equal to the value of the Collateral Securing such Secured Lender Claim."  The Disclosure Statement does not indicate what the value of the Collateral is, making it virtually impossible for the creditors in Class 1 to make an informed decision about the Plan.  The Plan attached to the Disclosure Statement provides that the Class 1 Secured Lender Claims are "allowed in the amount of $_____, which equal to the value of the Collateral securing the Secured Lender Claim."  (Plan Section 4.2.1).  No disclosure is made as to the value of this Collateral, nor is any disclosure made as to how or when the Debtor proposes to value the Collateral.

12.     Class 3 Secured Lender Deficiency Claims are described to received a pro-rata interest in the Creditor Trust New Common Stock Pool.  The Disclosure Statement  estimates recovery for this class at 100%, however, again this is based on the above merger transaction, the

---

[1] The Creditors Trustee is not an independent party, but will be the Reorganized Debtor.  See, Disclosure Statement at p.25

value of the stock being issued, feasibility of the newco entity and legality of the so called "10b5-1 Trading Plan". It is simply incongruous to require secured creditors to received stock subject to such a "trading plan" with an 18 month lock up, declare such secured creditors "unimpaired" while existing equity holders and affiliates of the Debtor receive significantly more stock in the Reorganized Debtor without such a lock up period or "trading plan". Again, the Disclosure Statement fails to address any of these issues or facts.

13.     Section 11.18 of the Disclosure statement provides for Releases by the Debtor of estate claims and by holders of Claims, individual releases against any claims that may be asserted against the Released Parties, and corresponding injunctions. The Released Parties include "the officers and director of the Debtor…". No disclosure is made as to (i) the propriety of such releases, (ii) the amount of funds the officers or other insiders were paid on account of old debts in the weeks leading to the Petition Date or (iii) what circumstances changed from the Debtors earlier pleadings, which represented to the Court that no releases to insiders would be given and that claims against such parties would be commenced.

14.     Additionally, as set forth in paragraph 3 above, the Debtor previously represented that its proposed plan of reorganization would not include any releases of potential claims against insiders, and would instead provide for the formation of a creditors' trust and the appointment of an independent trust administrator charged with investigating any preference or fraudulent transfer claims that the estate may have and pursuing any transfer claims on behalf of creditors. The proposed Plan fails to provide for such an independent trust administrator and instead vests that authority in the reorganized Debtor. Accordingly, the Debtor's should be estopped from proposing a plan which is in direct contradiction to what it has previously represented to this Court. Moreover, pursuant to paragraph 9 of the Stipulation and Order,

6

Joseph Frattaroli and John Masiz represented and warranted that they have not or will not fraudulently transfer any or their assets outside the reach of creditors, including without limitation the cash payments that they received from the Debtor from the Settlement Funds in December 2009.  By releasing any claims against Joseph Frattaroli and John Masiz, the Releases essentially the eviscerate those very obligations imposed by paragraph 9 of the Stipulation and Order.

**OBJECTION**

**POINT I**

**THE DISCLOSURE STATEMENT LACKS ADEQUATE INFORMATION**

15.     A disclosure statement may be approved as adequate only if it contains "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan." 11 U.S.C. § 1125(a); See also *In re Zenith Electronics Corp.*, 241 B.R. 92, 99-100 (Bankr. D. Del. 1999) (the disclosure statement must contain information that is "reasonably practicable [to permit an] informed judgment" by holders of claims or interests to vote on the plan).  Courts have ample discretion to determine what constitutes adequate information.  *In re Ionosphere Clubs, Inc.*, 179 B.R. 24, 29 (S.D.N.Y. 1995), *appeal dismissed by, in part, affirmed by, in part*, 184 B.R. 648 (S.D.N.Y. 1995). Although adequacy is determined on a case-by-case basis under a fact-specific flexible standard, *id.*, a disclosure statement must contain "simple and clear language delineating the consequences of the proposed plan on [creditors'] claims and the possible [bankruptcy] code alternatives so that [creditors] can intelligently accept or reject the plan."  *In re Copy Crafters Quickprint, Inc*., 92 B.R. 973, 981 (N.D.N.Y 1988).  A disclosure statement "must clearly and succinctly inform

YCST01:10090389.1                                                                                                    069382.1001

the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution." *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).

16.    As discussed above, the Disclosure Statement does not contain sufficient information to enable a reasonable person to make an "informed judgment about the plan." Indeed, the Disclosure Statement and the Plan contain broad and ambiguous provisions and/or omit critical and material information and facts that (i) may mislead holders of Claims or Interests or (ii) should be available to holders of Claims or Interests. In order to bring the Disclosure Statement into compliance with section 1125(a) of the Bankruptcy Code and to make the Plan potentially confirmable under the Bankruptcy code, the Disclosure Statement and Plan must be modified. Unless and until the Plan and Disclosure Statement are revised, the Disclosure Statement should not be approved.

