IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| In re: | Chapter 11 |
|---|---|
| | Case No. 10-10855 (CSS) |
| Vaso Active Pharmaceuticals, Inc[1]. | |
| Debtor. | |

**FIRST AMENDED DISCLOSURE STATEMENT RELATING TO THE FIRST
AMENDED CHAPTER 11 PLAN OF REORGANIZATION FOR
VASO ACTIVE PHARMACEUTICALS, INC.**

Wilmington, Delaware
August 31, 2010

DUANE MORRIS LLP
Michael R. Lastowski (DE 3892)
Christopher M. Winter (DE 4163)
1100 North Market Street, Suite 1200
Wilmington, Delaware 19801
Telephone:     (302) 657-4900
Facsimile:     (302) 657-4901
mlastowski@duanemorris.com
cmwinter@duanemorris.com

HINCKLEY ALLEN & SNYDER LLP
Thomas H. Curran, Esq. (admitted pro hac vice)
Jennifer V. Doran, Esq. (admitted pro hac vice)
28 State Street
Boston, MA 02109
Telephone:          (617) 345-9000
Facsimile:          (617) 345-9020
tcurran@haslaw.com
jdoran@haslaw.com

---

[1] THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE (THE "BANKRUPTCY COURT") UNDER SECTION 1125(b) OF THE BANKRUPTCY CODE FOR USE IN THE SOLICITATION OF ACCEPTANCES OF THE PLAN DESCRIBED HEREIN. ACCORDINGLY, THE FILING AND DISTRIBUTION OF THIS DISCLOSURE STATEMENT IS NOT INTENDED, AND SHOULD NOT BE CONSTRUED, AS A SOLICITATION OF ACCEPTANCES OF SUCH PLAN. THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON FOR ANY PURPOSE BEFORE A DETERMINATION BY THE BANKRUPTCY COURT THAT THIS DISCLOSURE STATEMENT CONTAINS "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE.

**TABLE OF CONTENTS**

**ARTICLE I      INTRODUCTION** ................................................................1

**ARTICLE II NOTICE TO HOLDERS OF CLAIMS AND EQUITY INTERESTS**.........2

**ARTICLE III EXPLANATION OF CHAPTER 11** ...............................................4

**ARTICLE IV OVERVIEW OF THE PLAN** ........................................................4

    **Section 4.1      Summary of Key Components of the Terms of the Plan**.............................5

    **Section 4.2      Summary of Distributions Under the Plan**.........................................5

**ARTICLE V THE DEBTOR'S BUSINESS AND PRE-PETITION DEBT**.....................10

    **Section 5.1      Overview of the Debtor's Business Operations and Facilities**...................10

    **Section 5.2      Pre-Petition Financing** .........................................................10

**ARTICLE VI EVENTS LEADING TO CHAPTER 11 FILING**..................................11

    **Section 6.1      SEC Issues and Ensuing Litigation** .............................................11

**ARTICLE VII THE REORGANIZED DEBTOR**..................................................11

    **Section 7.1      Certain Restructuring Transactions; Issuance of New Equity Interests and Merger Loan**.................................................................11

    **Section 7.2      Continued Corporate Existence of the Debtor**.........................................15

    **Section 7.3      Revesting of Assets** ............................................................15

    **Section 7.4      Management** ..................................................................15

    **Section 7.5      Initial Boards of Directors** .....................................................15

    **Section 7.6      Officers**.....................................................................16

**ARTICLE VIII INTENTIONALLY OMITTED** ...................................................16

**ARTICLE IX FINANCIAL PROJECTIONS AND ASSUMPTIONS**..............................16

    **Section 9.1      Purpose and Objectives**.........................................................16

    **Section 9.2      Projected Consolidated Financial Statements**.........................................16

**ARTICLE X THE CHAPTER 11 CASE**........................................................18

    **Section 10.1   Commencement of the Chapter 11 Case**.................................................18

    **Section 10.2   Continuation of Business after the Petition Date**.....................................18

    **Section 10.3   Post-Petition Reporting**.........................................................18

    **Section 10.4   The General Claims Bar Date**.....................................................18

    **Section 10.5   Representation of the Debtor**.....................................................18

    **Section 10.6   No Committee Appointed** .........................................................18

**Section 10.7  Exclusivity**................................................................................18

**Section 10.8  Claims Administration**...............................................................19

**ARTICLE XI THE CHAPTER 11 PLAN**.................................................................19

**Section 11.1 Introduction**...............................................................................19

**Section 11.2  General Description of the Treatment of Claims and Equity Interests**19

**Section 11.3  Acceptance or Rejection of the Plan; Effect of Rejection by**.......................22

**Section 11.4  Operations Between the Confirmation Date and the Effective Date**.........23

**Section 11.5  Certain Transactions On the Effective Date**............................................23

**Section 11.6  Causes of Action/Reservation of Rights**..................................................24

**Section 11.7  Causes of Action - No Waiver**...............................................................24

**Section 11.8  Appointment of the Disbursing Agent**...................................................24

**Section 11.9  Sources of Cash for Plan Distributions**...................................................24

**Section 11.10  Distribution Provisions**.......................................................................25

**Section 11.11  Creditor Trust**....................................................................................26

**Section 11.12  Setoffs**..............................................................................................27

**Section 11.13  Procedures for Resolving and Treating Contested Claims**.....................28

**Section 11.14 Conditions Precedent to Confirmation of Plan**.......................................29

**Section 11.15 Conditions Precedent to the Occurrence of the Effective Date**...............30

**Section 11.16 Waiver of Conditions**...........................................................................30

**Section 11.17  Effect of Non-Occurrence of the Effective Date**....................................31

**Section 11.18  INTENTIONALLY OMITTED**..............................................................31

**Section 11.19  Assumption and Rejection of Executory Contracts**................................31

**Section 11.20 Retention Of Jurisdiction**.....................................................................31

**ARTICLE XII RISK FACTORS**...................................................................................32

**Section 12.1  Certain Bankruptcy Considerations**......................................................32

**Section 12.2  The Reorganized Debtor's Actual Financial Results May Vary Significantly from the Projections Included in this Disclosure Statement**..................32

**Section 12.3  Competition, Market Considerations/Volatility and Other Variables**.32

**Section 12.4  Limited Liquidity of New Common Stock**..............................................32

**ARTICLE XIII SECURITIES LAW MATTERS**.............................................................33

**Section 13.1  Issuance of New Securities**..................................................................33

**Section 13.2  Subsequent Transfers of New Common Stock**........................................33

**Section 13.3  Delivery of Disclosure Statement**........................................................35

**Section 13.4  SEC Reporting Requirements** ..................................................................35

**Section 13.5  Transfers of Interests in the New Corporation** .......................................35

**ARTICLE XIV CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES** ...........35

**ARTICLE XV ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF
THE PLAN**  35

**Section 15.1  Liquidation Under Chapter 7 of the Bankruptcy Code** .........................35

**Section 15.2  Alternative Plans of Reorganization** ........................................................36

**ARTICLE XVI CONCLUSION** ...........................................................................................1

# ARTICLE I
## INTRODUCTION

All capitalized terms used in this Disclosure Statement and not otherwise defined herein shall have the meanings ascribed thereto in the Plan (see Article I of the Plan entitled "Definitions and Interpretations").

THIS DISCLOSURE STATEMENT INCLUDES AND DESCRIBES THE FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION, DATED AUGUST 31, 2010 (THE "PLAN"), A COPY OF WHICH IS ATTACHED AS <u>EXHIBIT A</u>, FILED BY VASO ACTIVE PHARMACEUTICALS, INC. (THE "<u>DEBTOR</u>").

HOLDERS OF CLASS 1 – SECURED LENDER CLAIMS ARE UNIMPAIRED AND ARE DEEMED TO HAVE ACCEPTED THE PLAN. CLASS ACTION NOTEHOLDER CLAIMS ARE IMPAIRED AND THUS ENTITLED TO VOTE THEIR CLAIMS IN CLASS 2 TO ACCEPT OR REJECT THE PLAN. HOLDERS OF SECURED LENDER DEFICIENCY CLAIMS ARE IMPAIRED AND THUS ENTITLED TO VOTE THEIR CLAIMS IN CLASS 3 TO ACCEPT OR REJECT THE PLAN. HOLDERS OF GENERAL UNSECURED CLAIMS ARE IMPAIRED AND THUS ENTITLED TO VOTE THEIR CLAIMS IN CLASS 5 TO ACCEPT OR REJECT THE PLAN. CLASS 6 COMMON CLASS A VASO ACTIVE EQUITY INTERESTS ARE IMPAIRED AND THUS ARE ENTITLED TO VOTE THEIR INTERESTS IN CLASS 7 TO ACCEPT OR REJECT THE PLAN.

CLASS 4 - PRIORITY CLAIMS ARE UNIMPAIRED UNDER THE PLAN AND ARE THEREFORE DEEMED TO HAVE ACCEPTED THE PLAN. CLASS 6 COMMON CLASS B VASO ACTIVE EQUITY INTERESTS ARE NOT ENTITLED TO A DISTRIBUTION UNDER THE PLAN AND ARE DEEMED TO HAVE REJECTED The PLAN.

ACCORDINGLY, THE DEBTOR IS SOLICITING ACCEPTANCES OF THE PLAN FROM THE HOLDERS OF IROQUOIS FUND SECURED CLAIMS IN CLASS 1, CLASS ACTION NOTEHOLDER CLAIMS IN CLASS 2, SECURED LENDER DEFICIENCY CLAIMS IN CLASS 3, GENERAL UNSECURED CLAIMS IN CLASS 5 AND COMMON CLASS A VASO ACTIVE EQUITY INTERESTS IN CLASS 7. THE DEBTOR IS NOT SOLICITING ACCEPTANCES FROM THE HOLDERS OF PRIORITY CLAIMS IN CLASS 4 AND COMMON CLASS A VASO ACTIVE EQUITY INTERESTS IN CLASS 6.

THE DEBTOR BELIEVES THAT THE PLAN IS IN THE BEST INTEREST OF AND PROVIDES THE HIGHEST AND MOST EXPEDITIOUS RECOVERIES TO HOLDERS OF ALL CLASSES OF CLAIMS. ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN ARE URGED TO VOTE IN FAVOR OF THE PLAN. TO BE COUNTED, YOUR BALLOT MUST BE DULY COMPLETED, EXECUTED AND RECEIVED BY 4:00 P.M., EASTERN STANDARD TIME, ON SEPTEMBER [__], 2010 (THE "<u>VOTING DEADLINE</u>").

**FOR YOUR ESTIMATED DISTRIBUTION, IF ANY, UNDER THE PLAN, PLEASE SEE THE CHART SET OUT IN "OVERVIEW OF THE PLAN – SUMMARY OF DISTRIBUTIONS UNDER THE PLAN."**

## ARTICLE II
### NOTICE TO HOLDERS OF CLAIMS AND EQUITY INTERESTS

The purpose of this Disclosure Statement is to enable you, as a creditor whose Claim is impaired under the Plan, to make an informed decision in exercising your right to accept or reject the Plan.

