## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ZLOOP, INC., *et al.*, [1] | Case No.  15-11660 (KJC) |
| Debtors. | (Jointly Administered) |
| | **Prop. Hrg. Date: May 16, 2016**<br>**Prop. Obj. Deadline: May 9, 2016 @ 4:00 p.m.** |

**MOTION OF THE DEBTORS FOR AN ORDER (I)(A) APPROVING PROCEDURES IN CONNECTION WITH THE SALE OF CERTAIN PROPERTY LOCATED IN HICKORY, N.C.; (B) SCHEDULING THE RELATED AUCTION AND HEARING TO CONSIDER APPROVAL OF SALE; (C) APPROVING THE FORM AND MANNER OF NOTICE THEREOF; (D) APPROVING BIDDER PROTECTIONS; AND (E) GRANTING RELATED RELIEF; AND (II)(A) AUTHORIZING THE SALE OF CERTAIN PROPERTY FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; AND (B) GRANTING RELATED RELIEF**

ZLOOP, Inc., and certain of its subsidiaries and affiliates, as debtors and debtors in possession (collectively, the "Debtors"), by and through undersigned counsel, DLA Piper, LLP (US), hereby move the Court (the "Motion") for the entry of an order under sections 105(a), 363 and 365 of  title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1 and 6004-1 of the Local Rules Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") for an order (i)(a) approving procedures in connection with the sale of the Hickory Assets, as defined below; (b) scheduling the related auction and hearing to consider approval of the sale; (c) approving the form and manner of notice thereof; (d) approving Bidder Protections, as defined below and (e)

---

[1] The Debtors in these Chapter 11 Cases and the last four digits of each Debtors' federal tax identification numbers are:  ZLOOP, Inc. (2960); ZLOOP Nevada, LLC (7516); and ZLOOP Knitting Mill, LLC (7098). The location of the Debtors' headquarters and the service address for each of the Debtors is 816 13th Street NE, Hickory, NC 28601.

granting related relief; and (ii)(a) authorizing the sale of the Hickory Assets free and clear of liens, claims, encumbrances and other interests; and (b) granting related relief.  If, prior to the hearing on the Sale aspects of the Motion, the Stalking Horse Bidder or any other bidder designates executory contracts or leases for assumption and assignment, the Debtors will file a separate notice and schedule of cure amounts with respect to such agreements.  In support of this Motion, William H. Henrich, the Debtors' Chief Restructuring Officer ("CRO") on behalf of the Debtors, respectfully states as follows:

## Jurisdiction and Venue

1.      The Court has jurisdiction over the Debtors, their estates and all property thereof, and this matter under 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware dated as of February 29, 2012. This is a core proceeding under 28 U.S.C. § 157(b).  Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.  The Debtors consent to the entry of final orders on this Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## Background

2.      On August 9, 2015 (the "Petition Date"), each of the Debtors filed a voluntary petition with this Court under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      On September 2, 2015, the United States Trustee for the District of Delaware appointed an Official Committee of Unsecured Creditors (the "Committee") in these cases.

4.      The Debtors operate a proprietary, state of the art, 100% landfill free eWaste[2] recycling company headquartered in Hickory, North Carolina.  Founded in 2012 to address the large, untapped, fragmented market opportunity for recycling eWaste, the Company offers eWaste recycling and data destruction services through its facility in Hickory, NC.  The Company provides all levels of government, corporations, and consumers with secure, fast and audited data destruction services, as well as end-of-life recycling of outdated or out-modeled electronics of all types.

5.      The Debtors own certain real property commonly known as 816 13th Avenue, comprising 3 parcels, and 838 14th Street NE, Hickory, NC (collectively, the "Real Property") and all personal property including fixtures, improvements and equipment located related to the business conducted on Real Property (collectively with the Real Property, the "Hickory Assets").

6.      The Hickory Assets do not include certain Excluded Assets, as such term is defined in the Stalking Horse Bid, defined below.

7.      The Debtors and their advisors have engaged in a broad marketing process to explore a sale of the Hickory Assets, which effort has resulted in an offer to purchase the Hickory Assets and other typical terms for the purchase of real estate and other assets in North Carolina and from a bankruptcy estate, as described below and as set forth fully in the Term Sheet—Acquisition of Assets of Zloop, Inc. et al.  (the "Stalking Horse Bid"), between the Debtors as Seller and Dynamic Recycling, Inc., or an entity to be formed by it and/or one or

---

[2]       eWaste is an ubiquitous term used to cover almost all types of electrical and electronic equipment (EEE) that has or could enter the waste stream. Examples include TVs, computers, mobile phones, iDevices, stereo systems, toys, small and large appliances (white goods) – almost any household or business item with circuitry or electrical components with power cords or battery supply.

more of its principals (the "Stalking Horse Bidder"), as Buyer.[3]  The Stalking Horse Bidder is not related in any way to the Debtors or any principal of the Debtors.

### Relief Requested[4]

8.      *First*, the Debtors request entry of an order, substantially in the form attached hereto as Exhibit C (the "Bidding Procedures Order"):  (A) approving procedures (the "Bidding Procedures," the form of which is attached to the proposed Bidding Procedures Order as Exhibit 1) for (i) submitting competing bids for the Hickory Assets and (ii) conducting an auction (the "Auction") of the Hickory Assets in the event the Debtors receive at least one competing bid that is higher or otherwise better than the Stalking Horse Bid; (B) scheduling the Auction; (C) scheduling a hearing to approve the sale of the Hickory Assets to the party that submits the highest or otherwise best bid at the Auction (the "Sale Hearing"); (D) approving procedures (the "Cure Procedures"), as set forth below, for the assumption and assignment of certain executory contracts (the "Contracts") and unexpired leases (the "Leases") of the Debtors to any purchaser(s) of the Fernley Assets, and to resolve any objections thereto and (E) approving  the form of notice of the Auction and Sale (the "Procedures Notice"), attached to the Bidding Procedures Order as Exhibit 3, to be served on the Procedures Notice Parties (as defined below).

9.      *Second*, the Debtors request entry of an order, pursuant to sections 105, 363 and 365 of the Bankruptcy Code:  (i) approving the sale of the Hickory Assets to the bidder

---

[3]     The Debtors and the Stalking Horse Bidder continue to negotiate towards a binding asset purchase agreement (such agreement the "Stalking Horse Agreement") and intend that the Stalking Horse Agreement will be completed and executed prior to any hearing on the Bidding Procedures Order and will be filed as an exhibit in advance of the hearing to consider the Bidding Procedures Order.