## POINT II

### THE DISCLOSURE STATEMENT DESCRIBES
### A PATENTLY UNCONFIRMABLE PLAN

17.    As demonstrated below, the Plan is patently unconfirmable, because, among other things, it impermissibly seeks to grant third party releases, modify and release contractual rights among non-debtors in violation of section 524(e) of the Bankruptcy Code and contains other provisions which violate the Bankruptcy Code.

18.    Thus, even if the Disclosure Statement provides adequate information, which it does not, it should not be approved because it describes a plan of reorganization that is unconfirmable on its face and thus should not be approved. *See John Hancock Mutual Life Insurance Co. v. Route 37 Business Park Associates*, 987 F.2d 154, 157 (3d Cir. 1993)*; see also In re Beyond.com*, 289 B.R. 138, 140 (Bankr. N.D. Cal. 2003) (denying approval of disclosure

YCST01:10090389.1                                                                069382.1001

statement where plan can not be confirmed); *In re Phoenix Petroleum Co.,* 278 B.R. 385, 394 (Bankr. D. Pa. 2001) ("if the disclosure statement describes a plan that is so 'fatally flawed' that confirmation is 'impossible,' the court should exercise its discretion to refuse to consider the adequacy of disclosures."); *In re Main Street AC, Inc.*, 234 B.R. 771, 775 (Bankr. N.D. Cal 1999) (noting that it is well accepted that a court may disapprove a disclosure statement, even if it contains adequate information, where plan is not confirmable).

19.    First, the proposed Plan at Section 6.12 and 13.18 contains impermissible releases and injunction provisions.

20.    The Bankruptcy Code provides no authority for the non-consensual release of the obligations of non-debtors and, therefore, the Plan's inclusion of such provisions renders it patently unconfirmable. *See In re Market Square Inn*, 163 B.R. at 68 (denying approval of disclosure statement where plan contained unauthorized non-debtor releases). "While the code expressly alters the contractual obligations of the bankrupt, it does not contemplate the same effect on the obligations and liabilities of third parties to a creditor." *Mellon Bank v. Siegel*, 96 B.R. 505, 506 (E.D. Pa. 1989)(quoted in *First Fidelity Bank v. McAteer*, 985 F.2d 114, 118 (3d Cir. 1993)). The equitable powers of the bankruptcy courts "must and can only be exercised within the confines of the bankruptcy code." *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 108 (1988). Section 105(a) of the Bankruptcy Code does not give bankruptcy courts "the power to create substantive rights that would otherwise be unavailable under the code." *In re Morristown & Erie R.R. Co.*, 885 F.2d 98, 100 (3d Cir. 1989).

21.    Further, the inclusion of third party releases in the Plan violates section 524(e) of the Bankruptcy Code. In applying section 524(e) of the Bankruptcy Code, courts in the Third Circuit have unanimously held, except in extraordinary circumstances plainly not present in this

case, that a bankruptcy court has no authority to release an obligation owing from one non-debtor to another without the individual consent of the party prejudiced by the release. *See, e.g., In re Zenith Elecs. Corp.*, 241 B.R. 92, 111 (Bankr. D. Del. 1999) (release of non-derivative third-party claims against non-debtor "cannot be accomplished without the affirmative agreement of the creditor affected"); *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 506-507 (Bankr. D.N.J. 1997) (holding that section 524(e) of the Bankruptcy Code prohibits the release of a third-party from liability, except where the effected creditor expressly consents to the release and receives consideration in exchange for that agreement); I*n re Market Square Inn, Inc.*, 163 B.R. at 66-68 (denying approval of disclosure statement describing plan containing non-consensual third-party release of plan proponent); *In re West Coast Video Enters.*, 174 B.R. 906, 911 (Bankr. E.D. Pa. 1994) (refusing to enforce releases with respect to movants who did not vote on plan because "each creditor bound by the terms of the [non-debtor] release must individually affirm same, either with a vote in favor of a plan including such a provision, or otherwise").

22.     Chapter 11 plans that contain such third party release provisions cannot be confirmed over the objection of an affected creditor regardless of whether such creditor's class accepts the plan. *See In re Arrowmill Dev. Corp.*, 211 B.R. at 507. ("[i]t is not enough for a creditor to abstain from voting for a plan, or even to simply vote 'yes' as to a plan . . . . Rather the validity of the release . . . hinge[s] upon principles of straight contract law or quasi-contract law rather than upon the bankruptcy court's confirmation order.").

23.     Here, the proposed third party releases would be effectuated without the non-Debtor released parties providing any delineated consideration.  Accordingly, the release provisions in favor of any of  non-Debtor parties are improper.

24.     Although such non-consensual "third party" releases may be approved in rare circumstances where (i) substantial value is provided by the released parties, (ii) substantial distributions are made to all creditors, (iii) a substantial majority of creditors impacted by the release support the plan and (iv) without the release there is little likelihood of success of confirming a plan, this is not one of those cases.  *See In re Continental Airlines*, 203 F.3d 203 (3d Cir. 2000); *In re Zenith Elecs. Corp.*, 241 B.R. 92 (Bankr. D. Del 1999; *See Also In re Global Ocean Carriers, Ltd.,* 251 B.R. 31, 42-43 (Bankr. D. Del. 2000).  Here, the non-Debtor released parties have not provided any consideration to creditors and/or the estates, and the Committee does not support the Plan.  Accordingly, the release provisions in favor of non-Debtors are blatantly improper thereby making the Plan patently unconfirmable.  Consequently, the Disclosure Statement should not be approved.