**THIS DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN. PLEASE READ THIS DOCUMENT WITH CARE.**

**PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN AND TO THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL GOVERN.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION ("SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS OF THE DEBTOR SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.**

**AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS**

**AGAINST, OR EQUITY INTERESTS IN, THE DEBTOR AND DEBTOR IN-POSSESSION IN THIS CASE.**

On [_____], 2010, after notice and a hearing, the Bankruptcy Court issued an order (the "Disclosure Statement Order") approving the Disclosure Statement because it contains information of a kind, in sufficient detail, and adequate to enable a hypothetical, reasonable investor typical of the solicited class of Claims of the Debtor to make an informed judgment with respect to the acceptance or rejection of the Plan (a true and correct copy of the Plan is annexed hereto as **Exhibit A**). The Disclosure Statement Order and the order approving solicitation procedures should be referred to for details regarding the procedures for the solicitation of votes on the Plan. **APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT OF THE FAIRNESS OR MERITS OF THE PLAN OR OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.**

Each holder of a Claim entitled to vote to accept or reject the Plan should read this Disclosure Statement and the Plan in their entirety before voting. No solicitation of votes to accept or reject the Plan may be made <u>except</u> pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code. No Person has been authorized to use or promulgate any information concerning the Debtor, its business, or the Plan other than the information contained in this Disclosure Statement and if given or made, such information may not be relied upon as having been authorized by the Debtor. You should not rely on any information relating to the Debtor, its business, or the Plan other than the information contained in this Disclosure Statement and the exhibits hereto.

After carefully reviewing this Disclosure Statement, including the attached exhibits, if you are entitled to vote to accept or reject the Plan, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed ballot (the "<u>Ballot</u>") for acceptance or rejection of the Plan and return the same to the address set forth on the Ballot, in the enclosed, postage prepaid, return envelope so that it will be received by the Debtor no later than the Voting Deadline.

**DO NOT RETURN ANY OTHER DOCUMENTS WITH YOUR BALLOT**

You may be bound by the Plan if it is accepted by the requisite holders of Claims even if you do not vote to accept the Plan, or if you are the holder of an unimpaired Claim.

Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a Confirmation Hearing on **[_____], 2010 at _____ [_].m.,** Eastern Time, before the Honorable Christopher S. Sontchi, United States Bankruptcy Judge. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed and served on or before **[_____], 2010 at 4:00 p.m.** Eastern Standard Time, in the manner described in the related order.

**THE DEBTOR SUPPORTS CONFIRMATION OF THE PLAN AND URGES ALL HOLDERS OF IMPAIRED CLAIMS AND INTERESTS TO ACCEPT THE PLAN**

### ARTICLE III
### EXPLANATION OF CHAPTER 11

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code, pursuant to which a debtor-in-possession may reorganize its business. The formulation of a plan of reorganization is the principal purpose of a chapter 11 case. The plan sets forth the means for satisfying the holders of claims against and interests in the debtor's estate.

Although referred to as a plan of reorganization, a plan may provide anything from a complex restructuring of a debtor's business and its related obligations to a simple liquidation of a debtor's assets. In either event, upon confirmation of the plan, it becomes binding on a debtor and all of its creditors and equity holders, and the obligations owed by a debtor to such parties are compromised and exchanged for the obligations specified in the plan.

After a plan of reorganization has been filed, the holders of impaired claims against and interests in a debtor may be permitted to vote to accept or reject the plan, although impaired Equity Interests in the Debtor are not permitted to vote here. Before soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires the proponent of a plan to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. **This Disclosure Statement is presented to holders of Claims against and Equity Interests in the Debtor to satisfy the requirements of section 1125 of the Bankruptcy Code in connection with the solicitation of votes by the Debtor on the Plan.**

The bankruptcy court may confirm a plan of reorganization even though fewer than all of the classes of impaired claims and equity interests accept such plan. For a plan of reorganization to be confirmed, despite its rejection by a class of impaired claims or equity interests, the plan must be accepted by at least one class of impaired claims (determined without counting the vote of insiders) and the proponent of the plan must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each impaired class of claims or equity interests that has not accepted the plan. **The Plan has been structured so that it will satisfy the foregoing requirements as to any rejecting class of Claims or Equity Interests and can therefore be confirmed, if necessary, over the objection of any (but not all) classes of Claims and any or all classes of Equity Interests.**

### ARTICLE IV
### OVERVIEW OF THE PLAN

The Plan provides for the treatment of Claims against and Equity Interests in the Debtor in the case of In re Vaso Active Pharmaceuticals, Inc., Chapter 11 Case No. 10-10855 (CSS).

**Section 4.1     Summary of Key Components of the Terms of the Plan.**

The Plan implements and is built around the following key elements:

(a)     The Debtor will merge into Boston Endoscopic Engineering Corporation, also known as BEE™ Medical Corp., and be reorganized from and after the Effective Date, and Boston Endoscopic Engineering Corporation, also known as BEE™ Medical Corp., as the surviving entity shall be the Reorganized Debtor.

(b)     As set forth in Section 4.8 of the Plan, all of the Common Class A Vaso Active Equity Interests shall be returned to the Debtor.  As of the Effective Date, the Reorganized Debtor shall issue shares in the Reorganized Debtor Common Class A Vaso Active Equity Interests, which shares shall be held with respect to the Common Class A Vaso Active Equity Interests for at least twenty-four (24) months by the Creditor Trustee.  The amount of New Common Stock issued to the Creditor Trust with respect to the Common Class A Vaso Active Equity Interests shall be one (1) share of New Common Stock for every two (2) shares of Common Class A Vaso Active Equity Interests returned to the Debtor.  The Creditor Trustee shall first liquidate shares of New Common Stock in the Creditor Trust relating to Allowed General Unsecured Claims, and if the proceeds of such shares of New Common Stock are equal to or greater than the value of the Allowed General Unsecured Claims, then the Creditor Trustee shall, upon the expiration of the twenty-four (24) month lock-up period, distribute the shares of New Common Stock in the Creditor Trust relating to the Common Class A Vaso Active Equity Interests, Pro Rata, to the Common Class A Vaso Active Equity Interests.  If the proceeds of such shares of New Common Stock are less than the value of the Allowed General Unsecured Claims, then the Creditor Trustee shall commence, upon the expiration of the twenty-four (24) month lock-up period, to liquidate the shares of New Common Stock in the Creditor Trust relating to the Common Class A Vaso Active Equity Interests and distribute such proceeds, Pro Rata, to holders of Allowed General Unsecured Claims until such Claims are satisfied in full, and the remaining shares of New Common Stock, if any, shall be distributed Pro Rata to holders of Common Class A Vaso Active Equity Interests.

(c)     All of the Common Class B Vaso Active Equity Interests shall be cancelled and returned to the Debtor as of the Effective Date, and the holders of Common Class B Vaso Active Equity Interests shall <u>not</u> retain any interest in the Reorganized Debtor.

(d)     Each holder of an Allowed Secured Lender Claim will receive on the Distribution Date, in Full satisfaction of its Allowed Secured Lender Claim, Cash in an amount equal to the value of the Collateral securing the Allowed Secured Lender Claim.

(e)     holders of Claims and Equity Interests will receive Plan distributions and treatment as described herein and as set forth in the Plan.

**Section 4.2     Summary of Distributions Under the Plan.**

The following is a summary of the distributions under the Plan. It is qualified in its entirety by reference to the full text of the Plan, which is attached to this Disclosure Statement as **<u>Exhibit A.</u>**

The claim amounts set forth below are based on information contained in the Debtor's Schedules and reflect what the Debtor believes to be reasonable estimates of the likely resolution of outstanding disputed Claims. The amounts utilized may differ from the outstanding filed claim amounts.

The following chart summarizes the distribution to each class under the Plan:

**UNCLASSIFIED CLAIMS**

| **Types of Claims** | **Treatment of Unclassified Claims** |
| --- | --- |
| Allowed Administrative Claim<br><br>(includes costs of the chapter 11 proceedings for the Debtor and expenses of operation as specified in section 503(b) (including 503(b)(9)) and 507(a)(2) of the Bankruptcy Code including Fee Claims, Claims arising after the Petition Date, obligations with respect to assumed executory contracts and leases, and any outstanding statutory fees. | Except to the extent that a holder of an Allowed Administrative Claim has been paid by the Debtor prior to the Effective Date or agrees to a less favorable treatment, each holder of an Allowed Administrative Claim shall receive, in full and final satisfaction of its Allowed Administrative Claim, a Plan Distribution of Cash in the amount of such holder's Allowed Administrative Claim, without interest, on the Distribution Date or such later date or dates as may be agreed to by the Debtor; provided, however, that an Allowed Administrative Claim representing a liability incurred after the Petition Date in the ordinary course of business by the Debtor may be paid in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions; provided, further, that such treatment will not provide a return to such holder having a present value as of the Effective Date in excess of such holder's Allowed Administrative Claim. **Estimated Recovery: 100% of Allowed Claim.** |
| Allowed Priority Tax Claim (includes all Claims entitled to priority under section 507(a)(8) of the Bankruptcy Code other than Secured Tax Claims). | Except to the extent that a holder of an Allowed Priority Tax Claim has been paid by the Debtor prior to the Effective Date or agrees to a less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction of such holder's Allowed Priority Tax Claim (a) payments in Cash, in regular installments over a period ending on the fifth (5th) anniversary of the Petition Date, of a total value, as of the Effective Date, equal to the Allowed amount |

of such Priority Tax Claim; (b) a lesser amount in one Cash payment as may be agreed upon in writing by such holder and the Debtor; or (c) such other treatment as may be agreed upon in writing by such holder the Debtor. **Estimated Recovery: 100% of Allowed Claim.**