[4]     In compliance with Local Rule 6004-1 and for the convenience of the reader, the salient terms of the transaction as currently set forth in the term sheet have been summarized and are attached hereto as Exhibit A.

submitting the highest or otherwise best offer (the "Sale"), free and clear of all liens, claims, encumbrances and liabilities, (ii) assume and assign designated executory contracts and leases, providing for cure, and (iii) authorizing the Debtors to consummate the Sale and all documents, agreements and contracts executed in conjunction therewith.[5]

## I.    PROPOSED BID AND AUCTION PROCEDURES

### Summary of Proposed Bidding Procedures

10.    All of the Debtors' rights, title and interest in the Hickory Assets shall be sold free and clear of any liens, security interests, claims, charges, encumbrances and other interests in accordance with section 363 of the Bankruptcy Code.  The Debtors propose that any such asserted liens, security interests, claims, charges, encumbrances and other interests attach to the proceeds of the Sale, net of any transaction fees (the "Sale Proceeds"), in the same order of priority and extent and subject to the rights, claims, defenses, and objections, if any, of all parties with respect thereto, subject to any further order of the Court.

11.    In order to ensure that the Debtors receive the maximum value for the Hickory Assets, the Stalking Horse Agreement is subject to higher or otherwise better offers made pursuant to the Bid Protections set forth herein, and, as such, the Stalking Horse Agreement will serve as the "stalking horse" bid for the Hickory Assets.

## A.    Provisions Governing Qualifications of Bidders

12.    Unless otherwise ordered by the Court, in order to participate in the bidding process, prior to the Bid Deadline (defined below), each person, other than the Stalking Horse Bidder, who wishes to participate in the bidding process (a "Potential Bidder") must deliver the following to the Notice Parties (as defined below):

---

[5]    A form of Sale Order will be filed with the Purchase Agreement of the Successful Bidder following the conclusion of the Auction.

(a)     a written disclosure of the identity of each entity that will be bidding for the Hickory Assets or otherwise participating in connection with such bid; and

(b)     financial information, to the satisfaction of the CRO and his professionals, demonstrating the financial wherewithal of such entity to purchase the Hickory Assets out of liquid assets or committed debt or equity financing; and

(c)     an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Debtors to a Potential Bidder) in form and substance satisfactory to the Debtors and which shall inure to the benefit of any purchaser of the Hickory Assets; without limiting the foregoing, each confidentiality agreement executed by a Potential Bidder shall contain standard non-solicitation provisions.

13.     A Potential Bidder that delivers the documents and information described above, that submits a written, irrevocable higher or otherwise better bid than the Stalking Horse Bid (together with a black-lined copy comparing such bid to the Stalking Horse Agreement) and that the Debtors determine in their reasonable business judgment is likely (based on availability of liquid assets, debt or equity committed financing, experience and other considerations) to be able to consummate the sale, will be deemed a "Qualified Bidder."

14.     As promptly as practicable after a Potential Bidder delivers all of the materials required above, the Debtors in consultation with the Committee, will determine and will notify the Potential Bidder if such Potential Bidder is a Qualified Bidder.

**B.     Due Diligence**

15.     The Debtors will afford any Qualified Bidder such due diligence access or additional information as the Debtors deem appropriate, in their reasonable discretion.  The due diligence period shall extend through and include the Bid Deadline; provided, however, that any Qualified Bid (as defined below) submitted shall not be subject to or contingent upon further diligence and be irrevocable until the selection of the Successful Bidder (defined below).  All

due diligence by the Stalking Horse Bidder, or any other potential Qualified Bidders, shall be completed prior to the commencement of the Auction.

**C.      Provisions Governing Qualified Bids**

16.      A bid submitted will be considered a Qualified Bid only if the bid is submitted by a Qualified Bidder and complies with all of the following (a "Qualified Bid"):

(a)      it states that the applicable Qualified Bidder offers to purchase all of the Hickory Assets in cash;

(b)      it includes a signed writing that the Qualified Bidder's offer is irrevocable until the selection of the Successful Bidder and the Back-Up Bidder (defined below), provided that if such bidder is selected as the Successful Bidder or the Back-Up Bidder then, the offer shall remain irrevocable until the earlier of (i) the closing of the transaction with the Successful Bidder and (ii) the date that is twenty (20) business days after entry of the Sale Order with respect to the Successful Bidder and after entry of the Sale Order with respect to the Back-Up Bidder;

(c)      confirmation that there are no conditions precedent to the Qualified Bidder's ability to enter into a definitive agreement;

(d)      sets forth each regulatory and third-party approval required for the Qualified Bidder to consummate the transaction and the time period within which the Qualified Bidder expects to receive such approvals, if any;

(e)      includes a duly authorized and executed copy of a purchase and sale agreement (a "Purchase Agreement"), including the purchase price for the Hickory Assets expressed in U.S. Dollars, together with copies marked ("Marked Agreement") to show any amendments and modifications to the Stalking Horse Agreement and the proposed order to approve the sale by the Court;

(f)      includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction, that will allow the Debtors to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Purchase Agreement;

(g)      is in an amount that is greater than or equal to the sum of the purchase price offered under the Stalking Horse Agreement, the amount of the Bidder Protections (assuming the maximum amount of expenses to be reimbursed), described below, and $50,000.00;

(h)     includes an acknowledgement and representation that the bidder: (A) has had an opportunity to conduct any and all required due diligence regarding the Hickory Assets prior to making its offer; (B) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Hickory Assets in making its bid; (C) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Hickory Assets or the completeness of any information provided in connection therewith or with the Auction (defined below), except as expressly stated in the Purchase Agreement; and (D) is not entitled to any expense reimbursement, break-up fee, or similar type of payment in connection with its bid;

(i)     includes evidence, in form and substance reasonably satisfactory to the Debtors, of authorization and approval from the Qualified Bidder's owners or board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Purchase Agreement;

(j)     is accompanied by a good faith deposit in the form of a wire transfer (to a bank account specified by the Debtors), certified check or such other form acceptable to the Debtors, payable to the order of the Debtors (or such other party as the Debtors may determine) in an amount equal to five percent (5%) of the Purchase Price;

(k)     contains such other information reasonably requested by the Debtors; and

(l)     is received prior to the Bid Deadline.

17.     Notwithstanding the foregoing, the Stalking Horse Purchaser is deemed a Qualified Bidder and the Stalking Horse Agreement is deemed a Qualified Bid, for all purposes in connection with the Bidding Process, the Auction, and the Sale.

18.     The Debtors shall notify the Stalking Horse Purchaser and all Qualified Bidders in writing as to whether or not any bids constitute Qualified Bids (and with respect to each Qualified Bidder that submitted a bid as to whether such Qualified Bidder's bid constitutes a Qualified Bid) no later than twenty four (24) hours following the expiration of the Bid Deadline.