25.     In *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 606 (Bankr. D. Del. 2001), the court faced a similar release clause which released the debtors' claims against the "officers, directors, employees, financial advisors, professionals, accountants, and attorneys" of the debtors, the appointed statutory committees and the administrative agent under the debtors' secured lender agreements.  The *Genesis Health* court recognized the Third Circuit's holding in *In re PWS Holding Co.,* 228 F.3d 224, 245 (3d Cir. 2000),  that the release could be upheld, but only to the extent that claims released arose post-petition and were not based on willful misconduct or *ultra vires* acts.  *See Genesis Health*, 266 B.R. at 606.

26.     However, where, as here, the release seeks to cover prepetition conduct, the test set forth in *Zenith Electronics* and described above must be satisfied.  Under the facts of this case, the test cannot be satisfied for the same reasons as described above -- the non-Debtor released parties are not making substantial contributions or providing any consideration to

YCST01:10090389.1                                                                                                    069382.1001

general unsecured creditors and there is little, if any, support for the Plan among the general unsecured creditors.

27.     The Plan is likewise unconfirmable given the treatment of the Class 1 Secured Lenders claims.

28.     First, the Plan provides that the Class 1 Secured Lender Claims are "unimpaired". This is incorrect.  Class 1 is not being paid in full and their contractual claims are being substantially altered.  One needs look no further than the fact that the Class 1 claims matured in May 1 2007.  "[A] delay in payment of a claim beyond its contractual maturity date results in impairment."  7 Collier on Bankruptcy 1124.02 (Alan N. Resnick & Harry J. Sommer eds., 16th ed)(citations omitted).  Thus, the Plan violates Bankruptcy Code sections 1124(1) and (2). Indeed, the Plan even contemplates that the Class 1 Secured Lender Claims are impaired, as they will result in a "deficiency" claim and will be placed in Class 3 Secured Lender Deficiency Claims.

29.     The Plan provides that the Class 3 Secured Lender Deficiency Claim (and certain other unsecured classes) will received a pro rata interest in the creditor Trust New Common Stock Pool (defined as 10,328, 603 shares, or 8.62% of the total shares issuable under the Plan). As mentioned above, the Creditor Trust New Common Stock is subject to an 18 month lock up under the vaguely described "10b5-1 Trading Plan" and after such 18 month period, liquidated NOT by the creditors, but by the Reorganized Debtor (as the self anointed Creditor Trustee). Several additional problems arise from such a structure.

30.     First, treatment of the Class 1 Secured Claim (which in impaired, as described above) and treatment of unsecured creditors New Common Stock being held under an 18 month lock up, while equity holders are to receive what appear to be unrestricted shares, violates the

absolute priority rule. Section 1129(b)(2) of the Bankruptcy Code provides that a plan is "fair and equitable" with respect to a dissenting impaired class of unsecured claims if the creditors in the class receive or retain property of a value equal to the allowed amount of their claims or, failing that, no creditor of lesser priority, or shareholder, receives any distribution under the plan.   The Plan, as drafted, violates the absolute priority rule.

31.     Second, even assuming arguendo, one could believe that the Debtor's plan will pay secured and unsecured creditors 100%, by requiring creditors stock to be restricted and held in an 18 month lock up, and only thereafter liquidated and paid monthly on a pro-rata basis, while equity holders stock, and stock being issued to Biochemics is not subject to similar restrictions and harsh treatment, such treatment runs afoul of not only the absolute priority rule, but of equality of treatment principles under the Bankruptcy Code.  There is no legitimate basis to permit secured creditors and unsecured creditors' plan distributions to be held in trust for 18 months,  and thereafter liquidated by the Reorganized Debtor (not the creditors) and paid out "on a Pro Rata basis monthly" while pre-petition equity and affiliates are not subject to such harsh treatment.

YCST01:10090389.1
069382.1001

## CONCLUSION

For all of the above reasons, the Motion to Approve the Debtor's Disclosure Statement should not be approved.

Dated: Wilmington, Delaware  
      August 25, 2010

YOUNG CONWAY STARGATT & TAYLOR LLP

/s/ Donald J. Bowman, Jr.  
Robert S. Brady (No. 2847)  
Donald J. Bowman (No. 4383)  
The Brandywine Building  
10 West Street, 17th Floor  
Wilmington, Delaware 19801  
Telephone: 302.571.6600  
Facsimile: 302.571.1253

-and-

OLSHAN GRUNDMAN FROME ROSENZWEIG & WOLOSKY LLP  
Thomas J. Fleming  
Adam H. Friedman  
Jennifer L. Heil  
Park Avenue Tower  
65 East 55th Street  
New York, New York 10022  
Telephone: 212.451.2300  
Facsimile: 212.451.2222

*Attorneys for Iroquois Master Fund, Ltd.*