## CLASSIFIED CLAIMS AND INTERESTS

| Types of Claims and Interests | Treatment of Claims and Interests |
| --- | --- |
| Class 1 –Secured Lender Claims | Unimpaired.<br><br>On the Effective Date, or as soon thereafter as practicable, each holder of an Allowed Secured Lender Claim shall receive a payment in Cash equal to the value of the Collateral securing such Secured Lender Claim.<br><br>**Estimated Recovery: 100% of Allowed Secured Claim** |
| Class 2 – Class Action Noteholder Claims | Impaired.<br><br>On the Effective Date, or as soon thereafter as practicable, each holder of an Allowed Class Action Noteholder Claim shall receive its Pro Rata Interest in the Creditor Trust New Common Stock Pool.<br><br>**Estimated Recovery: 100% of Allowed Claim** |
| Class 3 – Secured Lender Deficiency Claim held by Iroquois Fund | Impaired.<br><br>On the Effective Date, or as soon thereafter as practicable, Iroquois Fund shall receive on account of its Allowed Secured Lender Deficiency Claim its Pro Rata Interest in the Creditor Trust New Common Stock Pool.<br><br>**Estimated Recovery: 100% of Allowed Claim** |
| Class 4 – Allowed Priority Claims | Unimpaired.<br><br>Except to the extent that a holder of an Allowed Priority Claim agrees to a different treatment of such |

| | Allowed Priority Claim, each holder shall receive a Plan Distribution of Cash in an amount equal to such Allowed Priority Claim, without interest, on the Distribution Date or such later date or dates as may be agreed to by the Debtor and such holder. **Estimated Recovery: 100% of Allowed Claim.** |
|---|---|
| Class 5 – General Unsecured Claims | Impaired. |
| | Each holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the Creditor Trust New Common Stock Pool. |
| | **Estimated Recovery: At least 100% of Allowed Claim.** |
| Class 6 – Common Class B Vaso Active Equity Interests | Impaired. |
| | On the Effective Date, all Common Class B Vaso Active Equity Interests will be cancelled and extinguished, and the holders of Common Class B Vaso Active Equity Interests will not receive any Plan Distribution, or be entitled to retain any property or interest in property on account of such Common Class B Vaso Active Equity Interests. Holders of Common Class B Vaso Active Equity Interests are required to surrender their certificates or their instruments evidencing ownership of such Common Class B Vaso Active Equity Interests. |
| | **Estimated Recovery: None.** |

| Class 7 - Common Class A Vaso Active Equity Interests | Impaired. |
|---|---|
| | All of the Common Class A Vaso Active Equity Interests shall be returned to the Debtor. As of the Effective Date, the Reorganized Debtor shall issue shares in the Reorganized Debtor Common Class A Vaso Active Equity Interests, which shares shall be held with respect to the Common Class A Vaso Active Equity Interests for at least twenty-four (24) months by the Creditor Trustee. The amount of New Common Stock issued to the Creditor Trust with respect to the Common Class A Vaso Active Equity Interests shall be one (1) share of New Common Stock for every two (2) shares of Common Class A Vaso Active Equity Interests returned to the Debtor. The Creditor Trustee shall first liquidate shares of New Common Stock in the Creditor Trust relating to Allowed General Unsecured Claims, and if the proceeds of such shares of New Common Stock are equal to or greater than the value of the Allowed General Unsecured Claims, then the Creditor Trustee shall, upon the expiration of the twenty-four (24) month lock-up period, distribute the shares of New Common Stock in the Creditor Trust relating to the Common Class A Vaso Active Equity Interests, Pro Rata, to the Common Class A Vaso Active Equity Interests. If the proceeds of such shares of New Common Stock are less than the value of the Allowed General Unsecured Claims, then the Creditor Trustee shall commence, upon the expiration of the twenty-four (24) month lock-up period, to liquidate the shares of New Common Stock in the Creditor Trust relating to the Common Class A Vaso Active Equity Interests and distribute such proceeds, Pro Rata, to holders of Allowed General Unsecured Claims until such Claims are satisfied in full, and the remaining shares of New Common Stock, if any, shall be distributed Pro Rata to holders of Common Class A Vaso Active Equity Interests. |
| | **Estimated Recovery: [100%] of Allowed Claim.** |

# ARTICLE V
## THE DEBTOR'S BUSINESS AND PRE-PETITION DEBT

### Section 5.1    Overview of the Debtor's Business Operations and Facilities.

The Debtor is a Delaware corporation with its headquarters in Danvers, Massachusetts.  It is partially owned and controlled by BioChemics, Inc. ("BioChemics").  The Debtor's business has been commercializing over-the-counter ("OTC") pharmaceutical products developed by BioChemics.  BioChemics owns and develops drug delivery technologies, including a transdermal drug delivery system known as "VALE" (Vaso-Active Lipid Encapsulated) and a topical technology known as PENtoCORE.  Both technologies are novel and represent an advance over other transdermal and topical technologies currently available.

The Debtor has a license (the "License") to market three OTC products formulated by BioChemics.  The License incorporates a marketing and development agreement, under which BioChemics would continue to develop products for the Debtor to market.  The Debtor has determined that further development with respect to the License is no longer a viable business model. The Debtor does not intend to incorporate the License into its business after the Effective Date, and the Plan will constitute a motion to reject the License.  The Debtor no longer intends to distribute the products developed pursuant to the License.

### Section 5.2    Pre-Petition Financing

On August 16, 2005, the Debtor entered into a Securities Purchase Agreement ("SPA") with Iroquois Master Fund, Ltd. ("Iroquois Master Fund"), Smithfield Fiduciary LLC, Rockmore Investment Master Fund, Ltd., Otago Partners LLC, as assignee of RAQ LLC, and Portside Growth and Opportunity Fund (collectively, "Iroquois Fund"), pursuant to which Iroquois Fund loaned $2.5 million to the Debtor.  In exchange, Iroquois Fund received an Additional Investment Right, Senior Secured Convertible Notes (the "Notes"), a Warrant, and a Security Agreement.  Iroquois Master Fund acted as collateral agent with respect to the Notes.[2]  The Notes provided, *inter alia*, that the principal loan amount of $2.5 million was due on May 1, 2007, and that Iroquois Fund had the right to convert the Notes into Vaso common stock at a conversion price of $.70/share.  The Additional Investment Right gave Iroquois Fund the right to loan up to an additional $1.875 million to the Debtor with the right to convert the note for any such additional loan into the Debtor's common stock at a conversion price of $.70/share.  The Warrant gave Iroquois Fund the right to purchase 1,298,701 shares of Vaso common stock at an exercise price of $.77/share.

---

[2] Iroquois Fund was the lead investor in the transaction and loaned $1,125,000 to Vaso.  The Security Agreement designated Iroquois Fund as agent with the power to act on behalf of the other Noteholders.

## ARTICLE VI
## EVENTS LEADING TO CHAPTER 11 FILING

**Section 6.1    SEC Issues and Ensuing Litigation**

The Debtor conducted an initial public offering of stock on the NASDAQ on December 15, 2003.  In connection with the IPO, the Debtor filed a registration statement and prospectus with the Securities and Exchange Commission ("SEC"), which stated, among other things, that the three licensed products that BioChemics had developed had received FDA approval.  The Securities and Exchange Commission ("SEC") began an investigation of the Debtor on or about March 2004 with respect to the Debtor's public statements regarding the status of the FDA approval of the Biochemics' products.  On April 1, 2004, the SEC suspended trading in the Debtor as a result of the public statements regarding FDA approval, all of which had been based on negligent legal advice from the Debtor's former law firm.  In August 2004, the SEC filed a civil action against the Debtor, and the Debtor immediately settled with the SEC.  Numerous follow-on shareholder class action lawsuits were filed against the Debtor in 2004.  In September 2005, the Debtor settled the shareholder suits for $1.1 million in cash, plus $860,000 in two-year, subordinate callable notes that were convertible to the Debtor common stock at $1.75 per share.

In November 2006, the Debtor brought a legal malpractice action against its former law firm in Massachusetts Superior Court (the "Malpractice Litigation").   In December 2009, the Malpractice Litigation settled.  As part of the settlement, the Debtor's former law firm paid $2,500,000 to the Debtor (the "Settlement Funds").  From the Settlement Funds, the Debtor paid deferred wages and other compensation to its employees, John Masiz and Joseph Frattaroli, in the aggregate amount of approximately $900,000.

The Debtor believed that Iroquois Fund breached its obligations to the Debtor, and the Debtor commenced litigation against Iroquois Fund in the Commonwealth of Massachusetts.  On February 4, 2010, Iroquois Fund filed a complaint in New York State Court, in which it claimed, *inter alia*, that it had a perfected security interest in the Settlement Funds.  The Debtor commenced this bankruptcy case to determine the parties' interest in the Settlement Funds and to reorganize its business following years of litigation that had stifled the Debtor's ability to achieve its initial business goals.

## ARTICLE VII
## THE REORGANIZED DEBTOR

**Section 7.1    Certain Restructuring Transactions; Issuance of New Equity Interests and Merger Loan**

(a)       BioChemics, Inc. owns more than 43 percent of the Debtor's equity interests. No other shareholder holds more than 10 percent of the Debtor's equity interests.  The Debtor has issued and outstanding: 10,328,604 shares of Common Stock, consisting of 5,828,604 shares of Common Class A stock and 4,500,000 shares of Common Class B stock (owned by Biochemics).

(b)     Under the Plan, the Common Class A Vaso Active Equity Interests will be returned and exchanged for shares of the Reorganized Debtor to be held by the Creditor Trustee, who shall liquidate and distribute the proceeds of such shares to Common Class A Vaso Active Equity Interests only if Distributions made to holders of Allowed General Unsecured Claims are equal to or greater than one hundred percent (100%) of the value of such Allowed General Unsecured Claims, and the Common Class B Vaso Active Equity Interests will returned and cancelled.

(b)     <u>Corporate Action under the Plan: Certificates of Incorporation and Bylaws.</u>

On or before the Effective Date, the Debtor will cause to be filed a certificate of merger with Boston Endoscopic Engineering Corporation, also known as BEE Medical Corp., a privately-owned Delaware corporation having its principal office in the Commonwealth of Massachusetts (the "Merger Partner"), thereby effectuating a reverse merger of the Debtor into the Merger Partner, with the Merger Partner as the surviving entity. The Merger Partner is an early-stage medical device provider that develops interventional endoscopic devices that are designed to be less invasive than currently available devices. The Merger Partner has sophisticated management and world-renowned clinicians working together to develop and market the next generation of medical devices that are more efficient and less invasive than currently available devices. The devices developed by the Merger Partner are intended for use in gastroenterological, pulmonary and other specialty applications.

Formed in 2008, the Merger Partner has twelve (12) domestic and international patents that relate to its systems, methods and designs. The Merger Partner is in the process of receiving approval from the Food and Drug Administration for its first device, which approval should be issued in early 2011, and the Merger Partner has other products in various stages of development. The Merger Partner's devices are characterized by their efficacy, efficiency, improved functionality and cost-effectiveness.

Research and development is conducted by the Merger Partner in-house. Manufacturing of the Merger Partner's devices will be performed by Creganna-Taxt Medical, a leading device provider. In addition, the Merger Partner is prepared to engage other device manufacturers as demand for its product increases.

At this time, the Merger Partner has ho historical financial data because it is a start-up company in the process of developing its products for market. The Merger Partner expects to commence sales of its first product during the first quarter of 2011, and further develop other products to reach profitability in the future, as more fully set froth in the Business Plan and Projections attached hereto.