**D.     Bid Deadline**

19.     A Qualified Bidder that desires to make a competing bid will deliver written copies of its bid, confirming to the requirements above, to the following parties (collectively,

- 8 -

the "Notice Parties"): (i) the CRO, William H. Henrich, Getzler Henrich & Associates, LLC, whenrich@getzlerhenrich.com, with a copy to counsel to the Debtors: DLA Piper LLP (US), 1201 N. Market Street, Suite 2100, Wilmington, DE 19801 (Attn: Stuart M. Brown, Esq.), Stuart.Brown@dlapiper.com, (ii) counsel to the Stalking Horse Purchaser: Fox Rothschild, LLP, 919 North Market Street, Suite 300, Wilmington, DE 19801 (Attn: Jeffrey Schlerf, Esq.) JSchlerf@foxrothschild.com, and (iii) counsel to the Committee, Cole Schotz P.C., 900 Third Avenue, 16th Floor, New York, NY, 10022-4728 (Attn: Daniel F.X. Geoghan, Esq.) dgeoghan@coleschotz.com and 500 Delaware Avenue, Suite 1410, Wilmington, DE, 19801 (Attn: David R. Hurst, Esq.) dhurst@coleshotz.com, so as to be received by the Notice Parties not later than the Bid Deadline established in the Bidding Procedures Order (the "Bid Deadline").

E.      **Evaluation of Competing Bids**

20.      A Qualified Bid will be valued by the Debtors based upon several factors including, without limitation, (1) the amount of such bid, (2) the risks and timing associated with consummating such bid, (3) any proposed revisions to the form of Stalking Horse Agreement, and (4) any other factors deemed relevant by the Debtors in their reasonable discretion, in consultation with the other Notice Parties.  Prior to the commencement of the Auction, the Debtors, in consultation with the Committee shall announce to all Qualified Bidders the Qualified Bid determined by the Debtors to be the highest or otherwise best offer for the purchase of the Hickory Assets, together with an explanation of any intangible aspects valued by the Debtors, if any.

**F.      No Qualified Bids**

21.      If the Debtors do not receive any Qualified Bids other than the Stalking Horse Agreement by the Bid Deadline, the Debtors will not conduct the Auction and the Stalking Horse Purchaser will be named the Successful Bidder for the Hickory Assets.

**G.      Auction Process**

22.      If the Debtors receive one or more Qualified Bid(s) in addition to the Stalking Horse Agreement, the Debtors will conduct an Auction of the Hickory Assets on the date and time and at the location established in the Bidding Procedures Order.  The Auction shall be transcribed and be conducted by the CRO in accordance with the following procedures:

     (a)      only the Debtors, the Stalking Horse Purchaser, Qualified Bidders who have timely submitted a Qualified Bid, and the Committee, and their respective advisors may attend the Auction;

     (b)      only the Stalking Horse Purchaser and the Qualified Bidders who have timely submitted a Qualified Bid will be entitled to make any subsequent bids at the Auction;

     (c)      each Qualified Bidder shall be required to confirm on the record that it has not engaged in any collusion with respect to the bidding or the Sale;

     (d)      at least one (1) business day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Debtors whether it intends to attend the Auction; provided that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until the date of the selection of the Successful Bidder and the Back-Up Bidder (defined below) at the conclusion of the Auction. At least one (1) business day prior to the Auction, the Debtors will provide copies of the marked Purchase Agreement submitted as part of the Qualified Bid that the Debtors have determined in their business judgment, after consulting with the Notice Parties, is the highest or otherwise best offer (the "Starting Bid") to all Qualified Bidders;

     (e)      all Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction (the CRO reserves the right to seek clarifications of or increases to Qualified Bids in private sessions during the Auction) and the actual identity of each Qualified Bidder will be disclosed on the record at the

Auction; <u>provided</u> that all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder attending the Auction in person (the CRO reserves the right to permit Qualified Bidders to participate in the Auction by telephone subject to procedures determined by the CRO provided that one individual representative with authority to bind the Qualified Bidder attends the Auction in person);

(f)  the Debtors, after consultation with their advisors and the Committee, may employ and announce at the Auction changes to or additional procedural rules that are reasonable under the circumstances for conducting the Auction and maximizing the value of the Hickory Assets before the conclusion of the Auction, <u>provided</u> that such rules are (i) not inconsistent with the Bankruptcy Code, or any order of the Court entered in connection herewith, and (ii) disclosed to each Qualified Bidder at the Auction; and

(g)  bidding at the Auction will begin with the Starting Bid and continue in bidding increments (each a "<u>Subsequent Bid</u>") providing a net value to the estate of at least an additional $50,000.00 above the prior bid; provided, however, that a Qualified Bidder may bid less than $50,000.00 in the event such bid is its actual last Subsequent Bid.  After the first round of bidding and between each subsequent round of bidding, the Debtors shall announce the bid that it believes to be the highest or otherwise better offer (the "<u>Leading Bid</u>"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid. The CRO shall determine whether all Qualified Bidders shall submit bids in each round of bidding or Qualified Bidders shall submit Subsequent Bids successively. Qualified Bidders will not have the opportunity to pass, unless the CRO determines that permitting a pass will maximize the value for the Hickory Assets.  Except as specifically set forth herein, for the purpose of evaluating the value of the consideration provided by each Subsequent Bid, the Debtors will give effect to the Bidder Protections payable to the Stalking Horse Purchaser as well as any liabilities to be assumed by a Qualified Bidder and any additional costs which may be imposed on the Debtors.

## H.    Selection of Successful Bid

23.    Prior to the conclusion of the Auction, but following the conclusion of the submission of Subsequent Bids, the Debtors, in consultation with their advisors and the Committee, will review and evaluate each Qualified Bid in accordance with the procedures set forth herein and determine which Subsequent Bid is the Leading Bid from among the Qualified

Bids submitted at the Auction (one or more such bids, collectively the "Successful Bid" and the bidder(s) making such bid, collectively, the "Successful Bidder"), and communicate to the Qualified Bidders the identity of the Successful Bidder and the details of the Successful Bid. The determination of the Successful Bid by the Debtors at the conclusion of the Auction shall be final, subject only to approval by the Court. The Debtors shall not entertain any bids or communications following the closing of the Auction, except with the Successful Bidder and Back-Up Bidder in preparation for the Sale Hearing.

24.     Unless otherwise agreed to by the Debtors and the Successful Bidder, within two (2) business days after conclusion of the Auction and in all events before the commencement of the Sale Hearing, the Successful Bidder shall complete and execute all agreements, contracts, instruments and other documents evidencing and containing the terms and conditions upon which the Successful Bid was made. At least one (1) business day prior to the Sale Hearing, the Debtors shall file with the Court a notice identifying the Successful Bidder and describing the Successful Bid and shall serve such notice by fax, email or overnight mail to all counterparties whose contracts are to be assumed and assigned, if any.