The Merger Partner expects to concentrate its sales and marketing efforts in major markets in the United States, including the Northeast, the Southeast, Chicago, Texas and the West Coast. Through strategic partnerships and joint ventures, the Merger Partner shall expand its access to the marketplace. The Merger Partner may employ one or more of the Debtor's current employees, and any such employment shall be further disclosed in the Plan Supplement.

The merger will be financed with $2,000,000 (the "Merger Loan") obtained through a sale of approximately twelve percent (12%) of the Merger Partner's shares made pursuant to a Regulation S safe harbor from the Securities Act of 1933, as amended, in accordance with the terms stated in the Merger Loan Documents. The Merger Loan will be issued in two installments, the first of which shall be paid on October 15, 2010 and the second of which shall be paid on December 15, 2010. The transaction with the Merger Lender, which is based in Malaysia, will also provide international exposure for the Reorganized Debtor and access to new markets.

The Merger Loan will enable the Debtor to consummate the merger, register the shares of the Reorganized Debtor on the Over the Counter ("OTC") market, provide all current information to the SEC and obtain FDA approval for the Reorganized Debtor's first product. Upon the Reorganized Debtor's registration on the OTC market, the Reorganized Debtor will conduct an offering in the amount of $5,000,000 to raise additional capital needed to further develop the Reorganized Debtor's products, obtain FDA approval for additional products and engage a sales and marketing team to sell the products.

The Merger Partner will be the surviving entity following the merger and will constitute the Reorganized Debtor. The Reorganized Debtor will have 86,071,700 shares authorized, of which 8,245,669 shares will be issued to the Creditor Trust for the benefit of certain holders of Claims against the Debtor; 3,230,558 shares will be issued to Creditor Trust and held for at least twenty-four (24) months, after which time such shares shall be distributed to the current holders of Common Class A Vaso Active Equity Interests only if holders of Allowed General Unsecured Claims receive payment in full; and 74,595,473 will be issued to the Merger Partner and will be subject to an eighteen (18) month lock-up period. The Creditor Trustee will begin to sell the initial 8,245,669 shares of New Common Stock eighteen (18) months after the Effective Date and will be tasked with selling such New Common Stock over a period of six (6) months at such times and in such a manner to maximize the value of such shares. After the sale of the initial 8,245,669 shares of New Common Stock and distribution of such proceeds to the holders of Allowed General Unsecured Claims, the Creditor Trustee shall determine the aggregate value received by such holders. If such holders have been paid in full, then the remaining 3,230,558 shares issued to the Creditor Trust with respect to the Common Class A Vaso Active Equity Interests shall be distributed Pro Rata to the Common Class A Vaso Active Equity Interests. If the Allowed General Unsecured Claim holders have not received payment in full, the Creditor Trustee shall liquidate the remaining 3,230,558 shares over a period of six (6) months and distribute the proceeds of such sales Pro Rata to the Allowed General Unsecured Claim holders. If any shares of New Common Stock remain after the holders of Allowed General Unsecured Claims have received payment in full, the remaining shares shall be distributed, Pro Rata to the Common Class A Vaso Active Equity Interests. If no shares remain after payment to holders of Allowed Unsecured Claims, Common Class A Vaso Active Equity Interests will receive no distribution. All liquidations of New Common Stock from the Creditor Trust shall be at the sole discretion of the Creditor Trustee and with the purpose of maximizing the value received by the holders of Allowed Claims against, or Interests in, the Debtor.

A Certificate of Merger will be filed with the Secretary of State of the State of Delaware to effectuate the merger with the Merger Partner. The certificate of incorporation and bylaws of the Debtor will be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code. The Amended Certificate of Incorporation and Amended By-Laws will also include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code provisions (a) creating the New Common Stock, (b) to the extent necessary or appropriate, stating any restrictions on the transfer of the New Common Stock, and (c) to the extent necessary or appropriate, effectuating the provisions of the Plan. The Certificate of Merger, Amended Certificate of Incorporation and the Amended By-Laws shall be filed with the Bankruptcy Court at least five (5) Business Days prior to the Plan Objection Deadline.

On or before the Effective Date, Reorganized Debtor shall file the Amended Certificate of Incorporation with the Secretary of State of the State of Delaware. The Amended By-Laws shall be deemed adopted by the board of directors of the Reorganized Debtor as of the Effective Date.

On the Effective Date, the cancellation of the Common Class B Vaso Active Equity Interests, the authorization and issuance of the New Common Stock, the issuance of New Common Stock to the Creditor Trust and all other matters provided in the Plan involving the corporate and capital structure of the Debtor or the Reorganized Debtor or corporate action by the Debtor or the Reorganized Debtor shall be deemed to have occurred, be authorized, and shall be in effect from and after the Effective Date without requiring further action under applicable law, regulation, order or rule, including any action by the stockholders or directors of the Debtor or the Reorganized Debtor pursuant to section 303 of the General Corporation Law of the State of Delaware. Entry of the Confirmation Order will constitute approval of exhibits, schedules and appendices to the Plan, including the Plan Documents, and the transactions thereunder, subject to the occurrence of the Effective Date.

(c)     Effectuating Documents; Further Transactions

The acting chief executive officer, chief financial officer or any other appropriate officer of the Debtor shall be authorized to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The secretary or assistant secretary of the Debtor shall be authorized to certify or attest to any of the actions specified in the preceding sentence.

(d)     Execution of Documents and Certain Other Actions on or Prior to the Effective Date

The Plan provides that on or prior to the Effective Date, the Reorganized Debtor and the Merger Lender will execute the Merger Loan Documents and such other documents as are contemplated by the Merger Credit Agreement, all of which documents will become effective on the Effective Date, unless otherwise specified.

**Section 7.2    Continued Corporate Existence of the Debtor**

Following confirmation and consummation of the Plan, the Reorganized Debtor will continue to exist in accordance with the laws of the State of Delaware and pursuant to its certificate of incorporation and by-laws, in effect prior to the Effective Date, except to the extent such certificate of incorporation or bylaws are amended pursuant to the Plan or upon or after the Effective Date.

**Section 7.3    Revesting of Assets**

Pursuant to section 1141(b) of the Bankruptcy Code, all property of the Estate of the Debtor, together with any property of the Debtor that is not property of its Estate and that is not specifically disposed of pursuant to the Plan, shall vest in the Reorganized Debtor on the Effective Date without the payment or incursion of transfer tax liability pursuant to section 1146(a) of the Bankruptcy Code. Thereafter, subject to the terms of the Plan (including those of Article IV of the Plan), the Reorganized Debtor may operate its business and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules and the Bankruptcy Court. As of the Effective Date, all property of the Reorganized Debtor shall be free and clear of all Liens, Claims and Equity Interests, except as specifically provided in the Plan, the Confirmation Order or the Merger Loan Documents.

**Section 7.4    Management**

Upon the occurrence of the Effective Date, the management, control, and operation of the Reorganized Debtor shall be the general responsibility of, as applicable, the current board, as set forth in the Reorganized Debtor's governing documents and according to applicable law. Entry of the Confirmation Order shall ratify and approve all actions taken by the Debtor from the Petition Date through and until the Effective Date.

**Section 7.5    Initial Boards of Directors**

The Plan provides that the initial Board of Directors of the Reorganized Debtor shall be comprised of at least six (6) members, of which at least four (4) shall be outside, independent directors (one of whom shall be a financial expert) and two members who shall be actively involved in the business operations of the Reorganized Debtor, one of whom shall be appointed by the Merger Partner and one of whom shall be appointed by Biochemics. The Debtor shall file with the Bankruptcy Court the identities of the initial members on a date not less than five (5) Business Days prior to the Plan Objection Deadline. After the Effective Date, stockholders will elect members of the Board of Directors of the Reorganized Debtor in accordance with the Amended Certificate of Incorporation, Amended By-laws, any stockholders' agreement, and applicable nonbankruptcy law.

### Section 7.6     Officers

The Debtor will provide the identity of each Person that shall serve as the initial officers of the Reorganized Debtor on and after the Effective Date in the Plan Supplement.  The Debtor anticipates that the officers of the Merger Partner shall continue as the officers of the Reorganized Debtor, provided that the Reorganized Debtor shall engage a chief financial officer with public company experience.  The Debtor also anticipates that Joseph Frattaroli, the current President of the Debtor, may be retained by the Reorganized Debtor as an officer and/or employee, but no such agreement has been reached between Mr. Frattaroli and the Merger Partner at this time.  Such officers shall serve in accordance with the by-laws of the Reorganized Debtor, any employment agreement with such Reorganized Debtor and applicable nonbankruptcy law. The Debtor will provide the identity of each Insider that will be employed or retained by the Reorganized Debtor and the nature of any compensation for such Insider in the Plan Supplement.

## ARTICLE VIII
## INTENTIONALLY OMITTED


## ARTICLE IX
## FINANCIAL PROJECTIONS AND ASSUMPTIONS

### Section 9.1     Purpose and Objectives

The Reorganized Debtor's Business Plan Overview (the "Business Plan"), a copy of which is attached hereto as **Exhibit B**, and the Financial Forecast (the "Projections"), a copy of which is attached hereto as **Exhibit C**, serve as the basis for the Plan.  The Debtor believes that the assumptions that underlie the Projections are reasonable under the circumstances.

### Section 9.2     Projected Consolidated Financial Statements

The Projections are prepared on a consolidated basis for the period ending December 31, 2010 through December 31, 2015, assuming the effects of certain transactions that will occur in connection with and upon consummation of the Plan. The Projections, and a summary of significant assumptions related thereto, are attached to this Disclosure Statement as **Exhibit C.**

The Projections indicate that the 8,245,669 shares of New Common Stock held in the Creditor Trust will have a fair market value on the initial Interim Distribution Date that is projected to be between $8,245,669 and $14,429,920.75, based on a projected price per share of $1.00 to $1.75. Based on the Projections, holders of Allowed Claims being satisfied by Pro Rata distributions generated from the New Common Stock held in the Creditor Trust should receive an amount equal to or greater than the value of such Allowed Claims plus interest accruing from the Effective Date at the rate of five percent (5%) per annum.  The issuance of New Common Stock is not distribution of actual value as of the Effective Date, but rather provides the opportunity to receive value in the future if the Projections are met.

The Projections should be read in conjunction with the assumptions, qualifications, and the footnotes to the tables contained in the Projections, the historical consolidated financial information (including the notes and schedules thereto), and the information contained in "Selected Financial Information."

THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TO COMPLYING WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS NOR IN ACCORDANCE WITH U.S. GENERALLY ACCEPTED ACCOUNTING PRINCIPLES. THE DEBTOR'S ACCOUNTANTS HAVE NEITHER EXAMINED NOR COMPILED THE ACCOMPANYING PROSPECTIVE FINANCIAL INFORMATION AND, ACCORDINGLY, DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT THERETO.