25.     The Debtors will sell the Hickory Assets to the Successful Bidder pursuant to the terms of the Successful Bid and the Sale Order upon the approval of such Successful Bid by the Court at the Sale Hearing.

**I.      Return of Deposits**

26.     All deposits of each bidder not selected by the Debtors as the Successful Bidder or as the Back-Up Bidder (as defined below) shall be returned no later than five (5) business days following the entry of the Sale Order.

**J.      Back-Up Bidder**

27.      If an Auction is conducted, the Qualified Bidder or Qualified Bidders with the next highest or otherwise best Qualified Bid to the Successful Bidder, as determined by the Debtors in the exercise of their business judgment, at the Auction shall serve as the back-up bidder (the "Back-Up Bidder") and keep such bid open and irrevocable until five (5) business days after the closing deadline set forth in the Successful Bid.  If the Successful Bidder fails to consummate the approved Sale because of a breach or failure to perform on the part of such Successful Bidder, the Back-Up Bidder will be deemed to be the Successful Bidder under the Sale Order, without further order of the Court, but subject to the Debtors filing a notice of the substitution of the Back-Up Bidder for the Successful Bidder, and the Debtors will be authorized, to consummate the sale with the Back-Up Bidder.

**K.      Bidder Protections**

28.      In recognition of the expenditure of time, energy, and resources and the value to the Estates by the Stalking Horse setting the floor for the value of the Hickory Assets, the Debtors have agreed that if the Stalking Horse Purchaser is not the Successful Bidder, the Debtors will pay the Stalking Horse Purchaser a break-up fee equal to three per cent (3%) of the Stalking Horse Bid ("Break-Up Fee"), plus reimburse the Stalking Horse for its actual and reasonable out of pocket expenses subject to a cap of $75,000.00 (the "Expense Reimbursement" and together with the Break-Up Fee, the "Bidder Protections")).  The Stalking Horse Purchaser shall provide reasonable documentation of the Expense Reimbursement to the Debtors prior to the Sale Hearing (if the Stalking Horse Bidder is not the Successful Bidder). The Bidder Protections shall be earned and payable only upon a closing of the Sale to the Successful Bidder or Back-Up Bidder, as the case may be, and only out of the proceeds of Sale.

EAST\123763779.4

29.     Subject to entry of the Bidding Procedures Order approving the Bidder Protections, the Debtors' obligation to pay the Bidder Protections shall survive termination of the Stalking Horse Agreement, and constitute an allowed administrative expense claim under section 503(b) of the Bankruptcy Code.

**L.     Sale Hearing**

30.     The Debtors will seek entry of an order from the Court to approve and authorize the Sale to the Successful Bidder on terms and conditions set forth in the Successful Bid (the "Sale Hearing").

### Notice of Sale Hearing

31.     The Debtors request that this Court schedule a Sale Hearing.  The Debtors propose that any objections to the Sale shall be filed so as to be received seven (7) days before the Sale Hearing (the "Sale Objection Deadline").

32.     The Debtors also request that the Court approve the form of the Procedures Notice, substantially in the form of Exhibit 3 to the Bidding Procedures Order.  The Debtors will serve a copy of the Procedures Notice on the following parties: (a) the US Trustee, (b) the Committee, (c) any parties requesting notices in these cases pursuant to Bankruptcy Rule 2002, (d) counsel to the Stalking Horse Purchaser, (e) all Potential Bidders (collectively with the parties specified in this paragraph, the "Procedures Notice Parties"), and (f) all parties with an asserted security interest in the Hickory Assets.

33.     The Debtors propose to serve the Procedures Notice within two (2) business days following entry of the Bidding Procedures Order, by first-class mail, postage prepaid on the Procedures Notice Parties.  The Procedures Notice provides that any party that has not received a copy of the Motion or the Bidding Procedures Order that wishes to obtain a copy of the Motion or the Bidding Procedures Order, including all exhibits thereto, may make such a

- 14 -

request in writing to DLA Piper LLP (US), Attn: Daniel N. Brogan, Esq., 1201 N. Market Street, Suite 2100, Wilmington, DE 19801 or by emailing daniel.brogan@dlapiper.com.

34.     The Debtors submit that the foregoing notices comply fully with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the Bidding Procedures, Auction and Sale, and Sale Hearing to the Debtors' creditors and other parties in interests, as well as to those parties, who have expressed an interest or are likely to express an interest in bidding on the Hickory Assets.  Based on the foregoing, the Debtors respectfully request that this Court approve these proposed notice procedures.

### Sale Hearing

35.     At the Sale Hearing, the Debtors will seek Court approval of the Sale to the Successful Bidder, free and clear of all liens, claims and encumbrances pursuant to section 363 of the Bankruptcy Code, but subject to permitted encumbrances to  the extent set forth in the Successful Bid, with all asserted liens, claims and encumbrances to attach to the Sale Proceeds with the same validity, to the extent asserted and in the same order of priority as they attached to the Hickory Assets prior to the Sale.  The Debtors will submit and present additional evidence, as necessary, at the Sale Hearing demonstrating that the Sale is fair, reasonable and in the best interest of the Debtors' estates and all interested parties, and may submit a challenge and supporting evidence to the validity, enforceability, or extent of any such asserted lien, claim or encumbrance, or assert a cause of action to avoid any such lien, claim or encumbrance. Alternatively, the Debtors may seek an alternate date for a hearing before the Bankruptcy Court on any such challenge or avoidance action.

36.     If the Sale Order is entered in contemplation or furtherance of confirmation of a plan proposed in the chapter 11 cases, then the Debtors will seek approval to transfer the

Hickory Assets free and clear of all applicable taxes and other charges as permitted by section 1146(a) of the Bankruptcy Code.

### Procedures for the Assumption and Assignment of Assigned Contracts and Leases

37.     In connection with the Sale, the Debtors may seek to assume and assign certain Contracts and Leases to be designated by a Successful Bidder's Purchase Agreement (collectively, the "Assumed Executory Contracts").

38.     In the event that a Successful Bidder designates any Assumed Executory Contracts, the Debtors shall serve a "Cure Notice" upon each counterparty to the Assumed Executory Contracts.  The Cure Notice will state the date, time and place of the Sale Hearing as well as the date by which any objection to the assumption and assignment of Assumed Executory Contracts must be filed and served.  The Cure Notice also will identify the amounts, if any, that the Debtors believe are owed to each counterparty to an Assumed Executory Contract in order to cure any defaults that exist under such contract (the "Cure Amounts").