THE DEBTOR DOES NOT, AS A MATTER OF COURSE, PUBLISH ITS BUSINESS PLANS AND STRATEGIES OR PROJECTIONS OF ITS ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS. ACCORDINGLY, THE DEBTOR DOES NOT INTEND, AND DISCLAIMS ANY OBLIGATION, TO (1) FURNISH UPDATED BUSINESS PLANS OR PROJECTIONS TO HOLDERS OF CLAIMS OR EQUITY INTERESTS PRIOR TO THE EFFECTIVE DATE, OR TO HOLDERS OF SECURITIES, OR ANY OTHER PARTY AFTER THE EFFECTIVE DATE, (2) INCLUDE SUCH UPDATED INFORMATION IN ANY DOCUMENTS THAT MAY BE REQUIRED TO BE FILED WITH THE SEC, OR (3) OTHERWISE MAKE SUCH UPDATED INFORMATION PUBLICLY AVAILABLE.

THE PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THE PROJECTIONS HAVE BEEN PREPARED BY THE DEBTOR'S MANAGEMENT AND PROFESSIONALS. THESE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE BASED UPON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTOR'S CONTROL. THE DEBTOR CAUTIONS THAT NO ASSURANCES CAN BE MADE AS TO THE ACCURACY OF THE PROJECTIONS OR THE ABILITY OF THE REORGANIZED DEBTOR TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE, AND EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED, OR MAY BE UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER. THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. THE ASSUMPTIONS AND RESULTANT COMPUTATIONS WERE MADE SOLELY FOR PURPOSES OF PREPARING THE PROJECTIONS.

# ARTICLE X
# THE CHAPTER 11 CASE

### Section 10.1  Commencement of the Chapter 11 Case

On March 11, 2010, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

### Section 10.2  Continuation of Business after the Petition Date

From and after the Petition Date, the Debtor has maintained operations with minimal disruption. The Debtor currently has three (3) employees at its headquarters in Danvers, Massachusetts and continues to sell its products through on-line orders.

### Section 10.3  Post-Petition Reporting

The Debtor's employees have been engaged throughout the case in preparing the Debtor's statements of financial affairs and schedules of assets, liabilities, executory contracts, Bankruptcy Rule 2015.3 reports, budgets, monthly operating reports, and responses to various requests from vendors, suppliers, and secured and unsecured creditors.

### Section 10.4  The General Claims Bar Date

On August 9, 2010, the Debtor filed its Motion for Entry of an Order Establishing Bar Dates and Related Procedures for Filing Proofs of Claims and Approving the Form, Manner and Sufficiency of Notice of the Bar Dates pursuant to Fed. R. Bankr. P. 3003 and 9007 (Docket No. 147). On _____, the Court entered the Bar Date Order, establishing, among other things, the general bar date and the bar date for section 503(b)(9) administrative claims as _____. The Bar Date Order established the Bar Date.

### Section 10.5  Representation of the Debtor

The Debtor retained Duane Morris LLP and Hinckley, Allen & Snyder LLP as bankruptcy counsel to the Debtor in connection with the Chapter 11 Case.

### Section 10.6  No Committee Appointed

No Committee has been appointed in this case.

### Section 10.7  Exclusivity

Pursuant to sections 1121(b) and (c)(3) of the Bankruptcy Code, the Debtor has a certain amount of time in which it has the exclusive right (a) to file a Plan (the "Exclusivity Period"); and (b) to solicit acceptances of a timely filed Plan (the "Solicitation Period"). On July 9, 2010, the

Exclusivity Period lapsed. However, the Debtor and Iroquois Fund agreed by a stipulation approved by the Court that the Debtor would have until July 31, 2010 by which to file a Plan.

### Section 10.8   Claims Administration

In the ordinary course of business, the Debtor maintains books and records (the "Books and Records") that reflect, among other things, the Debtor's liabilities and the amounts owed to its creditors in connection with such liabilities. The Debtor and its Professional Persons will review the proofs of claim submitted in the Chapter 11 Case, including any supporting documentation, compare the Claims asserted in the proofs of claim with the Books and Records and will otherwise analyze the Claims to determine the validity of such Claims. The Debtor may file substantive and/or procedural objections based upon such review.

## ARTICLE XI
## THE CHAPTER 11 PLAN

### Section 11.1  Introduction

The following is a summary of certain terms and provisions of the Plan. This summary of the Plan is qualified in its entirety by reference to the full text of the Plan, which is annexed to this Disclosure Statement as **Exhibit A.**

### Section 11.2   General Description of the Treatment of Claims and Equity Interests

(a)     Unclassified Claims Generally

Administrative Claims and Priority Tax Claims are treated in accordance with sections 1129(a)(9)(A) and 1129(a)(9)(C) of the Bankruptcy Code, respectively. Such Claims are not designated as classes of Claims for the purposes of the Plan or for the purposes of sections 1123, 1124, 1125, 1126 or 1129 of the Bankruptcy Code.

(b)     Treatment of Allowed Administrative Claims

(i)     Administrative Claims Defined

Administrative Claims are rights to payment constituting a cost or expense of administration of the Chapter 11 Case allowed under sections 503(b) and 507(a)(2) of the Bankruptcy Code, including, without limitation, any actual and necessary costs and expenses of preserving the estate of the Debtor, any actual and necessary costs and expenses of operating the businesses of the Debtor, any indebtedness or obligations incurred or assumed by the Debtor in connection with the conduct of its business on or after the Petition Date, any allowances of compensation and reimbursement of expenses to the extent allowed by a Final Order under section 330 or 503 of the Bankruptcy Code, and any fees or charges assessed against the estate of the Debtor under 28 U.S.C. § 1930.

           (ii)        Time for Filing Administrative Claims

All requests for payment of Administrative Claims (other than (i) Administrative Claims incurred by the Debtor in the ordinary course of business after the Petition Date, (ii) Administrative Claims that have been Allowed by order of the Bankruptcy Court on or before the Effective Date, (iii) other Administrative Claims for which a Proof of Claim was filed on or before the Bar Date, and (iv) fees or charges assessed against the Debtor under section 1930 of title 28 of the United States Code) must be filed with the Bankruptcy Court and served on the Debtor and the U.S. Trustee not later than (x) thirty (30) days after service of the Notice of Confirmation, in the case of requests for payment of Administrative Claims other than Fee Claims and (y) forty-five (45) days after the Effective Date, in the case of Final Fee Applications seeking payment of Fee Claims; provided, however, that (A) any other Administrative Claim that was required pursuant to the terms of the Bar Date Order to be filed on or before the Bar Date and was not filed on or before the Bar Date is barred based on the Bar Date Order and shall remain forever barred and discharged; and (B) any Administrative Claim or Fee Claim that is not filed on or before the deadline shall result in the Administrative Claim or Fee Claim being forever barred and discharged. Any request for payment of an Administrative Claim must include at a minimum the name of the Debtor which is alleged to be liable for the Administrative Claim, the name of the holder of the alleged Administrative Claim, the amount of the alleged Administrative Claim, and the basis of the alleged Administrative Claim, and must be mailed by the applicable deadline set forth in the Plan:

           If by First Class U.S. mail, to:

           Vaso Active Pharmaceuticals, Inc.
           Attn: Joseph Frattaroli
           99 Rosewood Drive
           Danvers, MA 01923-1300

           with a copy to:

           Hinckley, Allen & Snyder LLP
           Jennifer V. Doran
           28 State Street, 29th Floor
           Boston, MA 02109
           Telephone:     (617) 345-9000
           Facsimile:      (617) 345-9020
           E-mail: jdoran@haslaw.com

**THE FAILURE TO FILE TIMELY A REQUEST FOR AN ADMINISTRATIVE CLAIM AND TO SERVE SUCH REQUEST WILL RESULT IN THE ADMINISTRATIVE CLAIM BEING FOREVER BARRED AND DISCHARGED.**

(iii)    Time for Filing Fee Claims

Each Professional Person who holds or asserts a Fee Claim will be required to file with the Bankruptcy Court, and serve on all parties required to receive notice, a Final Fee Application within forty-five (45) days after the Effective Date.

**THE FAILURE TO FILE TIMELY AND SERVE SUCH FEE APPLICATION WILL RESULT IN THE FEE CLAIM BEING FOREVER BARRED AND DISCHARGED.**

(iv)    Allowance of Administrative Claims/Fee Claims

Unless the Debtor objects, in whole or in part, to a timely filed request for payment of an Administrative Claim within sixty (60) days after the Effective Date, such request for payment of an Administrative Claim shall be deemed Allowed in the amount requested. If the Debtor objects to a request for payment of an Administrative Claim in whole or in part, the requested Administrative Claim shall become an Allowed Administrative Claim only to the extent allowed by a Final Order. A Fee Claim in respect of which a Final Fee Application has been properly and timely filed and served shall become an Allowed Administrative Claim only to the extent allowed by Final Order.

(v)    Payment of Allowed Administrative Claims

Except to the extent that a holder of an Allowed Administrative Claim has been paid prior to the Effective Date or agrees to a less favorable treatment, each holder of an Allowed Administrative Claim shall receive, in full and final satisfaction of its Allowed Administrative Claim, a Plan Distribution of Cash in the amount of such holder's Allowed Administrative Claim, without interest, on the Distribution Date or such later date or dates as may be agreed to by the Debtor and such holder; provided, however, that an Allowed Administrative Claim representing a liability incurred after the Petition Date in the ordinary course of business by the Debtor may be paid in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions.

(c)    Treatment of Priority Tax Claims

Except to the extent that a holder of an Allowed Priority Tax Claim has been paid by the Debtor prior to the Effective Date or agrees to a less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction of such holder's Allowed Priority Tax Claim (a) payments in Cash, in regular installments over a period ending on the fifth (5th) anniversary of the Petition Date, of a total value, as of the Effective Date, equal to the Allowed amount of such Priority Tax Claim; (b) a lesser amount in one Cash payment as may be agreed upon in writing by such holder  and the Debtor; or (c) such other treatment as may be agreed upon in writing by such holder and the Debtor. The Plan and Confirmation Order shall enjoin any holder of an Allowed Priority Tax Claim from commencing or continuing any action or proceeding against any responsible person, officer or director of the Debtor that otherwise would be liable to such holder for payment of an Allowed Priority Tax Claim so long as the

Debtor is in compliance with section 2.6 of the Plan. So long as the holder of an Allowed Priority Tax Claim is enjoined from commencing or continuing any action or proceeding against any responsible person, officer or director under section 2.6 of the Plan or pursuant to the Confirmation Order, the statute of limitations for commencing or continuing any such action or proceeding shall be tolled.