39.     If a Contract or Lease is assumed and assigned pursuant to Court Order, then unless the Assumed Executory Contract counterparty properly files and serves an objection to the Cure Amount contained in the Cure Notice, the Assumed Executory Contract counterparty will receive at the time of the Closing of the sale (or as soon as reasonably practicable thereafter), the Cure Amount as set forth in the Cure Notice, if any.  If an objection is filed by a counterparty to an Assumed Executory Contract, the Debtors propose that such objection must set forth a specific default in the executory contract or unexpired lease, claim a specific monetary amount that differs from the amount, if any, specified by the Debtors in the Cure Notice, and set forth any reason why the counterparty believes the executory contract or unexpired lease cannot be assumed and assigned to the Successful Bidder.

- 16 -

40.     If any counterparty objects for any reason to the assumption and assignment of an Assumed Executory Contract (a "Assumption Objection"), the Debtors propose that the counterparty must file the objection by no later than 4:00 p.m. (prevailing Eastern Time) on the date specified in the Cure Notice, provided, however, that any counterparty may raise at the Sale Hearing an objection to the assumption and assignment of the Assumed Executory Contract solely with respect to the Successful Bidder's ability to provide adequate assurance of future performance under the Assumed Executory Contract.  After receipt of an Assumption Objection, the Debtors will attempt to reconcile any differences in the Cure Amount or otherwise resolve the objection with the counterparty.  In the event that the Debtors and the counterparty cannot resolve an Assumption Objection, and the Court does not otherwise make a determination at the Sale Hearing regarding an Assumption Objection related to a Cure Amount, the Debtors may, in its discretion, segregate any disputed Cure Amounts pending the resolution of any such Cure Amount disputes by the Court or mutual agreement of the parties.

41.     The Successful Bidder shall be responsible for satisfying any requirements regarding adequate assurance of future performance that may be imposed under section 365(b) of the Bankruptcy Code in connection with the proposed assignment of any Assumed Executory Contract, and the failure to provide adequate assurance of future performance to any counterparty to any Assumed Executory Contract shall not excuse the Successful Bidder from performance of any and all of its obligations pursuant to the Successful Bidder's Purchase Agreement.  The Debtors propose that the Court make its determinations concerning adequate assurance of future performance under the Assumed Executory Contacts pursuant to section 365(b) of the Bankruptcy Code at the Sale Hearing.  Cure Amounts disputed by any

counterparty will be resolved by the Court at the Sale Hearing or such later date as may be agreed to or ordered by the Court.

42.     Except to the extent otherwise provided in the Successful Bidder's Purchase Agreement, the Debtors and the Debtors' estates shall be relieved of all liability accruing or arising after the assumption and assignment of the Assumed Executory Contracts pursuant to section 365(k) of the Bankruptcy Code.

## II.     APPLICABLE AUTHORITY

**A.      The Sale of the Hickory Assets is Authorized by Section 363 as a Sound Exercise of the Debtors' Business Judgment**

43.     In accordance with Bankruptcy Rule 6004, sales of property rights outside the ordinary course of business may be by private sale or public auction.  The Debtors have determined that the Sale of the Hickory Assets by public auction will enable them to obtain the highest and best offer for these assets (thereby maximizing the value of the estate) and is in the best interests of the Debtors' creditors.  In particular, the Stalking Horse Agreement is the result of extensive marketing and comprehensive arm's length negotiations for the Sale of the Hickory Assets and the Sale pursuant to the terms of the Stalking Horse Agreement, subject to higher or otherwise better offers at the Auction, will provide a greater recovery for the Debtors' creditors than would be provided by any other existing alternative.

44.     Section 363 of the Bankruptcy Code provides that a trustee, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).  Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, a sale of a debtor's assets should be authorized if a sound business purpose exists for doing so.  See, e.g., Meyers v. Martin (In re Martin), 91 F.3d 389, 395 (3d

- 18 -

Cir. 1996); In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986); In re Titusville Country Club, 128 B.R. 396 (W.D. Pa. 1991); In re Delaware & Hudson Ry. Co., 124 BR. 169, 176 D. Del. 1991); see also Official Committee of Unsecured Creditors v. The LTV Corp. (In re Chateaugay Corp.), 973 F.2d 141, 143 (2d Cir. 1992); Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983); Committee of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

45.    The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  See, e.g., In re Food Barn Stores, Inc., 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); Integrated Resources, 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the. . . [trustee's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting In re Atlanta Packaging Prods., Inc., 99 BR. 124, 130 (Bankr. N.D. Ga. 1988)).  As long as the sale appears to enhance a debtor's estate, court approval of a trustee's decision to sell should only be withheld if the trustee's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code.  GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd., 331 B.R. 251, 255 (N.D. Tex. 2005); In re Lajijani, 325 B.R. 282, 289 (9th Cir. B.A.P. 2005); In re WPRV-TV, Inc., 143 B.R. 315, 319 (D. P.R. 1991) ("The trustee has ample discretion to administer the estate, including authority to conduct public or private sales of estate property. Courts have much discretion on whether to approve proposed sales, but the trustee's business judgment is subject to great judicial deference.").

- 19 -

46.     Applying section 363, the proposed Sale of the Hickory Assets should be approved.  As set forth above, the Debtors have determined that the best method of maximizing the recovery of the Debtors' creditors would be through the Sale of the Hickory Assets.  The fairness and reasonableness of the consideration will be tested through the Auction consistent with the requirements of the Bankruptcy Code, the Bankruptcy Rules, and pursuant to the Bidding Procedures approved by the Court.  Consequently, the fairness and reasonableness of the consideration to be paid by the Successful Bidder ultimately will be demonstrated by adequate "market exposure" and an open and fair auction process — the best means, under the circumstances, for establishing whether a fair and reasonable price is being paid.  In order to ensure a fair and robust auction process, the Debtors have and will continue to solicit interest from numerous potential purchasers.