       (d)      <u>Classified Claims and Equity Interests</u>

The classified Claims against, and Equity Interests in, the Debtor are classified in the Plan as follows:

      i.      Class 1 —Secured Lender Claims
      ii.      Class 2 — Class Action Noteholder Claims
      iii.      Class 3 — Secured Lender Deficiency Claims
      iv.      Class 4 — Priority Claims
      v.      Class 5 — General Unsecured Claims
      vi.      Class 6 — Common Class B Vaso Active Equity Interests
      vii.      Class 7 — Common Class A Vaso Active Equity Interests

The treatment of each class of claims is summarized in Article IV hereof.

**Section 11.3   Acceptance or Rejection of the Plan; Effect of Rejection by One or More Classes of Claims**

       (a)      <u>Classes Entitled to Vote.</u>

Holders of Class 2 - Class Action Noteholder Claims, Class 3 - Secured Lender Deficiency Claims, Class 5 - General Unsecured Claims and Class 7 - Common Class A Vaso Active Equity Interests are entitled to vote on the Plan. Class 1 - Secured Lender Claims, and Class 4 - Priority Claims are deemed to have accepted the Plan. Class 6 - Common Class B Vaso Active Equity Interests are deemed to have rejected the Plan.

       (b)      <u>Class Acceptance Requirement</u>

A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have voted on the Plan.

       (c)      <u>Cramdown</u>

In the event that any impaired Class of Claims or Equity Interests rejects the Plan or is deemed to have rejected the Plan, the Debtor seeks to confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code with respect to such non-accepting Class.

       (d)      <u>Feasibility</u>

The Bankruptcy Code conditions confirmation of a plan of reorganization on, among other things, a finding that it is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor. For purposes of determining whether the Plan satisfies this condition, the Debtor has analyzed its capacity to service its obligations under the Plan. Based upon its analysis and the Projections (**<u>Exhibit C</u>**), the Debtor believes that the Reorganized Debtor or its successors pursuant to the Plan will be able to make all payments required to be made under the Plan. See also Article VIII hereof – "Selected Financial Information."

### Section 11.4   Operations Between the Confirmation Date and the Effective Date

During the period from the Confirmation Date through and until the Effective Date, the Debtor shall continue to operate its businesses as Debtor-in-Possession, subject to the oversight of the Bankruptcy Court as provided in the Bankruptcy Code, the Bankruptcy Rules and all orders of the Bankruptcy Court that are then in full force and effect.

### Section 11.5   Certain Transactions On the Effective Date

On the Effective Date:

1.      The Debtor shall conduct a reverse merger with the Merger Partner, and the surviving corporation shall be Boston Endoscopic Engineering Corporation, also known as BEE™ Medical Corp., the Reorganized Debtor, with the New Common Stock authorized as of the Effective Date, which New Common Stock shall be exempt from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code;

2.      The Reorganized Debtor shall issue the following shares of the New Common Stock to the following Persons:

(A)      to the Creditor Trust, 8,245,669 shares,
(B)      to the Merger Partner, 74,595,473 shares; and
(C)      to the Creditor Trust with respect to Common Class A Vaso Active Equity Interests (provided that holders of Allowed General Unsecured Claims receive payment in full), 3,230,558 shares.

3.      The Reorganized Debtor shall enter into the Merger Loan Documents with the Merger Lender.

### Section 11.6   Causes of Action/Reservation of Rights

The Reorganized Debtor shall, in accordance with section 1123(b) of the Bankruptcy Code, reserve, retain and may enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) all rights, claims, Causes of Action, rights of setoff, suits, proceedings or other legal or equitable defenses accruing to the Debtor or the Estate pursuant to the Bankruptcy Code or pursuant to any statute or legal theory, including any Avoidance Actions, except (i) as otherwise provided in the Plan or the Confirmation Order, (ii) with respect to the Released Parties and (iii) preference claims under section 547 of the Bankruptcy Code.

### Section 11.7   Causes of Action - No Waiver

Except as otherwise expressly set forth in the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or the relinquishment of any right or Cause of Action that the Debtor or the Reorganized Debtor may have or which the Debtor or the Disbursing Agent may choose to assert on behalf of the Debtor's Estate under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including (i) any and all Claims against any Person, to the extent such Person asserts a Claim, cross-claim, counterclaim and/or Claim for setoff which seeks affirmative relief against the Debtor, the Reorganized Debtor, its officers, directors or representatives and (ii) the turnover of any property of any of the Debtor's or the Reorganized Debtor's Estate.

The Reorganized Debtor may pursue, litigate, compromise, settle, transfer or assign any such rights, claims, causes of action, suits or proceedings as appropriate, in accordance with the best interests of the Reorganized Debtor.

No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtor will not pursue any and all available Causes of Action against them. The Debtor and the Estate expressly reserve all rights to prosecute any and all Causes of Action against any Person, except as otherwise provided in the Plan.

All Claims and Causes of Action under section 547 of the Bankruptcy Code are waived and released under the Plan.

### Section 11.8   Appointment of the Disbursing Agent

Upon the occurrence of the Effective Date, the Reorganized Debtor is deemed to be the Disbursing Agent, and will have all powers, rights, duties and protections afforded the Disbursing Agent under the Plan.

### Section 11.9   Sources of Cash for Plan Distributions

All Cash necessary for the Disbursing Agent to make payments and Plan Distributions shall be obtained from proceeds of the Debtor's existing Cash balances and/or proceeds of the Merger Loan.

**Section 11.10 Distribution Provisions**

      (a)      Distribution Record Date

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Equity Interests as maintained by the Debtor or its agents shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims or Equity Interests. The Debtor shall have no obligation to recognize any transfer of any Claims or Equity Interests occurring on or after the Distribution Record Date. The Debtor or Reorganized Debtor, as applicable, shall be entitled to recognize and deal for all purposes hereunder only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date.

      (b)      Plan Distributions

Reorganized Debtor as Disbursing Agent shall make all Plan Distributions. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. Notwithstanding the foregoing, the Creditor Trustee shall determine the timing and amount of all liquidation of New Common Stock held in the Creditor Trust, in its sole discretion.

      (c)      Timing of Plan Distributions

Each Plan Distribution shall be made on the relevant Distribution Date therefor and shall be deemed to have been timely made if made on such date or within ten (10) days thereafter.

      (d)      Interim Distributions may be made from time to time at the discretion of the Disbursing Agent.

      (e)      Address for Delivery of Plan Distributions/Unclaimed Distributions

Subject to Bankruptcy Rule 9010, any Plan Distribution or delivery to a holder of an Allowed Claim shall be made at the last known address of such holder as set forth (a) in the Schedules filed with the Bankruptcy Court unless the Debtor has been notified in writing of a change of address, including by the filing of a Proof of Claim by such holder that contains an address for such holder different from the address reflected in such Schedules for such holder, (b) on the Proof of Claim filed by such holder, (c) in any notice of assignment filed with the Bankruptcy Court with respect to such Claim pursuant to Bankruptcy Rule 3001(e), or (d) in any notice served by such holder giving details of a change of address. If any Plan Distribution is returned to the Disbursing Agent as undeliverable, no Plan Distributions shall be made to such holder unless the Disbursing Agent is notified of such holder's then current address within ninety (90) days after such Plan Distribution was returned. After such date, if such notice was not provided, a holder shall have forfeited its right to such Plan Distribution, and the undeliverable Plan Distributions shall be returned to Reorganized Debtor for distribution.

(f)     De Minimis Distributions

Notwithstanding anything to the contrary in the Plan, any holder of an Allowed Claim that would have received a Plan Distribution of less than twenty-five dollars ($25.00) with respect to such Allowed Claim shall not receive any Plan Distribution. The unpaid Plan Distributions of under $25.00 shall revert to the Reorganized Debtor.

(g)     Time Bar to Cash Payments

Checks issued in respect of Allowed Claims shall be null and void if not negotiated within ninety (90) days after the date of issuance thereof. Requests for reissuance of any voided check shall be made directly to the Disbursing Agent by the holder of the Allowed Claim to whom such check was originally issued. Any claim in respect of such a voided check shall be made within ninety (90) days after the date of issuance of such check. If no request is made as provided in the preceding sentence, any claims in respect of such voided check shall be discharged and forever barred and such unclaimed Plan Distribution shall revert to the Reorganized Debtor.

(h)     Manner of Payment under the Plan

All Plan Distributions of Cash or New Common Stock, as applicable, to the holders of Allowed Claims or Interests under the Plan shall be made by the Disbursing Agent or its designee on behalf of the Debtor.  Unless the Person receiving a Plan Distribution agrees otherwise, any Plan Distribution to be made in Cash under the Plan shall be made, at the election of the Disbursing Agent, by check drawn on a domestic bank or by wire transfer from a domestic bank. Cash payments to foreign creditors may, in addition to the foregoing, be made, at the option of the Disbursing Agent, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

(i)     Fractional Plan Distributions

Except as provided in section 7.9.4 herein, no payments of fractions of dollars shall be made under the Plan.  Fractions of dollars shall be rounded to the nearest whole dollar (up and down) with any half dollar rounded down.  No fractional shares of New Common Stock shall be issued or distributed under the Plan.  If any Plan Distribution would result in the issuance of shares of New Common Stock that is not a whole number, the actual Plan Distribution of shares of New Common Stock shall be rounded to the next higher or lower number, with fractions of one-half or less being rounded down. The total number of shares of New Common Stock to be distributed pursuant to the Plan shall be adjusted as necessary to account for the rounding provided for herein.  No consideration shall be provided in lieu of fractional shares that are rounded down.

**Section 11.11 Creditor Trust**

(a)     Vesting of Assets Of Estate

On or after the Effective Date, and subject only to the terms of this Plan, 7,419,381 shares of New Common Stock shall vest in the Creditor Trust free and clear of all liens, claims, encumbrances and interests.

(b)     Execution of the Creditor Trust Agreement

Upon the Effective Date, the Creditor Trustee and the Debtor on behalf of itself and the Estate will execute the Creditor Trust Agreement, in substantially the form submitted with the Plan Supplement.

(c)     Appointment of Creditor Trustee

The Creditor Trustee shall be an independent trustee that is the trust department of a nationally recognized financial institution and shall have the powers, duties, and obligations set forth in this Plan and in the Creditor Trust Agreement.  After the Effective Date, all actions required of the Creditor Trust shall be taken by the Creditor Trustee, or its designee, in the name of and on behalf of the Creditor Trust.  The Creditor Trustee shall be authorized to execute documents on behalf of the Creditor Trust.

(d)     Duties and Responsibilities of Creditor Trustee

The duties, responsibilities and obligations of the Creditor Trustee include, but are not limited to, the following:

(i)     Liquidating the New Common Stock in the Creditor Trust in a manner to maximize the value received with respect to such New Common Stock and making Distributions in accordance with the terms of the Plan; and

(ii)     responding to inquiries of Creditors with respect to the Creditor Trust.