47.     The Debtors believe that the timeline for the marketing and sale of the Hickory Assets is adequate.

**B.      The Bidding Procedures Are Appropriate and Will Maximize the Value Received for the Hickory Assets.**

48.     As noted above, the paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and, therefore, are appropriate in the context of bankruptcy sales.  See, e.g., In re Fin'l News Network, Inc., 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

49.     Procedures to dispose of assets, similar to the proposed Bidding Procedures, have been approved in other bankruptcy cases.[6] See, e.g., In re City Sports, Inc., Case No. 15-12054 (KG) (Bankr. D. Del., Oct. 23, 2015) In re Imris, Inc., Case No. 15-11212 (CSS) (Bankr. D. Del June 16, 2015); In re Velti Inc., Case No. 13-12878 (PJW) (Bankr. D. Del. Nov. 20 2013); In Re Restora Healthcare Holdings, LLC, Case No. 14-10367 (PJW) (Bankr. D. Del. Mar. 21, 2014); In re Orchard Supply Hardware Stores Corp., Case No. 13-11565 (CSS) (Bankr. D. Del. Jul. 8, 2013); In re Conex Holdings LLC, Case No. 11-10501 (CSS) (Bankr. D. Del. Sept. 14, 2011); In re Barnes Bay Dev. Ltd., Case No. 11-10792 (PJW) (Bankr. D. Del. May 19, 2011); In re East West Resort Dev. V, L.P., L.L.L.P., Case No. 10-10452 (BLS) (Bankr. D. Del. March 31, 2010); In re Dana Corp., Case No. 06-10354 (Bankr. S.D.N.Y. Oct. 19, 2006); In re Delphi Corp., Case No. 05-44481 (Bankr. S.D.N.Y. June 22, 2006); In re Oxford Automotive, Inc., Case No. 04-74377 (Bankr. E.D. Mich. Jan. 24, 2005).

50.     The Debtors believe that the Bidding Procedures will establish the parameters under which the value of the Hickory Assets may be tested at an auction and through the ensuing Sale Hearing.  Such procedures will increase the likelihood that the Debtors' creditors will receive the greatest possible consideration for these assets because they will ensure a competitive and fair bidding process.  They also allow the Debtors to undertake an auction in as expeditious and efficient manner as possible, which the Debtors believe is essential to maximizing the value of the Debtors' estate for its creditors.

51.     The Debtors also believe that the proposed Bidding Procedures will promote active bidding from seriously interested parties and will dispel any doubt as to the best and

---

[6]     Because of the voluminous nature of the unreported orders cited herein, such orders are not annexed to the Motion.  Copies of these orders are available upon request of Debtors' counsel.

highest offer reasonably available for the Hickory Assets.  In particular, the proposed Bidding Procedures will allow the Debtors to conduct an auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction.

52.    In sum, the Debtors believe that the Bidding Procedures will encourage bidding for the Hickory Assets and are consistent with the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings.  Accordingly, the proposed Bidding Procedures are reasonable, appropriate and within the Debtors' sound business judgment.

## C.    The Sale of the Hickory Assets Free and Clear of Liens and Other Interests is Authorized by Sections 363(f)

53.    The Debtors further submit that it is appropriate to sell the Hickory Assets free and clear of liens, claims, encumbrances and other interests pursuant to section 363(f) of the Bankruptcy Code, with any such liens, claims, encumbrances and other interests attaching to the Sale Proceeds of the Hickory Assets to the extent applicable.  Section 363(f) of the Bankruptcy Code authorizes a trustee to sell assets free and clear of liens, claims, interests and encumbrances if:

(1)    applicable non-bankruptcy law permits the sale of such property free and clear of such interests;

(2)    such entity consents;

(3)    such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

(4)    such interest is in bona fide dispute; or

(5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.  11 U.S.C. § 363(f).

54.     This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

55.     Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Hickory Assets "free and clear" of liens and interests. In re Kellstrom Indus., Inc., 282 B.R. 787, 793 (Bankr. D. Del. 2002); see also In re Dundee Equity Corp., 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. March 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); In re Bygaph, Inc., 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same); Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code section 363(f) is written in the disjunctive; holding that the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) is met).

56.     The Debtors believe that one or more of the tests of section 363(f) are satisfied with respect to the transfer of the Hickory Assets pursuant to the Stalking Horse Agreement and will be under the Successful Bid and Back-Up Bid.  In particular, the Debtors believe that at least sections 363(f)(2) or (3) will be met in connection with the transactions proposed under the Stalking Horse Agreement, Successful Bid and Back-Up Bid, because (i) each of the parties asserting liens, claims, encumbrances and other interests on the Hickory Assets will consent or, absent any objection to this motion, will be deemed to have consented to the Sale, and (ii) the Hickory Assets will be sold at a price well in excess of the aggregate amount of any liens, claims, encumbrances and other interests encumbering it.  Any lienholder also will be

- 23 -

adequately protected by having their liens, claims, encumbrances and other interests, if any, in each instance against the Debtors or their estate, attach to the Sale Proceeds ultimately attributable to the Hickory Assets in which such creditor alleges an interest, in the same order of priority, with the same validity, force and effect that such creditor had prior to the Sale, subject to any claims and defenses the Debtors may possess with respect thereto.  Accordingly, section 363(f) authorizes the transfer and conveyance of the Hickory Assets free and clear of any such liens, claims, encumbrances and other interests.

57.     Although section 363(f) of the Bankruptcy Code provides for the sale of assets "free and clear of any interests," the term "any interest" is not defined anywhere in the Bankruptcy Code.  Folger Adam Security v. DeMatteis/MacGregor JV, 209 F.3d 252, 257 (3d Cir. 2000).  In the case of In re Trans World Airlines, Inc.,  322 F.3d 283, 288-89 (3d Cir. 2003), the Third Circuit specifically addressed the scope of the term "any interest."  The Third Circuit observed that while some courts have "narrowly interpreted that phrase to mean only *in rem* interests in property," the trend in modern cases is towards "a more expansive reading of 'interests in property' which 'encompasses other obligations that may flow from ownership of the property.'"  Id. at 289 (citing 3 Collier on Bankruptcy 15th Ed. Rev., ¶ 363.06[1] (L. King, 15th rev. ed. 1988)).  As determined by the Fourth Circuit in In re Leckie Smokeless Coal Co., 99 F.3d 573, 581-582 (4th Cir. 1996), a case cited with approval and extensively by the Third Circuit in Folger, supra, the scope of section 363(f) is not limited to *in rem* interests.  Thus, the Third Circuit in Folger stated that Leckie held that the Debtors "could sell their assets under § 363(f) free and clear of successor liability that otherwise would have arisen under federal statute."  Folger, 209 F.3d at 258 (citing Leckie, 99 F.3d at 582).