(e)     Retention of Professionals

The Creditor Trustee may retain such attorneys (including special counsel), accountants, advisors, expert witnesses, and other professionals necessary as determined in the sole discretion of the Creditor Trustee) to liquidate the New Common Stock in the Creditor Trust and make distributions in accordance with the terms of the Plan.  The fees and expenses of the Creditor Trustee and its professionals shall be paid in the ordinary course from amounts held in the Creditor Trust.

(e)     Exculpation and Indemnification

Neither the Creditor Trustee nor its Related Persons shall in any way be liable for any acts or omissions taken or made in the performance of its duties, except for gross negligence or willful misconduct.  The Creditor Trustee and its Related Persons shall be indemnified by the Creditor Trust from and against any and all liabilities, expenses, claims, damages or losses incurred by them as a result of acts under the Plan and/or the Creditor Trust Agreement that do not constitute gross negligence or willful misconduct.

## Section 11.12 Setoffs

Other than with respect to the Secured Lender Claims (as to which any and all rights of setoff have been waived), the Debtor or the Reorganized Debtor may, but shall not be required to,

apply setoff against any Claim (for purposes of determining the Allowed amount of such Claim on which a Plan Distribution shall be made), any claims, rights, or Cause of Action of any nature whatsoever that the Debtor or Reorganized Debtor may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor or Reorganized Debtor of any such claim, right or Cause of Action the Debtor or Reorganized Debtor may have against the holder of such Claim. Notwithstanding the foregoing, the Debtor and the Reorganized Debtor shall be deemed to have waived any such rights of setoff that are not properly raised and preserved prior to the Confirmation Date.

### Section 11.13 Procedures for Resolving and Treating Contested Claims

(a)     Prosecution of Contested Claims

Unless otherwise ordered by the Bankruptcy Court, only the Disbursing Agent shall be entitled to object to, settle, compromise, withdraw or litigate objections to Claims. Any objections to Claims shall be served and filed on or before the Claims Objection Deadline (subject to being extended by the order of the Bankruptcy Court upon motion of the Disbursing Agent without notice or a hearing).

(b)     Claims Objection Deadline

As soon as practicable, but in no event later than one hundred and eighty (180) days after the Effective Date (subject to being extended by order of the Bankruptcy Court upon motion of the Disbursing Agent without notice or a hearing to all creditors), objections to Claims shall be filed with the Bankruptcy Court and served upon the holders of each of the Claims to which objections are made. If an objection has not been filed to a Proof of Claim or a Scheduled Claim by the Claims Objection Deadline, the Claim to which the Proof of Claim or Scheduled Claim relates will be treated as an Allowed Claim, if such Claim has not been previously Allowed.

(c)     Claims Settlement

From and after the Effective Date, the Disbursing Agent shall have authority to settle or compromise all Claims and Causes of Action (except for Claims and Causes of Action asserted by or against Iroquois Fund) without further review or approval of the Bankruptcy Court, other than any settlement or compromise of a Claim or Cause of Action that involves an Insider.

(d)     No Plan Distribution Pending Allowance

Notwithstanding any other provision of the Plan, no payments or Plan Distributions shall be made with respect to all or any portion of a Claim that is Contested in whole or in part, unless and until all objections to such Claim have been settled or withdrawn or have been determined by Final Order, and the Claim or some portion thereof, has become an Allowed Claim.

(e)     Distributions After Allowance

Subject to the setoff rights as provided in section 7.10, and subject to section 8.4, after such time as a Contested Claim becomes, in whole or in part, an Allowed Claim, the Disbursing Agent shall distribute to the holder thereof the Plan Distributions if any to which such holder is entitled under the Plan. No interest shall be paid on any Contested Claim that later becomes an Allowed Claim.

(f)     Contested Claims Reserve

The Disbursing Agent shall establish appropriate reserves for Contested Claims by withholding the lesser of (a) 100% of the Plan Distribution to which holders of Contested Claims would be entitled under the Plan if such Contested Claims were Allowed Claims, or (b) such other amount as may be approved by the Bankruptcy Court.  On, or as soon as practicable after the Initial Distribution Date, Reorganized Debtor shall transmit to the Disbursing Agent the Cash that would otherwise be distributable to a holder of a General Unsecured Claim if such Claim were not a Contested Claim.

(g)     No Recourse Against the Debtor or Reorganized Debtor

Any holder of a Contested Claim that ultimately becomes an Allowed Claim shall be entitled to receive its applicable Plan Distribution solely from the Contested Claim Reserve established on account of such Contested Claim. In no event shall any holder of a Contested Claim have any recourse with respect to Plan Distributions made, or to be made, under the Plan to holders of such Claims, to the Debtor or Reorganized Debtor or their Related Persons on account of such Contested Claim, regardless of whether such Contested Claim shall ultimately become an Allowed Claim, and regardless of whether sufficient Cash remains available for distribution in the Contested Claim Reserve established on account of such Contested Claim at the time such Claim becomes entitled to receive a Plan Distribution.

### Section 11.14 Conditions Precedent to Confirmation of Plan

The Plan will not be confirmed and the Confirmation Order will not be entered until and unless each of the following conditions has occurred or been waived in accordance with the terms of the Plan:

(a)     The clerk of the Bankruptcy Court shall have entered an order or orders:

(i)     approving the Disclosure Statement as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code;

(ii)     determining that all votes are binding and have been properly tabulated as acceptances or rejections of the Plan;

(iii)     confirming and giving effect to the terms and provisions of the Plan;

(iv)     determining that all applicable tests, standards and burdens in connection with the Plan have been duly satisfied and met by the Debtor and the Plan;

(v)     approving the Plan Documents, including the Merger Financing Documents; and

(vi)     authorizing the Debtor to execute, enter into, and deliver the Plan Documents and to execute, implement, and to take all actions otherwise necessary or appropriate to give effect to, the transactions contemplated by the Plan and the Plan Documents.

### Section 11.15 Conditions Precedent to the Occurrence of the Effective Date

The Effective Date of the Plan shall not occur unless and until each of the following conditions has occurred or has been waived in accordance with the terms of the Plan:

(i)     the Confirmation Order shall have been entered and shall have become a Final Order;

(ii)     all necessary consents, authorizations and approvals shall have been given for the transfers of property and the payments provided for or contemplated by the Plan, including satisfaction or waiver of all conditions to the obligations of the Debtor under the Plan and the Plan Documents;

(iii)     the Merger Loan Documents shall have been entered into by all parties thereto and all conditions to the initial draw thereunder shall have been satisfied in accordance with the terms thereof such that the Reorganized Debtor shall have credit available to provide financing sufficient to meet its Cash obligations under the Plan and have sufficient borrowing capacity to satisfy its working capital requirements as of the Effective Date;

(iv)     all actions, documents and agreements necessary to implement the Plan and the transactions contemplated by the Plan shall have been effected or executed;

(v)     the New Common Stock to be issued under the Plan shall have been duly authorized and, upon issuance, shall be validly issued and outstanding; and

(vi)     the Debtor and the Merger Partner shall have closed and effectuated a reverse merger as described in the Plan and the Reorganized Debtor shall be the surviving corporation.  The Certificate of Merger shall have been filed with the Delaware Secretary of State.

### Section 11.16 Waiver of Conditions

The Debtor may waive, in whole or in part, any of the conditions to confirmation of the Plan or the effectiveness of the Plan.  Any such waiver of a condition may be effected at any time, without notice or leave or order of the Bankruptcy Court and without any formal action, other than the filing of a notice of such waiver with the Bankruptcy Court.

### Section 11.17 Effect of Non-Occurrence of the Effective Date

In the event that the conditions specified in section 9.2 of this Plan have not been satisfied or waived in accordance with section 9.3 of this Plan, and upon notification submitted by the Debtor to the Bankruptcy Court, (a) the Confirmation Order shall be vacated; (b) no Plan Distributions shall be made; (c) the Debtor and all holders of Claims and Equity Interests shall be restored to the *status quo* ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred; and (d) all of the Debtor's obligations with respect to the Claims and Equity Interests shall remain unchanged and nothing contained in the Plan shall be deemed to constitute a waiver or release of any Claims or Causes of Action by or against the Debtor or any other entity or to prejudice in any manner the rights of the Debtor or any other entity in any proceedings further involving the Debtor.

### Section 11.18 INTENTIONALLY OMITTED

### Section 11.19 Assumption and Rejection of Executory Contracts

(a)       Default Rejection

As of the Effective Date, any Executory Contract which has not expired by its own terms on or prior to the Confirmation Date shall be deemed rejected by the Reorganized Debtor effective on the Confirmation Date, and the Plan shall constitute a motion to reject such Executory Contract.  Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Clerk of the Bankruptcy Court shall constitute approval of such the rejection of each Executory Contract pursuant to section 365(a) of the Bankruptcy Code, and a finding by the Bankruptcy Court that each rejection is in the best interests of the Debtor and its Estate.

(b)       Claims Arising from Rejected Contracts

Claims arising from the rejection of Executory Contracts must be filed with the Bankruptcy Court and served on the Debtor and its counsel within thirty (30) days after service of (a) the Notice of Confirmation or (b) other notice that the Executory Contract has been rejected. Any Claims for which a Proof of Claim is not filed and served within such time will be forever barred from assertion and shall not be enforceable against the Debtor, its Estate, Affiliates, Assets, properties or interests in property or against the Reorganized Debtor or its Estate, Assets, property or interests in property.  Unless otherwise ordered by the Bankruptcy Court, all such Claims that are properly filed and served shall be treated as Class 5 - General Unsecured Claims under the Plan and shall be subject to objection by the Disbursing Agent.

### Section 11.20 Retention Of Jurisdiction

On and after the Effective Date, the Bankruptcy Court shall retain and have exclusive jurisdiction over all matters arising in, arising under, or related to the Chapter 11 Case, and such other matters as set forth in Article XII of the Plan.

**ARTICLE XII**
**RISK FACTORS**

### Section 12.1   Certain Bankruptcy Considerations

If the Plan is not confirmed and consummated, there can be no assurance that any alternative plan of reorganization would be on terms as favorable to the holders of Claims as the terms of the Plan. In addition, if a protracted reorganization were to occur, there is a substantial risk that holders of Claims would receive less than they will receive under the Plan. See section 15.1 hereof for a discussion regarding the liquidation of the Debtor.

### Section 12.2   The Reorganized Debtor's Actual Financial Results May Vary Significantly from the Projections Included in this Disclosure Statement

The financial projections included in this Disclosure Statement are dependent upon the successful implementation of the Reorganized Debtor's business plan and the validity of the numerous assumptions contained therein. The significant assumptions underlying the Projections are discussed in greater detail in **Exhibit C** to this Disclosure Statement.

Many of these assumptions are beyond the control of the Debtor and may not materialize. In addition, unanticipated events and circumstances occurring subsequent to the preparation of the Projections may adversely affect the financial results of the Reorganized Debtor. Although the Debtor believes that the Projections and assumptions are reasonable, variations between the actual financial results and those projected may be material.