58.     Courts have consistently held that a buyer of a debtor's assets pursuant to a section 363 sale takes such assets free from successor liability resulting from pre-existing claims.  See The Ninth Avenue Remedial Group v. Allis-Chalmers Corp., 195 B.R. 716, 732 (Bankr. N.D. Ind. 1996) (stating that a bankruptcy court has the power to sell assets free and clear of any interest that could be brought against the bankruptcy estate during the bankruptcy); MacArthur Company v. Johns-Manville Corp. (In re Johns-Manville Corp.), 837 F.2d 89, 93-94 (2d Cir. 1988) (channeling of claims to proceeds consistent with intent of sale free and clear under section 363(f) of the Bankruptcy Code); In re New England Fish Co., 19 B.R. 323, 329 (Bankr. W.D. Wash. 1982) (transfer of property in free and clear sale included free and clear of Title VII employment discrimination and civil rights claims of debtor's employees); In re Hoffman, 53 B.R. 874, 876 (Bankr. D.R.I. 1985) (transfer of liquor license free and clear of any interest permissible even though the estate had unpaid taxes); American Living Systems v. Bonapfel (In re All Am. of Ashburn, Inc.), 56 B.R. 186, 190 (Bankr. N.D. Ga. 1986) (product liability claims based on successor doctrine precluded after sale of assets free and clear); WBO P'ship v. Virginia Dept. of Medical Assistance Servs. (In re WBO P'ship), 189 B.R. 97, 104-05 (Bankr. E.D. Va. 1995) (Commonwealth of Virginia's right to recapture depreciation is an "interest" as used in section 363(f)).[7]  The purpose of an order purporting to authorize the transfer of assets free and clear of all "interests" would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against the purchaser arising from the Debtors' pre-sale conduct.  Under section 363(f) of the Bankruptcy Code, the purchaser is

---

[7]     Some courts, concluding that section 363(f) of the Bankruptcy Code does not empower them to convey assets free and clear of claims, have nevertheless found that section 105(a) of the Bankruptcy Code provides such authority.  See, e.g. Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) (stating that the absence of specific authority to sell assets free and clear of claims poses no impediment to such a sale, as such authority is implicit in the court's equitable powers when necessary to carry out the provisions of title 11).

entitled to know that the Debtors' assets are not infected with latent claims that will be asserted against the purchaser after the proposed transaction is completed.  Accordingly, consistent with the above-cited case law, the order approving the Sale should state that the Successful Bidder is not liable as a successor under any theory of successor liability, for claims that encumber or relate to the Hickory Assets.

**D.      The Proposed Notice of Bidding Procedures and Auction Is Appropriate**

59.      The Debtors believe that it will obtain the maximum recovery for creditors of the Debtors' estate if the Hickory Assets are sold through a well-advertised sale and auction.  The Debtors have already taken significant steps to identify potential purchasers.

60.      Under Bankruptcy Rules 2002(a) and (c), the Debtors are required to notify creditors of the proposed sale of the Hickory Assets, including a disclosure of the time and place of an auction, the terms and conditions of a sale, and the deadline for filing any objections.  The Debtors submit that the notice procedures herein comply fully with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the sale by auction to the Debtors' creditors and other interested parties, as well as to those parties who have expressed an interest, or may express an interest, in bidding on the Hickory Assets.  The proposed time frame between the filing of this Motion, the commencement of the bidding process and the Auction should provide interested purchasers ample time to participate in the Auction.

**E.      The Bidder Protections are Appropriate Under the Circumstances**

61.      The Debtors submit that Bidder Protections are a normal and often necessary component of sales outside the ordinary course of business under section 363 of the Bankruptcy Code.  In particular, such protections encourage a potential purchaser to invest the requisite time, money and effort to conduct due diligence and sale negotiations with a debtor despite the

- 26 -

inherent risks and uncertainties of the chapter 11 process.  See, e.g. In re Comdisco, Inc., Case No. 01 24795 (RB) (Bankr. N.D. Ill. Aug. 9, 2002) (approving a termination fee as, inter alia, an actual and necessary cost and expense of preserving the debtor's estate, of substantial benefit to the debtor's estate and a necessary inducement for, and a condition to, the proposed purchaser's entry into the purchase agreement); Integrated Resources, 147 B.R. at 660 (noting that fees may be legitimately necessary to convince a "white knight" to offer an initial bid by providing some form of compensation for the expenses such bidder incurs and the risks such bidder faces by having its offer held open, subject to higher and better offers); In re Hupp Indus., 140 B.R. 191, 194 (Bankr. N.D. Ohio 1997) (without any reimbursement, "bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's. . . due diligence"); In re Marrose Corp., 1992 WL 33848, at *5 (Bankr. S.D.N.Y. 1992) (stating that "agreements to provide reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers"); In re 995 Fifth Ave. Assocs., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (finding that bidding incentives may be "legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citations omitted).

62.     Moreover, expense reimbursements, similar to the Expense Reimbursements sought to be approved by this Motion, have been approved in other chapter 11 cases in this Court.[8]  See, e.g. re Nortel Networks Inc., Case No. 09-10138 (KG) (Bankr. D. Del. Feb. 27, 2009) (approving up to $400,000 in expense reimbursements in connection with $17.65 million

---

[8]     Because of the voluminous nature of the unreported orders cited herein, such orders are not annexed to the Motion.  Copies of these orders are available upon request of Debtors' counsel.

sale); In re Tallygenicom, L.P., Case No. 09-10266 (CSS) (Bankr. D. Del. Feb. 19, 2009) (approving $750,000 expense reimbursement in connection with $36.6275 million sale); In re Fluid Routing Solutions Intermediate Holding Corp., Case No. 09-10384 (CSS) (Bankr. D. Del. Feb. 19, 2009) (approving expense reimbursement of $750,000 in connection with an $11 million sale).

63.    A proposed bidding incentive, such as the Bidder Protections, should be approved when it is in the best interests of the estate. In re S.N.A. Nut Co., 186 B.R. 98, 104 (Bankr. N.D. Ill. 1995); see also In re America West Airlines, Inc., 166 B.R. 908 (Bankr. D. Ariz. 1994); In re Hupp Indus., Inc., 140 B.R. 191 (Bankr. N.D. Ohio 1992). Typically, this requires that the bidding incentive provide some benefit to the debtor's estate. Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 533 (3d Cir. 1999) (holding even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions the administrative expense provisions of Bankruptcy Code section 503(b) govern in the bankruptcy context).

64.    In Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy), the Third Circuit found that whether breakup fees and expenses could be paid to Calpine Corp. ("Calpine") as a "stalking horse" depended on whether such fees were necessary to preserve the value of the estate. O'Brien Envtl. Energy, 181 F.3d at 536. The court determined that Calpine's right to break up fees and expenses depended on whether it provided a benefit to the debtor's estate by promoting competitive bidding or researching the value of the assets at issue to increase the likelihood that the selling price reflected the true value of the company. Id. at 537. The Debtors believe that approval of the Bidder Protections will create such a competitive bidding process.