### Section 12.3   Competition, Market Considerations/Volatility and Other Variables

Forward-looking statements involve risks and uncertainties, which could cause actual results or outcomes to differ materially from those expressed. Forward-looking statements in this Disclosure Statement or in the Projections reflect expectations regarding future revenues and expenses, and the effect of state and federal regulations on operations and revenues. The Debtor's expectations, beliefs and projections are expressed in good faith and are believed by the Debtor to have a reasonable basis, including without limitation, management's examination of historical operating trends, data contained in the Debtor's records and other data available from third parties. Nonetheless, the Debtor's expectations, beliefs or projections may not be achieved or accomplished. Forward-looking statements are subject to known and unknown risks and uncertainties.

The Debtor's competitive position, financial position and results of operations may be adversely affected by technological advances and the Debtor's efforts to anticipate and employ such technological advances may prove unsuccessful. Regulatory approvals may also impact the Debtor's business operations and may affect the Debtor's ability to market its products.

### Section 12.4   Limited Liquidity of New Common Stock

The New Common Stock will not qualify for listing on a securities exchange at the time it is issued on the Effective Date of the Plan. Further, the terms by which the New Common Stock is issued will include restrictions on the ability of holders of the new Common Stock to trade in such Stock for a certain period of time. Lack of liquidity of the New Common Stock may make it more difficult for the Reorganized Debtor to raise additional capital, if necessary, through equity financings.

**ARTICLE XIII**
**SECURITIES LAW MATTERS**

### Section 13.1  Issuance of New Securities

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act of 1933, as amended (the "Securities Act"), and state securities laws if three principal requirements are satisfied: (i) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan; (ii) the recipients of the securities must hold prepetition or administrative claims against the debtor or interests in the debtor; and (iii) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in exchange for such claim or interest and partly for cash or property. The Debtor believes that the offer and sale of the New Common Stock satisfies the requirements of section 1145(a)( 1) of the Bankruptcy Code and is, therefore, exempt from registration under the Securities Act and state securities laws.

### Section 13.2  Subsequent Transfers of New Common Stock

The New Common Stock to be issued pursuant to the Plan will be held in the Creditor Trust and will be liquidated, beginning eighteen (18) months from the Effective Date, and all proceeds of such sales shall be distributed, Pro Rata, to holders of Allowed Claims at such times that the Creditor Trustee determines, in its sole discretion, will maximize the value of the New Common Stock. The New Common Stock may be subject to other restrictions under any shareholder or other contractual agreement. All resales and subsequent transfers of the New Common Stock are exempt from registration under the Securities Act and state securities laws, unless the holder is an "underwriter" with respect to such securities. Section 1145(b) of the Bankruptcy Code defines four types of "underwriters":

(a)     persons who purchase a claim against, an interest in, or a claim for an administrative expense against the debtor with a view to distributing any security received in exchange for such claim or interest;

(b)     persons who offer to sell securities offered under a plan for the holders of such securities;

(c)     persons who offer to buy such securities from the holders of such securities, if the offer to buy is with a view to distributing such securities under an agreement made in connection with the plan, the consummation of the plan, or with the offer or sale of securities under the plan; or

(d)     a person who is an "issuer" with respect to the securities as the term "issuer" is defined in section 2(11) of the Securities Act.

Under section 2(11) of the Securities Act, an "issuer" includes any Person directly or indirectly controlling or controlled by the issuer, or any Person under direct or indirect common control of the issuer.

To the extent that Persons who receive New Common Stock pursuant to the Plan are deemed to be "underwriters," resales by such Persons would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Persons deemed to be underwriters may, however, be permitted to sell such New Common Stock without registration pursuant to the provisions of Rule 144 under the Securities Act. These provisions may permit the public sale of securities received by "underwriters" if current information regarding the issuer is publicly available and if volume limitations and certain other conditions are met.

Whether or not any particular Person would be deemed to be an "underwriter" with respect to the New Common Stock or other security to be issued pursuant to the Plan would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtor expresses no view as to whether any particular Person receiving New Common Stock or other securities under the Plan would be an "underwriter" with respect to such New Common Stock or other securities.

Pursuant to the Plan, certificates evidencing the New Common Stock received by restricted holders or by a holder that the Debtor determines is an underwriter within the meaning of section 1145 of the Bankruptcy Code will bear a legend substantially in the form below:

**THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND MAY NOT BE SOLD, OFFERED FOR SALE OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER SAID ACT AND APPLICABLE STATE SECURITIES LAWS OR UNLESS THE COMPANY RECEIVES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.**

BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER, THE DEBTOR DOES NOT MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE DISTRIBUTED UNDER THE PLAN. The Debtor recommends that potential recipients of the New Common Stock consult their own counsel

concerning whether they may freely trade the New Common Stock under the Securities Act and/or state securities laws.

### Section 13.3   Delivery of Disclosure Statement

Under section 1145(a)(4) of the Bankruptcy Code, "stockbrokers" (as that term is defined in section 101 (53A) of the Bankruptcy Code) are required to deliver to their customers, for the first 40 days after the Effective Date, a copy of this Disclosure Statement (and any supplement to it ordered by the Bankruptcy Court) at or before the time of delivery of any security issued under the Plan.

### Section 13.4   SEC Reporting Requirements

The Debtor is not currently required to file reports with the SEC under the Exchange Act of 1934 because it has been delisted. The Debtor anticipates the need to commence filing reports with the SEC as a result of the transactions provided for in the Plan and will make such filings as required by applicable law.

### Section 13.5   Transfers of Interests in the Reorganized Debtor

 Transfers of Interests in the Reorganized Debtor will be subject to a number of restrictions, including those described in section 13.2 hereof.  In addition to those restrictions, the agreement governing the Reorganized Debtor will provide that such interests may not be transferred except pursuant to an effective registration statement under the Securities Act or unless an exemption from registration under the Securities Act is available with respect thereto.

## ARTICLE XIV
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

The confirmation and execution of the Plan may have tax consequences to holders of Claims and Equity Interests. The Debtor offers no opinion as to the tax consequences to holders of Claims and Equity Interests as a result of the confirmation and distributions under the Plan. All holders should satisfy themselves as to their own tax consequences by obtaining independent advice from their own tax advisors.

## ARTICLE XV
## ALTERNATIVES TO CONFIRMATION AND
## CONSUMMATION OF THE PLAN

The Debtor has evaluated numerous alternatives to the Plan, including, without limitation, the sale of the Debtor as a going concern and the liquidation of the Debtor. After studying these alternatives, the Debtor has concluded that the Plan is the best alternative and will maximize recoveries of holders of Claims and Interests. The following discussion provides a summary of the analysis supporting the conclusion that a liquidation of the Debtor or an alternative plan of reorganization for the Debtor will not provide higher value to holders of Claims and Interests.

### Section 15.1   Liquidation Under Chapter 7 of the Bankruptcy Code

If no plan of reorganization can be confirmed, the Chapter 11 Case of the Debtor may be converted to a case under chapter 7, in which event a trustee would be elected or appointed to liquidate the properties and interests in property of the Debtor for distribution to its creditors in accordance with the priorities established by the Bankruptcy Code. The Debtor's current assets consist of accounts receivable, miscellaneous office equipment and inventory, the aggregate value of which the Debtor estimates to be approximately $25,000, all of which are subject to the Secured Lender's first priority lien. If the Chapter 11 Case were converted to Chapter 7, unsecured creditors would not receive any proceeds from the liquidation of such assets. A trustee would also have the right to pursue any recipient of a preferential transfer of the Debtor's property made within the ninety (90) days prior to the Petition Date (or within one year of the Petition Date for any insiders). The Debtor made transfers in the amount of $1,523,599.41 during the preference period, and a trustee could investigate and pursue any preference liability. The Debtor does not believe that the payments made during the preference period constitute preferences, such that the trustee would not recovery amounts to make any significant distribution to general creditors.

The Debtor believes that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for under the Plan because of (1) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee for bankruptcy and professional advisors to such trustee; (2) the erosion in value of assets in the context of the expeditious liquidation required under chapter 7 and the "forced sale" environment in which such a liquidation would likely occur; and (3) the inability of the Debtor to capitalize on its public company platform and available technology to partner with a viable enterprise. In a chapter 7 liquidation, the Debtor believes that distributions to secured creditors would be minimal, and unsecured creditors would receive no distribution on account of their claims. Accordingly, the Debtor has determined that confirmation of the Plan will provide each holder of a Claim with a greater recovery than it would receive pursuant to liquidation of the Debtor under chapter 7.

Section 1129(a)(7) of the Bankruptcy Code provides that with respect to impaired classes, each holder of a claim or interest of such class must receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount such holder would so receive or retain if the debtor liquidated under chapter 7 of the Bankruptcy Code on such date. As the Plan provides for a greater recovery to holders of Claims than they would receive in a liquidation under chapter 7 of the Bankruptcy Code, the Plan satisfies section 1129(a)(7).

### Section 15.2   Alternative Plans of Reorganization

Subject to the Debtor's exclusivity granted under section 1121 of the Bankruptcy Code, other parties in interest can undertake to formulate different plans of reorganization for the Debtor. Such a plan of reorganization might involve either (x) a reorganization and continuation of the business of the Debtor, (y) the sale of the Debtor as a going concern or (z) an orderly liquidation of the properties and interests in property of the Debtor. With respect to an alternative plan of reorganization, the Debtor has examined various other alternatives in connection with the process involved in the formulation and development of the Plan. The Debtor

believes that the Plan, as described herein, enables holders of Claims to realize the best recoveries under the present circumstances. In a liquidation of the Debtor under chapter 11, the properties and interests in property would be sold in a more orderly fashion and over a more extended period of time than in a liquidation under chapter 7, probably resulting in marginally greater recoveries. However, the salable assets of the Debtor are limited, such that even an orderly sale under chapter 11 would not result in recovery for unsecured creditors. Further, if a trustee were not appointed, because one is not required in a chapter 11 case, the expenses for professional fees would most likely be lower than in a chapter 7 case. However, although preferable to a chapter 7 liquidation, the Debtor believes that a liquidation under chapter 11 for the Debtor is a much less attractive alternative to holders of Claims than the Plan because the recovery realized by holders of Claims under the Plan is likely to be greater than the recovery under a chapter 11 liquidation.

## ARTICLE XVI
## CONCLUSION

The Debtor believes that the Plan is in the best interest of all holders of Claims and Interests, and urges all holders of Claims and Interests in an impaired class entitled to vote on the Plan to accept the Plan and to evidence such acceptance by returning their Ballots in accordance with the instructions accompanying the Disclosure Statement.

Dated: __8/ 3 /____, 2010

VASO ACTIVE PHARMACEUTICALS, INC.

By: Joseph Frattaroli
Its: President