- 28 -

65.     The Debtors believe that the proposed Bidder Protections are fair and reasonably compensate the Stalking Horse Purchaser for taking actions that have and will continue to benefit the Debtors' estates.  The Bidder Protections compensate the Stalking Horse Purchaser for diligence and professional fees incurred in negotiating the terms of the Stalking Horse Agreement on an expedited timeline and most importantly, in light of the history of the marketing efforts and expressions of interest prior to entry of the Stalking Horse Agreement, the Stalking Horse Agreement sets a floor for the value of the Hickory Assets that is beneficial to the Debtors, their estates and their creditors.

66.     Next, the Debtors do not believe that the Bidder Protections will have a chilling effect on the sale process.  Rather, the Stalking Horse Purchaser will increase the likelihood that the best possible price for the Hickory Assets will be received, by permitting other qualified bidders to rely on the diligence performed by the Stalking Horse Purchaser, and moreover, by allowing qualified bidders to utilize the Stalking Horse Agreement as a platform for negotiations and modifications in the context of a competitive over bidding process.

67.     Finally, the Bidder Protections will be paid only if, among other things, the Debtors enter into a transaction for the Hickory Assets with a bidder other than the Stalking Horse Purchaser for a greater price and such alternative transaction closes.  Accordingly, no Bidder Protections will be paid unless a higher and better offer is achieved and consummated.

68.     In sum, the Bidder Protections are reasonable under the circumstances, have provided value to the Debtors' estates and will enable the Debtors to maximize the value for the Hickory Assets while limiting any chilling effect in the sale process.

**F.     Assumption and Assignment of Certain Executory Contracts and Unexpired Leases**

69.     Section 365(a) of the Bankruptcy Code provides that, subject to the court's approval, a trustee "may assume or reject any executory contracts or unexpired leases of the

debtor." 11 U.S.C. § 365(a). Upon finding that a trustee has exercised its sound business judgment in determining to assume an executory contract or unexpired lease, courts will approve the assumption under section 365(a) of the Bankruptcy Code. See Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.), 78 F.3d 18, 25 (2d Cir. 1996); Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1099 (2d Cir. 1993).

70.     Pursuant to section 365(f)(2) of the Bankruptcy Code, a trustee may assign an executory contract or unexpired lease of nonresidential real property if:

> (A)     the trustee assumes such contract or lease in accordance with the provisions of this section; and

> (B)     adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

71.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1989); see also In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); In re Bon Ton Rest. & Pastry Shop, Inc., 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

72.     Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease has financial resources and

- 30 -

expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding; chief determinant of adequate assurance is whether rent will be paid).

73.     The Debtors and the Successful Bidder will present evidence at the Sale Hearing to prove the financial credibility, willingness and ability of the Successful Bidder to perform under the Contracts or Leases.  The Court and other interested parties therefore will have the opportunity to evaluate the ability of any Successful Bidder to provide adequate assurance of future performance under the Contracts or Leases, as required by section 365(b)(1)(C) of the Bankruptcy Code.

74.     In addition, the Cure Procedures are appropriate and consistent with section 365 of the Bankruptcy Code.  To the extent that any defaults exist under any Assumed Executory Contracts, any such defaults will be cured pursuant to the Successful Bidder's Purchase Agreement.  Except as otherwise limited by section 365 of the Bankruptcy Code, any provision in the Assumed Executory Contracts that would restrict, condition, or prohibit an assignment of such contracts will be deemed unenforceable pursuant to section 365(f)(1) of the Bankruptcy Code.

75.     Accordingly, the Debtors submit that the Cure Procedures for effectuating the assumption and assignment of the Assumed Executory Contracts as set forth herein are appropriate and should be approved.

**G.     The Successful Bidder Should be Afforded All Protections Under Section 363(m) as A Good Faith Purchaser**

76.     Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest in property purchased from the debtor's estate notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal.  Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under
> [section 363(b)] . . . does not affect the validity of a sale . . . to an

> entity that purchased . . . such property in good faith, whether or
> not such entity knew of the pendency of the appeal, unless such
> authorization and such sale were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(m) "fosters the 'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely.'"  In re Chateaugay Corp., 1993 U.S. Dist. Lexis 6130, *9 (S.D.N.Y. 1993) (quoting In re Abbotts Dairies of Penn., Inc., 788 F.2d 143, 147 (3d Cir. 1986)); see also Allstate Ins. Co. v. Hughes, 174 BR. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal"); In re Stein & Day, Inc., 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

77.     The selection of the Successful Bidder will be the product of arm's-length, good faith negotiations in an anticipated competitive purchasing process.  The Debtors intend to request at the Sale Hearing a finding that the Successful Bidder is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

**H.     Relief from the Fourteen Day Waiting Period Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate**

78.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."   Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."   The

Debtors request that the Order be effective immediately by providing that the fourteen (14) day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

79.      The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  <u>See</u> Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen (14) day stay period, <u>Collier</u> suggests that the fourteen (14) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." <u>Collier on Bankruptcy</u> ¶ 6004.11 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).  Furthermore, <u>Collier</u> provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. <u>Id.</u>

80.      The Debtors hereby request that the Court waive the fourteen-day stay periods under Bankruptcy Rules 6004(h) and 6006(d) or, in the alternative, if an objection to the Sale is filed, reduce the stay period to the minimum amount of time needed by the objecting party to file its appeal.

<strong><u>Notice</u></strong>

81.      Notice of this Motion has been provided to: (a) the US Trustee, (b) counsel to the Committee; (c) those parties requesting notice pursuant to Bankruptcy Rule 2002, (d) all creditors listed in the debtor's schedules of assets and liabilities, (e) the United States Attorney's Office for the District of Delaware, (f) the Internal Revenue Service, (g) the Securities and Exchange Commission; and (h) counsel to the Stalking Horse Purchaser.  In light

- 33 -

of the nature of the relief requested, the Debtors respectfully submit that no further notice of this Motion is required.

WHEREFORE, the Debtors respectfully request that the Court enter orders substantially in the form attached hereto as Exhibit C and Exhibit D: (a) granting the relief requested herein and (b) granting to the Debtors such other and further relief as the Court may deem proper.

Dated:  May 3, 2016
Wilmington, Delaware

Respectfully submitted,

**DLA PIPER LLP (US)**

*/s/ Stuart M. Brown*
Stuart M. Brown (DE 4050)
R. Craig Martin (DE 5032)
Daniel N. Brogan (DE 5723)
Kaitlin M. Edelman (DE 5924)
1201 North Market Street, Suite 2100
Wilmington, Delaware  19801
Telephone:  (302) 468-5700
Facsimile:   (302) 394-2341
Email:  stuart.brown@dlapiper.com
        craig.martin@dlapiper.com
        daniel.brogan@dlapiper.com
        kaitlin.edelman@dlapiper.com

*Counsel to Debtors and*
*Debtors in Possession*

- 34 -